ACCEPTED
06-15-00002-CR
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
6/4/2015 1:59:14 PM
DEBBIE AUTREY
CLERK

**---ORAL ARGUMENT REQUESTED---**

IN THE COURT OF APPEALS

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS

6/4/2015 1:59:14 PM

DEBBIE AUTREY
Clerk

SIXTH DISTRICT OF TEXAS

TEXARKANA, TEXAS

| | | |
|---|---|---|
| BRADLEY LEROY THOMPSON, | § | |
| Appellant | § | |
| | § | |
| vs. | § | NO. 06-15-00002-CR |
| | § | |
| THE STATE OF TEXAS, | § | |
| Appellee | § | |

ON APPEAL FROM

THE 115TH JUDICIAL DISTRICT COURT

OF UPSHUR COUNTY, TEXAS

TRIAL COURT NO. 16,737

BARRY CLARK WALLACE
State Bar No. 00785170
Law Office of Barry Clark Wallace, P.C.
Attorney & Counselor at Law
P.O. Box 1408
206 E. Upshur
Gladewater, Texas 75647
Telephone: (903)845-2192
Facsimile: (903)845-2193
e-mail: bcwallace@suddenlinkmail.com
ATTORNEY FOR APPELLANT

-1-

# IDENTITY OF PARTIES AND COUNSEL

BRADLEY LEROY THOMPSON
TDCJ#1971513
DANIEL UNIT
938 SOUTH FM 1673
SNYDER, TEXAS 79549
APPELLANT

BARRY CLARK WALLACE
P.O. BOX 1408
GLADEWATER, TEXAS 75647-1408
APPELLANT'S COUNSEL AT TRIAL

BILLY BYRD
UPSHUR COUNTY CRIMINAL DISTRICT ATTORNEY
UPSHUR COUNTY JUSTICE CENTER
405 N. TITUS ST.
GILMER, TEXAS 75644
APPELLEE'S COUNSEL AT TRIAL

BARRY CLARK WALLACE
P.O. BOX 1408
GLADEWATER, TEXAS 75647-1408
APPELLANT'S COUNSEL ON APPEAL

NATALIE A. MILLER
UPSHUR COUNTY ASSISTANT CRIMINAL DISTRICT ATTORNEY
UPSHUR COUNTY JUSTICE CENTER
405 N. TITUS ST.
GILMER, TEXAS 75644
APPELLEE'S COUNSEL ON APPEAL

# **TABLE OF CONTENTS**

List of Parties and Counsel...................................................................... 2

Table of Contents.................................................................................... 3

Index of Authorities............................................................................... 4

Statement of the Case............................................................................ 6

Point of Error Number One.................................................................... 7, 14

      The trial court erred in denying Appellant's Motion to Suppress.

Statement of Facts.................................................................................. 7

Summary of Argument............................................................................ 13

Argument................................................................................................. 14

Conclusion and Prayer............................................................................ 22

Certificate of Compliance....................................................................... 23

Certificate of Service.............................................................................. 23

# INDEX OF AUTHORITIES

**CONSTITUTIONS:**

Fourth Amendment, U.S. Constitution.................................................... 7, 13, 16, 21

**U.S. SUPREME COURT CASES:**

*Ohio v. Robinette*, 519 U.S. 33 (1996)..................................................... 16-17
*Rodriguez v. United States*, 135 S.Ct. 1609 (2015).............................. 21

**STATE CASES:**

*Kothe v. State*, 152 S.W.3d 54 (Tex.Crim.App. 2004).......................... 17-18
*Thomas v. State*, 420 S.W.3d 195 (Tex.App. Amarillo 2013)............... 18
*Richardson v. State*, 402 S.W.3d 272 (Tex.App. Fort Worth 2013)..... 18
*Davis v. State*, 947 S.W.2d 240 (Tex.Crim.App. 1997)........................ 18
*Ford v. State*, 158 S.W.3d 488 (Tex.Crim.App. 2005)......................... 18

NO. 06-15-00002-CR

IN THE

COURT OF APPEALS

FOR THE

SIXTH JUDICIAL DISTRICT OF TEXAS

BRADLEY LEROY THOMPSON,
                                    APPELLANT

vs.

THE STATE OF TEXAS,
                                    APPELLEE

TO THE HONORABLE JUSTICES OF SAID COURT:

NOW COMES BRADLEY LEROY THOMPSON, Appellant, by and through his attorney, Barry Clark Wallace, hereinafter referred to as Appellant, who, in conformity with the Texas Rules of Appellate Procedure, submits this brief in support of reversing the judgment and sentence in Cause No. 06-15-00002-CR in the 115th Judicial District Court of Upshur County, Texas (Trial Court No. 16,737).

## STATEMENT OF THE CASE

On May 9, 2014, the Grand Jury for Upshur County, Texas indicted Appellant in a two paragraph indictment setting out an allegation of Possession of a Controlled Substance Listed in Penalty Group One of the Texas Controlled Substances Act (specifically, methamphetamine) with Intent to Deliver (in an amount of four grams or more but less than 200 grams) in Paragraph A. Paragraph B alleged the same offense without the allegation of intent to deliver. CR7.

Appellant filed his Motion to Suppress on October 3, 2014. CR 21. A hearing was held on Appellant's Motion to Suppress on October 14, 2014. 2RR. The trial court denied the motion on October 21, 2014. CR36. On December 2, 2014, Appellant entered into a plea bargain agreement with the Upshur County Criminal District Attorney and was assessed punishment at thirty (30) years. CR 39. As a condition of the plea bargain agreement, Appellant maintained his right to appeal matters raised by written motion filed and ruled upon prior to his trial. CR41. Accordingly, Appellant filed with the clerk of the trial court his Notice of Appeal After Plea of Guilty, seeking herein to reverse the trial court's denial of Appellant's Motion to Suppress, and a reversal of the conviction and sentence assessed. CR53.

For clarity, THE STATE OF TEXAS will be referred to as "the State" and BRADLEY LEROY THOMPSON will be referred to as "Defendant" or "Appellant" hereinafter.

## ISSUES PRESENTED

## POINT OF ERROR NUMBER ONE

The trial court erred in denying Appellant's Motion to Suppress.

## STATEMENT OF THE FACTS

Appellant's Motion to Suppress attacked the continued detention of Appellant, who was a passenger in a motor vehicle, after the stated reason for the stop (by the arresting officer) was concluded. CR23. The hearing on the motion included matters raised in the same type of motion filed by Craig L. Bass, attorney for the driver of the vehicle and co-defendant, DALE DEWAYNE FISHER, hereinafter referred to as FISHER. 2RR2. Following an initial discussion pertaining to the burden of proof that is somewhat confusing, the State proceeded presumably with the trial court ruling the State had the burden of proof to show the warrantless search was reasonable and not in violation of the Fourth Amendment to the United States Constitution. 2RR8. The State's sole witness at the hearing was the arresting officer, Upshur County

Deputy Sheriff David Thompson. 2RR8. Deputy Thompson's testimony established that he performed duties as a patrol officer and as a K-9 drug interdiction officer with his canine partner, Chiva. 2RR9, 10, 30.

Deputy Thompson executed a traffic stop on a motor vehicle traveling northbound on U.S. Highway 259 on the night of December 30, 2013, for a defective license plate light on the rear license plate of the vehicle. 2RR11. Deputy Thompson testified that he made contact with the driver of the vehicle (FISHER) and requested his driver's license and proof of insurance after informing him of the reason for the traffic stop. 2RR19. When FISHER could not produce his driver's license on request, Deputy Thompson permitted FISHER to exit the vehicle to look through his clothing in the back of the vehicle for his driver's license. 2RR20. While FISHER was searching for his license, Deputy Thompson requested the passenger in the vehicle to produce his driver's license or identification card and he was able to confirm the identity of the passenger as Appellant by his Texas Identification Card. 2RR21.

Ultimately, FISHER informed Deputy Thompson he could not locate his driver's license and he provided Thompson with his full name and date of birth so

dispatch could determine whether FISHER had a valid driver's license.  2RR22, 23.

With FISHER's information and Appellant's ID card, Deputy Thompson was able to

check with dispatch for the possibility of open warrants and for criminal histories for

both subjects, and further testified that this is a task that he normally performs in

traffic stops.  2RR23.

The report from dispatch confirmed that FISHER had a valid driver's license

and proof of insurance as required by law.  2RR40.  Deputy Thompson further

learned from the report from dispatch that neither Appellant nor FISHER had

outstanding warrants for their arrest.  2RR41.  The report further confirmed that

Appellant and FISHER both had criminal histories involving narcotics.  2RR41.  Up

to this point in the traffic stop, Deputy Thompson testified that neither Appellant nor

FISHER demonstrated any behavior that seemed out of the ordinary or of a suspicious

nature.  2RR24, 25.  Also at this point in the traffic stop, Deputy Thompson testified

that he did not smell the odor of marijuana.  2RR29.

At this juncture, rather than citing or warning FISHER for the defective license

plate light that was the basis for the traffic stop, Deputy Thompson decided instead

to continue the detention which then, according to Thompson, was no longer a traffic

stop but an investigative stop. 2RR41, 42.

Deputy Thompson had FISHER exit his vehicle and step to the back of the vehicle so Deputy Thompson could continue with his investigation. 2RR26. Upon resuming his contact with FISHER, Deputy Thompson testified how FISHER began sweating increasingly, and how, for the first time, he became aware of the odor of marijuana on FISHER's clothing. 2RR26, 27, 28. Based on FISHER's sweating and the smell of marijuana on his clothing, and because FISHER had been arrested before for possession of narcotics, Deputy Thompson requested of FISHER permission to search the vehicle. 2RR29, 30, CR31. FISHER denied Deputy Thompson permission to search the vehicle. 2RR30.

Deputy Thompson then advised FISHER that he was a K-9 officer and that he was going to conduct a free air search on the vehicle with his K-9 partner, Chiva. 2RR30. Deputy Thompson then retrieved his K-9 partner and conducted an air search of FISHER's vehicle. 2RR30-33. Deputy Thompson testified that Chiva alerted on the vehicle and he then allowed Chiva to enter the vehicle, and that Chiva again alerted inside the vehicle. 2RR32, 33. Inside the center console area of the vehicle, Deputy Thompson located methamphetamines, a pistol, pills, and currency which

-10-

appeared to be counterfeit. 2RR33, 34. FISHER and Appellant were arrested. Deputy Thompson testified he could have issued FISHER a warning or a citation for the traffic infraction and concluded the stop without prolonging the detention, but he instead chose to continue the detention based on FISHER's and Appellant's criminal histories involving narcotics and Thompson's understanding that the two were traveling along a highway coming from Houston, a major hub for illegal narcotics. 2RR41, 44. Other reasons cited by Deputy Thompson in claiming reasonable suspicion for criminal activity at the moment he was awaiting the return from dispatch concerning FISHER's and Appellant's warrant status and criminal histories, included his testimony that he believed FISHER was slow in pulling his vehicle over after he had activated his emergency lights to make the traffic stop, and FISHER's inability to produce his driver's license on demand. 2RR45. Deputy Thompson admitted there was nothing to prevent him from conducting the free air search of FISHER's vehicle while awaiting the returns from dispatch if he believed there was suspicious activity or criminal activity afoot. 2RR43. Despite having backup at the scene, Deputy Thompson's only explanation for his failure to conduct the free air search while awaiting the return from dispatch was that he does not pull his partner

out until he gets all his returns on every traffic stop.  2RR22, 43.

The Trial Court denied Appellant's Motion to Suppress on October 21, 2014. CR36.  On December 2, 2014, Appellant entered into a plea bargain agreement with the Upshur County Criminal District Attorney and was assessed punishment following a plea of guilty at thirty (30) years.  CR39.  As a condition of the plea bargain agreement, Appellant maintained his right to appeal matters raised by written motion filed and ruled upon prior to his trial.  CR41.

## SUMMARY OF THE ARGUMENT

The basis for the stop by Deputy Thompson was for a traffic violation. As part of the traffic stop, Deputy Thompson sought to determine whether the driver of the vehicle had a valid driver's license and proof of insurance. He also obtained proof of identification of the remaining occupant of the vehicle and ran both subjects through dispatch to obtain any criminal histories of the subjects and to determine whether there were any outstanding warrants for either subject. Deputy Thompson learned from dispatch that the driver of the vehicle had a valid driver's license and proof of insurance, and that no warrants existed for either the driver or the occupant of the vehicle. Rather than issuing a warning or a citation for the traffic violation and concluding the stop, Deputy Thompson chose instead to prolong the detention to conduct what was no longer a traffic stop but an investigative stop. The prolonged detention and investigation and subsequent warrantless search by Deputy Thompson were not reasonable and violated the Fourth Amendment to the U.S. Constitution and applicable Texas law. The trial court should have granted Appellant's Motion to Suppress. It was error not to do so.

## POINT OF ERROR NUMBER ONE

The trial court erred in denying Appellant's Motion to Suppress.

## ARGUMENT

Deputy Thompson was more than a patrol officer with the Upshur County Sheriff's Department; he was the Department's K-9 officer who traveled at all times with his certified narcotics dog and partner, Chiva. Deputy Thompson acknowledged his duties included searching for illegal narcotics being trafficked along the major highways of Upshur County. The two traveled together and conducted drug interdiction operations, including the use of Chiva in free air searches of vehicles stopped by Deputy Thompson.

Appellant was a passenger in a vehicle stopped by Deputy Thompson for a traffic violation. Once the reason for the traffic stop had been concluded, a warning or a citation for the traffic violation should have been issued by Deputy Thompson and the driver and Appellant released. The existence of reasonable, articulable suspicion was required for Deputy Thompson to continue any detention of the driver and Appellant once the traffic stop had been concluded.

In support of his decision to continue the detention of the driver beyond the

conclusion of the traffic stop, Deputy Thompson focused on the driver's failure to stop immediately after he activated his emergency lights and on the driver's inability to produce his driver's license on demand. Deputy Thompson further focused on the information that the driver and Appellant were traveling from Houston (a major hub for narcotics according to Thompson) along a highway known for narcotics trafficking (also according to Thompson). Curiously, Deputy Thompson failed to articulate in his offense report any of these suspicions as a basis for his decision to continue the detention of the driver beyond the conclusion of the traffic stop.

What was known to Deputy Thompson once the return from dispatch was received was this: the driver of the vehicle did, in fact, have a valid driver's license; the driver of the vehicle did, in fact, possess a valid insurance policy for the vehicle as required by law; neither the driver nor Appellant had any outstanding warrants for their arrest; and both subjects had criminal histories involving narcotics. Until this moment, Deputy Thompson admitted that neither the driver nor Appellant had exhibited any behavior that was out of the ordinary or suspicious in nature, and that the driver had been calm. Despite having these facts at his disposal, Deputy Thompson chose to prolong the detention. It seems apparent that the main focus of

Deputy Thompson's decision to prolong the detention was the report of the criminal histories of the driver and Appellant; it seems incredulous to believe Thompson would have otherwise prolonged the detention in the absence of any criminal history for the subjects.

Deputy Thompson's reliance on the driver's sweating and the smell of marijuana detected on the driver's clothing as a basis for the prolonged detention are misplaced. Neither of these observations would have occurred had Thompson not prolonged the detention. Once he decided to prolong the detention and to proceed with his investigation, Deputy Thompson requested permission from the driver to search the vehicle. When asked by the driver why he wanted to search the vehicle, Deputy Thompson's response (which he provided as set down in his offense report) was because he (the driver) had been arrested before for possession of narcotics in the past. When his request to search was denied by the driver, Deputy Thompson, undeterred, conducted a free air search of the vehicle with his K-9 partner, Chiva.

In trying to gauge whether Deputy Thompson's decision to prolong the detention beyond what was necessary to effect the original purpose of the stop was reasonable under the Fourth Amendment, the reasonableness is to be measured in

objective terms by examining the totality of the circumstances. *Ohio v. Robinette*, 519 US 33, 39 (1996). In applying this manner of measuring the reasonableness of the detention, Justice Ginsberg stressed in *Ohio v. Robinette* the need to evaluate both the reason for the initial detention as well as the scope of the detention to ensure that police officers are not using traffic stops merely as a means to conduct "fishing expeditions." *Ohio v. Robinette*, 519 US 33, 41 (1996) (Ginsburg, J., concurring). Under this authority and *Kothe v. State*, 152 S.W.3d 54 (Tex.Crim.App. 2004), Deputy Thompson's continued detention of the vehicle was not authorized. In *Kothe*, the majority provided guidance on questions of "reasonableness" and the scope of a detention. First, the stop should last no longer than is necessary to effect the purpose of the stop. *Kothe v. State*, 152 S.W.3d 54, 63 (Tex.Crim.App. 2004). Here, the purpose of the stop was for a traffic infraction; specifically, a defective light on the rear license plate. As part of making this traffic stop, police officers may request certain information from a driver, such as a driver's license and car registration, and may conduct a computer check on that information. *Id.* Once the computer check is completed, and the officer knows that the driver has a currently valid license, no outstanding warrants, and the car is not stolen, that traffic stop investigation is fully

-17-

resolved and the detention must end and the driver be permitted to leave. *Id*., at 63, 64. As previously stated in this brief, once the computer check was completed, Deputy Thompson knew that the driver had a currently valid license and proof of insurance required by law. He knew that neither the driver nor Appellant had any outstanding warrants and there was no information suggesting the car was stolen. He also admitted that neither the driver nor Appellant had exhibited any behavior that was out of the ordinary or suspicious in nature, and that the driver had been calm.

Stops by the police should last no longer than the time required to conclude the reason for the stop and should be as short in duration as possible. *Thomas v. State*, 420 S.W.3d 195 (Tex.App. Amarillo 2013); *Richardson v. State*, 402 S.W.3d 272 (Tex.App. Fort Worth 2013); and *Davis v. State*, 947 S.W.2d 240 (Tex.Crim.App. 1997). In addition to measuring the reasonableness of an officer's decision to prolong the detention, reasonable suspicion exists when, based on the totality of the circumstances, the officer has specific, articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably conclude that a particular person is, has been, or soon will be engaged in criminal activity. *Ford v. State*, 158 S.W.3d 488, 492 (Tex.Crim.App. 2005). When the reason for the stop was

concluded and Deputy Thompson returned to the driver following the computer check, the driver and Appellant should have been permitted to depart since the traffic stop had been fully resolved. The real question presented to the trial court and preserved for this court is this: did Deputy Thompson possess specific, articulable facts that, when combined with rational inferences from those facts, lead him to reasonably conclude that the driver or Appellant were presently, had been, or would soon engage in criminal activity?

As stated more than once, Deputy Thompson knew following the computer check that the driver had a valid driver's license and proof of insurance. He knew neither the driver nor Appellant had outstanding warrants for their arrest. He knew their behavior, to that point in the detention, did not exhibit anything that was out of the ordinary or suspicious in nature. The specific, articulable facts upon which Deputy Thompson would have us draw rational inferences from in support of his decision to reasonably conclude that the driver and Appellant were, had, or would soon be engaging in criminal activity are: (1) both were traveling from Houston, a major hub for drug trafficking according to Thompson; (2) both were traveling along a major highway, a known drug trafficking corridor also according to Thompson; (3)

the driver's failure to immediately pull over when Thompson activated his emergency lights; (4) the driver's failure to produce his driver's license on demand; and (5) the criminal histories of both the driver and Appellant. Can it not also be a rational inference to reasonably conclude that the driver and Appellant were traveling along the major highway in question from Houston because that was the most direct path for the destination of New Boston provided to Deputy Thompson by the driver, who said he and Appellant were en route to this destination to help with the funeral plans for his mother? CR30, 2RR39. Can there not also be criminal activity-neutral (whether past, present or future) inferences that are rational for drivers operating vehicles on our public roads who can not locate their driver's licenses on demand who nonetheless possess valid driver's licenses? Or criminal-activity neutral inferences that are rational for drivers who may not immediately pull over when law enforcement officers think they should pull over after activating their overhead emergency lights? Both vehicles were traveling presumably at highway speeds along a major highway in opposite directions when Deputy Thompson activated his emergency lights after observing the defective license plate light on the northbound vehicle in which Appellant was the passenger. 2RR12, 12. There are criminal neutral

inferences equally rational that may be made by looking at the facts objectively. There was no cause consistent with the Fourth Amendment for Deputy Thompson to choose to prolong the detention of the vehicle in which Appellant was the passenger once the reason for the stop had been concluded. The Motion to Suppress should have been granted. This error was properly preserved by Appellant in his plea agreement at trial. The State would have no evidence of the crime alleged but for the improper prolonged detention that led to the unauthorized search and subsequent seizure because the evidence would be "fruit of the poisonous tree" and otherwise inadmissible.

The applicability of a recent U.S. Supreme Court case strongly states that any prolonged detentions, however slight, not based on specific facts which give rise to reasonable suspicion of additional criminal activity separate from the traffic violation that provided the original basis for the stop (and particularly those involving drug sniffing dogs) violate the Fourth Amendment. _Rodriguez v. United States_, 135 S.Ct. 1609 (2015). Here the free air search conducted by Deputy Thompson could have been performed while awaiting the report from dispatch. Deputy Thompson and his K-9 partner, Chiva, were present. Deputy Thompson had a backup officer present for

officer safety.  If he did, in fact, possess concerns or suspicions that the driver and Appellant at the time of the traffic stop had been, were presently, or likely to engage in criminal activity, there is no reason why he could not have then conducted the free air search and not otherwise have prolonged the detention beyond the scope of what was a routine traffic stop.

## CONCLUSION AND PRAYER

For the reasons recited herein, the judgment and sentence of the trial court should be reversed and remanded for a new trial, by finding the trial court erred in failing to grant Appellant's Motion to Suppress.

Respectfully submitted,

/s/ Barry Clark Wallace
BARRY CLARK WALLACE
State Bar No. 00785170
Law Office of Barry Clark Wallace, P.C.
Attorney & Counselor at Law
P.O. Box 1408
206 E. Upshur
Gladewater, Texas 75647
Telephone: (903)845-2192
Facsimile: (903)845-2193
e-mail: bcwallace@suddenlinkmail.com
ATTORNEY FOR APPELLANT

## CERTIFICATE OF COMPLIANCE

I do hereby certify that the foregoing complies with the Texas Rules of Appellate Procedure, Rule 9 regarding length of documents, in that exclusive of caption, identity of parties and counsel, statement regarding oral argument, table of contents, index of authorities, statement of the case, statement of issues presented, statement of jurisdiction, statement of procedural history, signature, proof of service, certification, certificate of compliance, and appendix, it consists of 3,097 words.

/s/ Barry Clark Wallace
BARRY CLARK WALLACE
State Bar No. 00785170

## CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the above and foregoing Appellant's Brief has been provided to Natalie A. Miller, Upshur County Assistant Criminal District Attorney on this fourth day of June, 2015.

/s/ Barry Clark Wallace
BARRY CLARK WALLACE
State Bar No. 00785170

## [Rodriguez v. United States](#)

Supreme Court of the United States

January 21, 2015, Argued; April 21, 2015, Decided

No. 13-9972.

**Reporter**

191 L. Ed. 2d 492; 2015 U.S. LEXIS 2807; 135 S. Ct. 1609; 83 U.S.L.W. 4241; 25 Fla. L. Weekly Fed. S 191

DENNYS RODRIGUEZ, PETITIONER v. UNITED STATES

**Notice:** The LEXIS pagination of this document is subject to change pending release of the final published version.

**Prior History:** **[\*\*1]** ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT
*[United States v. Rodriguez, 741 F.3d 905, 2014 U.S. App. LEXIS 1897 (8th Cir. Neb., 2014)](#)*

**Disposition:** Vacated and remanded.

## Case Summary

### Overview

HOLDINGS: [1]-A police stop exceeding the time needed to handle the matter for which the stop was made violated the United States Constitution's shield against unreasonable seizures; [2]-A seizure justified only by a police-observed traffic violation became unlawful if it was prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation; [3]-Lacking the same close connection to roadway safety as the ordinary inquiries, a dog sniff was not fairly characterized as part of the officer's traffic mission; [4]-The question whether reasonable suspicion of criminal activity justified detaining defendant beyond completion of the traffic infraction investigation was open for consideration on remand as the lower court had not reviewed the determination that the detention for a dog sniff was not independently supported by individualized suspicion.

### Outcome

Judgment vacated; case remanded. 6-3 decision, 3 dissents.

## Syllabus

 **[\*494]** Officer Struble, a K-9 officer, stopped petitioner Rodriguez for driving on a highway shoulder, a violation of Nebraska law. After Struble attended to everything relating to the stop, including, *inter alia,* checking the driver's licenses of Rodriguez and his passenger and issuing a warning for the traffic offense, he asked Rodriguez for permission to walk his dog around the vehicle. When Rodriguez refused, Struble detained him until a second officer arrived. Struble then retrieved his dog, who alerted to the presence of drugs in the vehicle. The ensuing search revealed methamphetamine. Seven or eight minutes elapsed from the time Struble issued the written warning until the dog alerted.

Rodriguez was indicted on federal drug charges. He moved to suppress the evidence seized from the vehicle on the ground, among others, that Struble had prolonged the traffic stop without reasonable suspicion in order to conduct the dog sniff. The Magistrate Judge recommended denial of the motion. He found no reasonable suspicion supporting detention once Struble issued the written warning. Under Eighth [**2] Circuit precedent, however, he concluded that prolonging the stop by "seven to eight minutes" for [*495] the dog sniff was only a *de minimis* intrusion on Rodriguez's *Fourth Amendment* rights and was for that reason permissible. The District Court then denied the motion to suppress. Rodriguez entered a conditional guilty plea and was sentenced to five years in prison. The Eighth Circuit affirmed. Noting that the seven or eight minute delay was an acceptable "*de minimis* intrusion on Rodriguez's personal liberty," the court declined to reach the question whether Struble had reasonable suspicion to continue Rodriguez's detention after issuing the written warning.

Held:

1. Absent reasonable suspicion, police extension of a traffic stop in order to conduct a dog sniff violates the Constitution's shield against unreasonable seizures.

A routine traffic stop is more like a brief stop under *Terry v. Ohio, 392 U. S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889*, than an arrest, see, *e.g., Arizona v. Johnson, 555 U. S. 323, 330, 129 S. Ct. 781, 172 L. Ed. 2d 694*. Its tolerable duration is determined by the seizure's "mission," which is to address the traffic violation that warranted the stop, *Illinois v. Caballes, 543 U. S. 405, 407, 125 S. Ct. 834, 160 L. Ed. 2d 842* and attend to related safety concerns. Authority for the seizure ends when tasks tied to the traffic infraction are—or reasonably should have been—completed. The *Fourth Amendment* may tolerate [**3] certain unrelated investigations that do not lengthen the roadside detention, *Johnson, 555 U. S., at 327-328, 129 S. Ct. 781, 172 L. Ed. 2d 694* (questioning); *Caballes, 543 U. S., at 406, 408, 125 S. Ct. 834, 160 L. Ed. 2d 842* (dog sniff), but a traffic stop "become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of issuing a warning ticket, *id., at 407, 125 S. Ct. 834, 160 L. Ed. 2d 842*.

Beyond determining whether to issue a traffic ticket, an officer's mission during a traffic stop typically includes checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly. See *Delaware v. Prouse, 440 U. S. 648, 658-659, 99 S. Ct. 1391, 59 L. Ed. 2d 660*. Lacking the same close connection to roadway safety as the ordinary inquiries, a dog sniff is not fairly characterized as part of the officer's traffic mission.

In concluding that the *de minimis* intrusion here could be offset by the Government's interest in stopping the flow of illegal drugs, the Eighth Circuit relied on *Pennsylvania v. Mimms, 434 U. S. 106, 98 S. Ct. 330, 54 L. Ed. 2d 331*. The Court reasoned in *Mimms* that the government's "legitimate and weighty" interest in officer safety outweighed the "*de minimis*" additional intrusion of requiring a driver, lawfully stopped, [**4] to exit a vehicle, *id., at 110-111, 98 S. Ct. 330, 54 L. Ed. 2d 331*. The officer-safety interest recognized in *Mimms*, however, stemmed from the danger to the officer associated with the traffic stop itself. On-scene investigation into other crimes, in contrast, detours from the officer's traffic-control mission and therefore gains no support from *Mimms*.

The Government's argument that an officer who completes all traffic-related [*496] tasks expeditiously should earn extra time to pursue an unrelated criminal investigation is unpersuasive, for

a traffic stop "prolonged beyond" the time in fact needed for the officer to complete his traffic-based inquiries is "unlawful," *Caballes, 543 U. S., at 407, 125 S. Ct. 834, 160 L. Ed. 2d 842*. The critical question is not whether the dog sniff occurs before or after the officer issues a ticket, but whether conducting the sniff adds time to the stop. Pp. 5-8.

2. The determination adopted by the District Court that detention for the dog sniff was not independently supported by individualized suspicion was not reviewed by the Eighth Circuit. That question therefore remains open for consideration on remand. P. 9.

*741 F. 3d 905*, vacated and remanded.

**Counsel:** Shannon P. O'Connor argued the cause for petitioner

Ginger D. Anders argued the cause for respondent

**Judges:** GINSBURG, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. **[**5]** KENNEDY, J., filed a dissenting opinion. THOMAS, J., filed a dissenting opinion, in which ALITO, J., joined, and in which KENNEDY, J., joined as to all but Part III. ALITO, J., filed a dissenting opinion.

**Opinion by:** GINSBURG

## Opinion

JUSTICE GINSBURG delivered the opinion of the Court.

In *Illinois v. Caballes, 543 U. S. 405, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005)*, this Court held that a dog sniff conducted during a lawful traffic stop does not violate the *Fourth Amendment*'s proscription of unreasonable seizures. This case presents the question whether the *Fourth Amendment* tolerates a dog sniff conducted after completion of a traffic stop. We hold that a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, "become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of issuing a ticket for the violation. *Id., at 407, 125 S. Ct. 834, 160 L. Ed. 2d 842*. The Court so recognized in *Caballes*, and we adhere to the line drawn in that decision.

I

Just after midnight on March 27, 2012, police officer Morgan Struble observed a Mercury Mountaineer veer slowly onto the shoulder of Nebraska State Highway 275 for one or two seconds and then jerk back onto the road. Nebraska **[**6]** law prohibits driving on highway shoulders, see *Neb. Rev. Stat. §60-6,142* (2010), and on that basis, Struble pulled the Mountaineer over at 12:06 a.m. Struble is a K-9 officer with the Valley Police Department in Nebraska, and his dog Floyd was in his patrol car that night. Two men were in the Mountaineer: the driver, Dennys Rodriguez, and a front-seat passenger, Scott Pollman.

Struble approached the Mountaineer on the passenger's side. After Rodriguez identified himself, Struble asked him why he had driven onto the shoulder. Rodriguez replied that he had swerved to avoid

a pothole. Struble then gathered Rodriguez's license, registration, and proof of insurance, **[*497]** and asked Rodriguez to accompany him to the patrol car. Rodriguez asked if he was required to do so, and Struble answered that he was not. Rodriguez decided to wait in his own vehicle.

After running a records check on Rodriguez, Struble returned to the Mountaineer. Struble asked passenger Pollman for his driver's license and began to question him about where the two men were coming from and where they were going. Pollman replied that they had traveled to Omaha, Nebraska, to look at a Ford Mustang that was for sale and that they were returning to Norfolk, **[**7]** Nebraska. Struble returned again to his patrol car, where he completed a records check on Pollman, and called for a second officer. Struble then began writing a warning ticket for Rodriguez for driving on the shoulder of the road.

Struble returned to Rodriguez's vehicle a third time to issue the written warning. By 12:27 or 12:28 a.m., Struble had finished explaining the warning to Rodriguez, and had given back to Rodriguez and Pollman the documents obtained from them. As Struble later testified, at that point, Rodriguez and Pollman "had all their documents back and a copy of the written warning. I got all the reason[s] for the stop out of the way[,] . . . took care of all the business." App. 70.

Nevertheless, Struble did not consider Rodriguez "free to leave." *Id.,* at 69-70. Although justification for the traffic stop was "out of the way," *id.,* at 70, Struble asked for permission to walk his dog around Rodriguez's vehicle. Rodriguez said no. Struble then instructed Rodriguez to turn off the ignition, exit the vehicle, and stand in front of the patrol car to wait for the second officer. Rodriguez complied. At 12:33 a.m., a deputy sheriff arrived. Struble retrieved his dog and led him twice around the Mountaineer. **[**8]** The dog alerted to the presence of drugs halfway through Struble's second pass. All told, seven or eight minutes had elapsed from the time Struble issued the written warning until the dog indicated the presence of drugs. A search of the vehicle revealed a large bag of methamphetamine.

Rodriguez was indicted in the United States District Court for the District of Nebraska on one count of possession with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U. S. C. §§841(a)(1) and (b)(1). He moved to suppress the evidence seized from his car on the ground, among others, that Struble had prolonged the traffic stop without reasonable suspicion in order to conduct the dog sniff.

After receiving evidence, a Magistrate Judge recommended that the motion be denied. The Magistrate Judge found no probable cause to search the vehicle independent of the dog alert. App. 100 (apart from "information given by the dog," "Officer Struble had [no]thing other than a rather large hunch"). He further found that no reasonable suspicion supported the detention once Struble issued the written warning. He concluded, however, that under Eighth Circuit precedent, extension of the stop by "seven to eight minutes" for the dog **[**9]** sniff was only a *de minimis* intrusion on Rodriguez's *Fourth Amendment* rights and was therefore permissible.

The District Court adopted the Magistrate Judge's factual findings and legal conclusions and denied Rodriguez's motion to suppress. The **[*498]** court noted that, in the Eighth Circuit, "dog sniffs that occur within a short time following the completion of a traffic stop are not constitutionally prohibited if they constitute only de minimis intrusions." App. 114 (quoting *United States v. Alexander, 448 F. 3d 1014, 1016 (CA8 2006))*. The court thus agreed with the Magistrate Judge that the "7 to 10 minutes"

added to the stop by the dog sniff "was not of constitutional significance." App. 114. Impelled by that decision, Rodriguez entered a conditional guilty plea and was sentenced to five years in prison.

The Eighth Circuit affirmed. The "seven- or eight-minute delay" in this case, the opinion noted, resembled delays that the court had previously ranked as permissible. *741 F. 3d 905, 907 (2014)*. The Court of Appeals thus ruled that the delay here constituted an acceptable "*de minimis* intrusion on Rodriguez's personal liberty." *Id., at 908*. Given that ruling, the court declined to reach the question whether Struble had reasonable suspicion to continue Rodriguez's detention after issuing the written **[**10]** warning.

We granted certiorari to resolve a division among lower courts on the question whether police routinely may extend an otherwise-completed traffic stop, absent reason-able suspicion, in order to conduct a dog sniff. *573 U. S. ___, 135 S. Ct. 43, 189 L. Ed. 2d 896 (2014)*. Compare, *e.g., United States v. Morgan, 270 F. 3d 625, 632 (CA8 2001)* (postcompletion delay of "well under ten minutes" permissible), with, *e.g., State v. Baker, 2010 UT 18, ¶13, 229 P. 3d 650, 658 (2010)* ("[W]ithout additional reasonable suspicion, the officer must allow the seized person to depart once the purpose of the stop has concluded.").

II

A seizure for a traffic violation justifies a police investigation of that violation. "[A] relatively brief encounter," a routine traffic stop is "more analogous to a so-called '*Terry* stop' . . . than to a formal arrest." *Knowles v. Iowa, 525 U. S. 113, 117, 119 S. Ct. 484, 142 L. Ed. 2d 492 (1998)* (quoting *Berkemer v. McCarty, 468 U. S. 420, 439, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984)*, in turn citing *Terry v. Ohio, 392 U. S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968))*. See also *Arizona v. Johnson, 555 U. S. 323, 330, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009)*. Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission"—to address the traffic violation that warranted the stop, *Caballes, 543 U. S., at 407 125 S. Ct. 834, 160 L. Ed. 2d 842*, and attend to related safety concerns, *infra*, at 6-7. See also *United States v. Sharpe, 470 U. S. 675, 685, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985)*; *Florida v. Royer, 460 U. S. 491, 500, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983)* (plurality opinion) ("The scope of the detention must be carefully tailored to its underlying justification."). Because addressing the infraction is the purpose of the stop, it may "last no longer than is necessary to effectuate th[at] purpose." **[**11]** *Ibid*. See also *Caballes, 543 U. S., at 407, 125 S. Ct. 834, 160 L. Ed. 2d 842*. Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed. See *Sharpe, 470 U. S., at 686, 105 S. Ct. 1568, 84 L. Ed. 2d 605* (in determining the reasonable duration of a stop, "it [is] appropriate to examine whether the police diligently pursued [the] investigation").

**[*499]** Our decisions in *Caballes* and *Johnson* heed these constraints. In both cases, we concluded that the *Fourth Amendment* tolerated certain unrelated investigations that did not lengthen the roadside detention. *Johnson, 555 U. S., at 327-328, 129 S. Ct. 781, 172 L. Ed. 2d 694* (questioning); *Caballes, 543 U. S., at 406, 408, 125 S. Ct. 834, 160 L. Ed. 2d 842* (dog sniff). In *Caballes*, however, we cautioned that a traffic stop "can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of issuing a warning ticket. *543 U. S., at 407, 125 S. Ct. 834, 160 L. Ed. 2d 842*. And we repeated that admonition in *Johnson*: The seizure remains lawful only "so long as [unrelated] inquiries do not measurably extend the duration of the stop." *555 U. S., at 333, 129 S.*

*Ct. 781, 172 L. Ed. 2d 694*. See also *Muehler v. Mena, 544 U. S. 93, 101, 125 S. Ct. 1465, 161 L. Ed. 2d 299 (2005)* (because unrelated inquiries did not "exten[d] the time [petitioner] was detained[,] . . . no additional *Fourth Amendment* justification . . . was required"). An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop. But contrary to JUSTICE ALITO's suggestion, *post,* at 4, n. 2, he may not do so in a way that prolongs **[**12]** the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual. But see *post*, at 1-2 (ALITO, J., dissenting) (premising opinion on the dissent's own finding of "reasonable suspicion," although the District Court reached the opposite conclusion, and the Court of Appeals declined to consider the issue).

Beyond determining whether to issue a traffic ticket, an officer's mission includes "ordinary inquiries incident to [the traffic] stop." *Caballes, 543 U. S., at 408, 125 S. Ct. 834, 160 L. Ed. 2d 842*. Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. See *Delaware v. Prouse, 440 U. S. 648, 658-660, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979)*. See also 4 W. LaFave, Search and Seizure §9.3(c), pp. 507-517 (5th ed. 2012). These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly. See *Prouse, 440 U. S., at 658-659, 99 S. Ct. 1391, 59 L. Ed. 2d 660*; LaFave, Search and Seizure §9.3(c), at 516 (A "warrant check makes it possible to determine whether the apparent traffic violator is wanted for one or more previous traffic offenses.").

A dog sniff, by contrast, is a measure aimed at "detect[ing] evidence of ordinary criminal wrongdoing." *Indianapolis v. Edmond, 531 U. S. 32, 40-41, 121 S. Ct. 447, 148 L. Ed. 2d 333 (2000)*. See also *Florida v. Jardines, 569 U. S. 1, ___-___, 133 S. Ct. 1409, 185 L. Ed. 2d 495 (2013) (slip op., at 7-8*). Candidly, **[**13]** the Government acknowledged at oral argument that a dog sniff, unlike the routine measures just mentioned, is not an ordinary incident of a traffic stop. See Tr. of Oral Arg. 33. Lacking the same close connection to roadway safety as the ordinary inquiries, a dog sniff is not fairly characterized as part of the officer's traffic mission.

In advancing its *de minimis* rule, the Eighth Circuit relied heavily on our decision in *Pennsylvania v. Mimms, 434 U. S. 106, 98 S. Ct. 330, 54 L. Ed. 2d 331 (1977)* (*per curiam*). **[*500]** See *United States v. $404,905.00 in U. S. Currency, 182 F. 3d 643, 649 (CA8 1999)*. In *Mimms*, we reasoned that the government's "legitimate and weighty" interest in officer safety outweighs the "*de minimis*" additional intrusion of requiring a driver, already lawfully stopped, to exit the vehicle. *434 U. S., at 110-111, 98 S. Ct. 330, 54 L. Ed. 2d 331*. See also *Maryland v. Wilson, 519 U. S. 408, 413-415, 117 S. Ct. 882, 137 L. Ed. 2d 41 (1997)* (passengers may be required to exit vehicle stopped for traffic violation). The Eighth Circuit, echoed in JUSTICE THOMAS's dissent, believed that the imposition here similarly could be offset by the Government's "strong interest in interdicting the flow of illegal drugs along the nation's highways." *$404,905.00 in U. S. Currency, 182 F. 3d, at 649*; see *post,* at 9.

Unlike a general interest in criminal enforcement, however, the government's officer safety interest stems from the mission of the stop itself. Traffic stops are "especially fraught with danger to police officers," **[**14]** *Johnson, 555 U. S., at 330, 129 S. Ct. 781, 172 L. Ed. 2d 694* (internal quotation marks omitted), so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely. Cf. *United States v. Holt, 264 F. 3d 1215, 1221-1222 (CA10 2001)* (en banc) (recognizing officer safety justification for criminal record and outstanding warrant checks),

abrogated on other grounds as recognized in *United States* v. *Stewart,* 473 F. 3d 1265, 1269 (CA10 2007). On-scene investigation into other crimes, however, detours from that mission. See *supra,* at 6-7. So too do safety precautions taken in order to facilitate such detours. But cf. *post,* at 2-3 (ALITO, J., dissenting). Thus, even assuming that the imposition here was no more intrusive than the exit order in *Mimms*, the dog sniff could not be justified on the same basis. Highway and officer safety are interests different in kind from the Government's endeavor to detect crime in general or drug trafficking in particular.

The Government argues that an officer may "incremental[ly]" prolong a stop to conduct a dog sniff so long as the officer is reasonably diligent in pursuing the traffic-related purpose of the stop, and the overall duration of the stop remains reasonable in relation to the duration of other traffic stops involving similar circumstances. Brief for United States 36-39. The Government's argument, in **[\*\*15]** effect, is that by completing all traffic-related tasks expeditiously, an officer can earn bonus time to pursue an unrelated criminal investigation. See also *post,* at 2-5 (THOMAS, J., dissenting) (embracing the Government's argument). The reasonableness of a seizure, however, depends on what the police in fact do. See *Knowles, 525 U. S., at 115-117, 119 S. Ct. 484, 142 L. Ed. 2d 492*. In this regard, the Government acknowledges that "an officer always has to be reasonably diligent." Tr. of Oral Arg. 49. How could diligence be gauged other than by noting what the officer actually did and how he did it? If an officer can complete traffic-based inquiries expeditiously, then that is the amount of "time reasonably required to complete [the stop's] mission." *Caballes, 543 U. S., at 407, 125 S. Ct. 834, 160 L. Ed. 2d 842*. As we said in *Caballes* and reiterate today, a traffic stop "prolonged beyond" that point is "unlawful." **[\*501]** *Ibid.* The critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticket, as JUSTICE ALITO supposes, *post,* at 2-4, but whether conducting the sniff "prolongs"—*i.e.,* adds time to—"the stop," *supra,* at 6.

III

The Magistrate Judge found that detention for the dog sniff in this case was not independently supported by individualized suspicion, see App. 100, and the **[\*\*16]** District Court adopted the Magistrate Judge's findings, see *id.*, at 112-113, . The Court of Appeals, however, did not review that determination. But see *post,* at 1, 10-12 (THOMAS, J., dissenting) (resolving the issue, nevermind that the Court of Appeals left it unaddressed); *post,* at 1-2 (ALITO, J., dissenting) (upbraiding the Court for addressing the sole issue decided by the Court of Appeals and characterizing the Court's answer as "unnecessary" because the Court, instead, should have decided an issue the Court of Appeals did not decide). The question whether reasonable suspicion of criminal activity justified detaining Rodriguez beyond completion of the traffic infraction investigation, therefore, remains open for Eighth Circuit consideration on remand.

\* \* \*

For the reasons stated, the judgment of the United States Court of Appeals for the Eighth Circuit is vacated, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

**Dissent by:** KENNEDY; THOMAS; ALITO

## Dissent

JUSTICE KENNEDY, dissenting.

My join in JUSTICE THOMAS' dissenting opinion does not extend to Part III. Although the issue discussed in that Part was argued here, the Court of Appeals has not addressed that aspect of the **[\*\*17]** case in any detail. In my view the better course would be to allow that court to do so in the first instance.

JUSTICE THOMAS, with whom JUSTICE ALITO joins, and with whom JUSTICE KENNEDY joins as to all but Part III, dissenting.

Ten years ago, we explained that "conducting a dog sniff [does] not change the character of a traffic stop that is lawful at its inception and otherwise executed in a reasonable manner." *Illinois v. Caballes, 543 U. S. 405, 408, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005)*. The only question here is whether an officer executed a stop in a reasonable manner when he waited to conduct a dog sniff until after he had given the driver a written warning and a backup unit had arrived, bringing the overall duration of the stop to 29 minutes. Because the stop was reasonably executed, no *Fourth Amendment* violation occurred. The Court's holding to the contrary cannot be reconciled with our decision in *Caballes* or a number of common police practices. It was also unnecessary, as the officer possessed reasonable suspicion to continue to hold the driver to conduct the dog sniff. I respectfully dissent.

I

The *Fourth Amendment* protects "[t]he right of the people to be secure **[\*502]** in their persons, houses, papers, and effects, against unreasonable searches and seizures." *U. S. Const., Amdt. 4*. As the text indicates, and as we **[\*\*18]** have repeatedly confirmed, "the ultimate touchstone of the *Fourth Amendment* is 'reasonableness.'" *Brigham City v. Stuart, 547 U. S. 398, 403, 126 S. Ct. 1943, 164 L. Ed. 2d 650 (2006)*. We have defined reasonableness "in objective terms by examining the totality of the circumstances," *Ohio v. Robinette, 519 U. S. 33, 39, 117 S. Ct. 417, 136 L. Ed. 2d 347 (1996)*, and by considering "the traditional protections against unreasonable searches and seizures afforded by the common law at the time of the framing," *Atwater v. Lago Vista, 532 U. S. 318, 326, 121 S. Ct. 1536, 149 L. Ed. 2d 549 (2001)* (internal quotation marks omitted). When traditional protections have not provided a definitive answer, our precedents have "analyzed a search or seizure in light of traditional standards of reasonableness by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Virginia v. Moore, 553 U. S. 164, 171, 128 S. Ct. 1598, 170 L. Ed. 2d 559 (2008)* (internal quotation marks omitted).

Although a traffic stop "constitutes a 'seizure' of 'persons' within the meaning of [the *Fourth Amendment*]," such a seizure is constitutionally "reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States, 517 U. S. 806, 809-810, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996)*. But "a seizure that is lawful at its inception can violate the *Fourth Amendment* if its manner of execution unreasonably infringes interests protected by the Constitution." *Caballes, supra, at 407, 125 S. Ct. 834, 160 L. Ed. 2d 842*.

Because Rodriguez does **[\*\*19]** not dispute that Officer Struble had probable cause to stop him, the only question is whether the stop was otherwise executed in a reasonable manner. See Brief for

Appellant in No. 13-1176 (CA8), p. 4, n. 2. I easily conclude that it was. Approximately 29 minutes passed from the time Officer Struble stopped Rodriguez until his narcotics-detection dog alerted to the presence of drugs. That amount of time is hardly out of the ordinary for a traffic stop by a single officer of a vehicle containing multiple occupants even when no dog sniff is involved. See, *e.g., United States v. Ellis, 497 F. 3d 606 (CA6 2007)* (22 minutes); *United States v. Barragan, 379 F. 3d 524 (CA8 2004)* (approximately 30 minutes). During that time, Officer Struble conducted the ordinary activities of a traffic stop—he approached the vehicle, questioned Rodriguez about the observed violation, asked Pollman about their travel plans, ran serial warrant checks on Rodriguez and Pollman, and issued a written warning to Rodriguez. And when he decided to conduct a dog sniff, he took the precaution of calling for backup out of concern for his safety. See *741 F. 3d 905, 907 (CA8 2014)*; see also *Pennsylvania v. Mimms, 434 U. S. 106, 110, 98 S. Ct. 330, 54 L. Ed. 2d 331 (1977)* (*per curiam*) (officer safety is a "legitimate and weighty" concern relevant to reasonableness).

As *Caballes* makes clear, the fact that Officer Struble waited **[**20]** until after he gave Rodriguez the warning to conduct the dog sniff does not alter this analysis. Because "the use of a well-trained narcotics-detection dog . . . generally does not implicate legitimate **[*503]** privacy interests," *543 U. S., at 409, 125 S. Ct. 834, 160 L. Ed. 2d 842*, "conducting a dog sniff would not change the character of a traffic stop that is lawful at its inception and otherwise executed in a reasonable manner," *id., at 408, 125 S. Ct. 834, 160 L. Ed. 2d 842*. The stop here was "lawful at its inception and otherwise executed in a reasonable manner." *Ibid*. As in *Caballes*, "conducting a dog sniff [did] not change the character of [the] traffic stop," *ibid.*, and thus no *Fourth Amendment* violation occurred.

II

Rather than adhere to the reasonableness requirement that we have repeatedly characterized as the "touchstone of the *Fourth Amendment*," *Brigham City, supra, at 403, 126 S. Ct. 1943, 164 L. Ed. 2d 650*, the majority constructed a test of its own that is inconsistent with our precedents.

A

The majority's rule requires a traffic stop to "en[d] when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Ante*, at 5. "If an officer can complete traffic-based inquiries expeditiously, then that is the amount of time reasonably required to complete the stop's mission" and he may hold the individual no longer. *Ante*, at 8 (internal **[**21]** quotation marks and alterations omitted). The majority's rule thus imposes a one-way ratchet for constitutional protection linked to the characteristics of the individual officer conducting the stop: If a driver is stopped by a particularly efficient officer, then he will be entitled to be released from the traffic stop after a shorter period of time than a driver stopped by a less efficient officer. Similarly, if a driver is stopped by an officer with access to technology that can shorten a records check, then he will be entitled to be released from the stop after a shorter period of time than an individual stopped by an officer without access to such technology.

I "cannot accept that the search and seizure protections of the *Fourth Amendment* are so variable and can be made to turn upon such trivialities." *Whren, 517 U. S., at 815, 116 S. Ct. 1769, 135 L. Ed. 2d 89* (citations omitted). We have repeatedly explained that the reasonableness inquiry must not hinge on the characteristics of the individual officer conducting the seizure. We have held, for example, that an

officer's state of mind "does not invalidate [an] action taken as long as the circumstances, viewed objectively, justify that action." *Id., at 813, 116 S. Ct. 1769, 135 L. Ed. 2d 89* (internal quotation marks omitted). We have spurned theories **[\*\*22]** that would make the *Fourth Amendment* "change with local law enforcement practices." *Moore, supra, at 172, 128 S. Ct. 1598, 170 L. Ed. 2d 559*. And we have rejected a rule that would require the offense establishing probable cause to be "closely related to" the offense identified by the arresting officer, as such a rule would make "the constitutionality of an arrest . . . vary from place to place and from time to time, depending on whether the arresting officer states the reason for the detention and, if so, whether he correctly identifies a general class of offense for which probable cause exists." *Devenpeck v. Alford, 543 U. S. 146, 154, 125 S. Ct. 588, 160 L. Ed. 2d 537 (2004)* (internal quotation marks and citation omitted). In *Devenpeck*, a unanimous **[\*504]** Court explained: "An arrest made by a knowledgeable, veteran officer would be valid, whereas an arrest made by a rookie *in precisely the same circumstances* would not. We see no reason to ascribe to the *Fourth Amendment* such arbitrarily variable protection." *Ibid.*

The majority's logic would produce similarly arbitrary results. Under its reasoning, a traffic stop made by a rookie could be executed in a reasonable manner, whereas the same traffic stop made by a knowledgeable, veteran officer *in precisely the same circumstances* might not, if in fact his knowledge and experience made him capable **[\*\*23]** of completing the stop faster. We have long rejected interpretations of the *Fourth Amendment* that would produce such haphazard results, and I see no reason to depart from our consistent practice today.

B

As if that were not enough, the majority also limits the duration of the stop to the time it takes the officer to complete a narrow category of "traffic-based inquiries." *Ante,* at 8. According to the majority, these inquiries include those that "serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Ante,* at 6. Inquiries directed to "detecting evidence of ordinary criminal wrongdoing" are not traffic-related inquiries and thus cannot count toward the overall duration of the stop. *Ibid.* (internal quotation marks and alteration omitted).

The combination of that definition of traffic-related inquiries with the majority's officer-specific durational limit produces a result demonstrably at odds with our decision in *Caballes. Caballes* expressly anticipated that a traffic stop could be *reasonably* prolonged for officers to engage in a dog sniff. We explained that no *Fourth Amendment* violation had occurred in *Caballes*, where the "duration of the stop **[\*\*24]** . . . was entirely justified by the traffic offense and the ordinary inquiries incident to such a stop," but suggested a different result might attend a case "involving a dog sniff that occurred during an *unreasonably* prolonged traffic stop." *543 U. S., at 407-408, 125 S. Ct. 834, 160 L. Ed. 2d 842* (emphasis added). The dividing line was whether the overall duration of the stop exceeded "the time reasonably required to complete th[e] mission," *id., at 407, 125 S. Ct. 834, 160 L. Ed. 2d 842*, not, as the majority suggests, whether the duration of the stop "in fact" exceeded the time necessary to complete the traffic-related inquiries, *ante,* at 8.

The majority's approach draws an artificial line between dog sniffs and other common police practices. The lower courts have routinely confirmed that warrant checks are a constitutionally permissible part of a traffic stop, see, *e.g., United States v. Simmons, 172 F. 3d 775, 778 (CA11 1999)*; *United States v. Mendez, 118 F. 3d 1426, 1429 (CA10 1997)*; *United States v. Shabazz, 993 F. 2d 431, 437 (CA5*

*1993)*, and the majority confirms that it finds no fault in these measures, *ante,* at 6. Yet its reasoning suggests the opposite. Such warrant checks look more like they are directed to "detecting evidence of ordinary criminal wrongdoing" than to "ensuring that vehicles on the road are operated safely and responsibly." *Ante,* at 6 (internal quotation **[*505]** marks and alteration omitted). Perhaps one could argue that the existence **[**25]** of an outstanding warrant might make a driver less likely to operate his vehicle safely and responsibly on the road, but the same could be said about a driver in possession of contraband. A driver confronted by the police in either case might try to flee or become violent toward the officer. But under the majority's analysis, a dog sniff, which is directed at uncovering that problem, is not treated as a traffic-based inquiry. Warrant checks, arguably, should fare no better. The majority suggests that a warrant check is an ordinary inquiry incident to a traffic stop because it can be used "'to determine whether the apparent traffic violator is wanted for one or more previous traffic offenses.'" *Ante,* at 6 (quoting 4 W. LaFave, Search and Seizure §9.3(c), p. 516 (5th ed. 2012)). But as the very treatise on which the majority relies notes, such checks are a "manifest[ation of ] the 'war on drugs' motivation so often underlying [routine traffic] stops," and thus are very much like the dog sniff in this case. *Id.*, §9.3(c), at 507-508.

Investigative questioning rests on the same basis as the dog sniff. "Asking questions is an essential part of police investigations." *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty., 542 U. S. 177, 185, 124 S. Ct. 2451, 159 L. Ed. 2d 292 (2004)*. And the lower courts have routinely **[**26]** upheld such questioning during routine traffic stops. See, *e.g., United States v. Rivera, 570 F. 3d 1009, 1013 (CA8 2009)*; *United States v. Childs, 277 F. 3d 947, 953-954 (CA7 2002)*. The majority's reasoning appears to allow officers to engage in *some* questioning aimed at detecting evidence of ordinary criminal wrongdoing. *Ante,* at 5. But it is hard to see how such inquiries fall within the "seizure's 'mission' [of ] address[ing] the traffic violation that warranted the stop," or "attend[ing] to related safety concerns." *Ibid.* Its reasoning appears to come down to the principle that dogs are different.

## C

On a more fundamental level, the majority's inquiry elides the distinction between traffic stops based on probable cause and those based on reasonable suspicion. Probable cause is *the* "traditional justification" for the seizure of a person. *Whren, 517 U. S., at 817, 116 S. Ct. 1769, 135 L. Ed. 2d 89* (emphasis deleted); see also *Dunaway v. New York, 442 U. S. 200, 207-208, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979)*. This Court created an exception to that rule in *Terry v. Ohio, 392 U. S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)*, permitting "police officers who suspect criminal activity to make limited intrusions on an individual's personal security based on less than probable cause," *Michigan v. Summers, 452 U. S. 692, 698, 101 S. Ct. 2587, 69 L. Ed. 2d 340 (1981)*. Reasonable suspicion is the justification for such seizures. *Prado Navarette v. California, 572 U. S. ___, ___, 134 S. Ct. 1683, 188 L. Ed. 2d 680 (2014) (slip op., at 3*).

Traffic stops can be initiated based on probable cause or reasonable suspicion. Although the Court has commented that a routine traffic stop is "more analogous to a so-called '*Terry* **[**27]** stop' than to a formal arrest," it has rejected the notion "that a traffic stop supported by probable cause may not exceed the bounds set by the *Fourth Amendment* on the scope of a *Terry* stop." *Berkemer v. McCarty, 468 U. S. 420, 439, 104 S. Ct. 3138, 82 L. Ed. 2d 317, and n. 29 (1984)* (citation omitted).

 **[*506]** Although all traffic stops must be executed reasonably, our precedents make clear that traffic stops justified by reasonable suspicion are subject to additional limitations that those justified by

probable cause are not. A traffic stop based on reasonable suspicion, like all *Terry* stops, must be "justified at its inception" and "reasonably related in scope to the circumstances which justified the interference in the first place." *Hiibel, 542 U. S., at 185, 124 S. Ct. 2451, 159 L. Ed. 2d 292* (internal quotation marks omitted). It also "cannot continue for an excessive period of time or resemble a traditional arrest." *Id., at 185-186, 124 S. Ct. 2451, 159 L. Ed. 2d 292* (citation omitted). By contrast, a stop based on probable cause affords an officer considerably more leeway. In such seizures, an officer may engage in a warrantless arrest of the driver, *Atwater, 532 U. S., at 354, 121 S. Ct. 1536, 149 L. Ed. 2d 549*, a warrantless search incident to arrest of the driver, *Riley v. California, 573 U. S. ___, ___, 134 S. Ct. 2473, 189 L. Ed. 2d 430, 441 (2014)*, and a warrantless search incident to arrest of the vehicle if it is reasonable to believe evidence relevant to the crime of arrest might be found there, *Arizona v. Gant, 556 U. S. 332, 335, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009)*.

The majority casually tosses this **[**28]** distinction aside. It asserts that the traffic stop in this case, which was undisputedly initiated on the basis of probable cause, can last no longer than is in fact necessary to effectuate the mission of the stop. *Ante,* at 8. And, it assumes that the mission of the stop was merely to write a traffic ticket, rather than to consider making a custodial arrest. *Ante,* at 5. In support of that durational requirement, it relies primarily on cases involving *Terry* stops. See *ante,* at 5-7 (citing *Arizona v. Johnson, 555 U. S. 323, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009)* (analyzing "stop and frisk" of *passenger* in a vehicle temporarily seized for a traffic violation); *United States v. Sharpe, 470 U. S. 675, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985)* (analyzing seizure of individuals based on suspicion of marijuana trafficking); *Florida v. Royer, 460 U. S. 491, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983)* (plurality opinion) (analyzing seizure of man walking through airport on suspicion of narcotics activity)).

The *only* case involving a traffic stop based on probable cause that the majority cites for its rule is *Caballes*. But, that decision provides no support for today's restructuring of our *Fourth Amendment* jurisprudence. In *Caballes*, the Court made clear that, in the context of a traffic stop supported by probable cause, "a dog sniff would not change the character of a traffic stop that is lawful at its inception and otherwise executed **[**29]** in a reasonable manner." *543 U. S., at 408, 125 S. Ct. 834, 160 L. Ed. 2d 842*. To be sure, *the dissent* in *Caballes* would have "appl[ied] *Terry*'s reasonable-relation test . . . to determine whether the canine sniff impermissibly expanded the scope of the initially valid seizure of Caballes." *Id., at 420, 125 S. Ct. 834, 160 L. Ed. 2d 842* (GINSBURG, J., dissenting). But even it conceded that the *Caballes* majority had "implicitly [rejected] the application of *Terry* to a traffic stop converted, by calling in a dog, to a drug search." *Id., at 421, 125 S. Ct. 834, 160 L. Ed. 2d 842*.

By strictly limiting the tasks that define the durational scope of the traffic **[\*507]** stop, the majority accomplishes today what the *Caballes* dissent could not: strictly limiting the scope of an officer's activities during a traffic stop justified by probable cause. In doing so, it renders the difference between probable cause and reasonable suspicion virtually meaningless in this context. That shift is supported neither by the *Fourth Amendment* nor by our precedents interpreting it. And, it results in a constitutional framework that lacks predictability. Had Officer Struble arrested, handcuffed, and taken Rodriguez to the police station for his traffic violation, he would have complied with the *Fourth Amendment*. See *Atwater, supra, at 354-355, 121 S. Ct. 1536, 149 L. Ed. 2d 549*. But because he made Rodriguez wait for seven or eight extra **[**30]** minutes until a dog arrived, he evidently committed a constitutional violation. Such a view of the *Fourth Amendment* makes little sense.

III

Today's revision of our *Fourth Amendment* jurisprudence was also entirely unnecessary. Rodriguez suffered no *Fourth Amendment* violation here for an entirely independent reason: Officer Struble had reasonable suspicion to continue to hold him for investigative purposes. Our precedents make clear that the *Fourth Amendment* permits an officer to conduct an investigative traffic stop when that officer has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Prado Navarette, 572 U. S., at ___, 134 S. Ct. 1683, 188 L. Ed. 2d 680, 686, 691, 692*) (internal quotation marks omitted). Reasonable suspicion is determined by looking at "the whole picture," *ibid.*, taking into account "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act," *Ornelas v. United States, 517 U. S. 690, 695, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996)* (internal quotation marks omitted).

Officer Struble testified that he first became suspicious that Rodriguez was engaged in criminal activity for a number of reasons. When he approached the vehicle, he smelled an "overwhelming odor of air freshener coming from the vehicle," which is, in his experience, "a common attempt to conceal an odor that [people] don't **[\*\*31]** want . . . to be smelled by the police." App. 20-21. He also observed, upon approaching the front window on the passenger side of the vehicle, that Rodriguez's passenger, Scott Pollman, appeared nervous. Pollman pulled his hat down low, puffed nervously on a cigarette, and refused to make eye contact with him. The officer thought he was "more nervous than your typical passenger" who "do[esn't] have anything to worry about because [t]hey didn't commit a [traffic] violation." *Id.*, at 34.

Officer Struble's interactions with the vehicle's occupants only increased his suspicions. When he asked Rodriguez why he had driven onto the shoulder, Rodriguez claimed that he swerved to avoid a pothole. But that story could not be squared with Officer Struble's observation of the vehicle slowly driving off the road before being jerked back onto it. And when Officer Struble asked Pollman where they were coming from and where they were going, Pollman told him they were traveling from Omaha, Nebraska, back to Norfolk, Nebraska, after looking at a vehicle they were considering purchasing. Pollman told the officer that he had neither seen pictures of the vehicle nor confirmed title before the trip. As Officer Struble **[\*\*32]** **[\*508]** explained, it "seemed suspicious" to him "to drive . . . approximately two hours . . . late at night to see a vehicle sight unseen to possibly buy it," *id.,* at 26, and to go from Norfolk to Omaha to look at it because "[u]sually people leave Omaha to go get vehicles, not the other way around" due to higher Omaha taxes, *id.,* at 65.

These facts, taken together, easily meet our standard for reasonable suspicion. "[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion," *Illinois v. Wardlow, 528 U. S. 119, 124, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000),* and both vehicle occupants were engaged in such conduct. The officer also recognized heavy use of air freshener, which, in his experience, indicated the presence of contraband in the vehicle. "[C]ommonsense judgments and inferences about human behavior" further support the officer's conclusion that Pollman's story about their trip was likely a cover story for illegal activity. *Id., at 125, 120 S. Ct. 673, 145 L. Ed. 2d 570.* Taking into account all the relevant facts, Officer Struble possessed reasonable suspicion of criminal activity to conduct the dog sniff.

Rodriguez contends that reasonable suspicion cannot exist because each of the actions giving rise to the officer's suspicions could be entirely innocent, but our cases easily dispose of that argument. Acts

that, by themselves, **[**33]** might be innocent can, when taken together, give rise to reasonable suspicion. *United States v. Arvizu, 534 U. S. 266, 274-275, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002)*. *Terry* is a classic example, as it involved two individuals repeatedly walking back and forth, looking into a store window, and conferring with one another as well as with a third man. *392 U. S., at 6, 88 S. Ct. 1868, 20 L. Ed. 2d 889*. The Court reasoned that this "series of acts, each of them perhaps innocent in itself, . . . together warranted further investigation," *id., at 22, 88 S. Ct. 1868, 20 L. Ed. 2d 889*, and it has reiterated that analysis in a number of cases, see, *e.g., Arvizu, supra, at 277, 122 S. Ct. 744, 151 L. Ed. 2d 740*; *United States v. Sokolow, 490 U. S. 1, 9-10, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989)*. This one is no different.

* * *

I would conclude that the police did not violate the *Fourth Amendment* here. Officer Struble possessed probable cause to stop Rodriguez for driving on the shoulder, and he executed the subsequent stop in a reasonable manner. Our decision in *Caballes* requires no more. The majority's holding to the contrary is irreconcilable with *Caballes* and a number of other routine police practices, distorts the distinction between traffic stops justified by probable cause and those justified by reasonable suspicion, and abandons reasonableness as the touchstone of the *Fourth Amendment*. I respectfully dissent.

JUSTICE ALITO, dissenting.

This is an unnecessary, [1] impractical, and arbitrary decision. It addresses a purely **[*34]** hypothetical question: whether the traffic stop in this case *would be* unreasonable if the police officer, prior to leading a drug-sniffing dog around the exterior of petitioner's car, did not already have reasonable suspicion that the car contained drugs. In fact, however, the police officer *did have* reasonable suspicion, **[*509]** and, as a result, the officer was justified in detaining the occupants for the short period of time (seven or eight minutes) that is at issue.

The relevant facts are not in dispute. Officer Struble, who made the stop, was the only witness at the suppression hearing, and his testimony about what happened was not challenged. Defense counsel argued that the facts recounted by Officer Struble were insufficient to establish reasonable suspicion, but defense counsel did not dispute those facts or attack the officer's credibility. Similarly, the Magistrate Judge who conducted the hearing did not question the officer's credibility. And as JUSTICE THOMAS's opinion shows, the facts recounted by Officer Struble "easily meet our standard for reasonable suspicion." *Ante*, at 11 (dissenting opinion); see also, *e.g.*, *United States v. Carpenter, 462 F. 3d 981, 986-987 (CA8 2006)* (finding reasonable suspicion for **[**35]** a dog sniff based on implausible travel plans and nervous conduct); *United States v. Ludwig, 641 F. 3d 1243, 1248-1250 (CA10 2011)* (finding reasonable suspicion for a dog sniff where, among other things, the officer smelled "strong masking odors," the defendant's "account of his travel was suspect," and the defendant "was exceptionally nervous throughout his encounter").

Not only does the Court reach out to decide a question not really presented by the facts in this case, but the Court's answer to that question is arbitrary. The Court refuses to address the real *Fourth Amendment* question: whether the stop was unreasonably prolonged. Instead, the Court latches onto the

---

[1] See Brief in Opposition 11-14.

fact that Officer Struble delivered the warning prior to the dog sniff and proclaims that the authority to detain based on a traffic stop ends when a citation or warning is handed over to the driver. The Court thus holds that the *Fourth Amendment* was violated, not because of the length of the stop, but simply because of the sequence in which Officer Struble chose to perform his tasks.

This holding is not only arbitrary; it is perverse since Officer Struble chose that sequence for the purpose of protecting his own safety and possibly the safety of others. See App. 71-72. Without prolonging the stop, Officer Struble **[\*\*36]** could have conducted the dog sniff while one of the tasks that the Court regards as properly part of the traffic stop was still in progress, but that sequence would have entailed unnecessary risk. At approximately 12:19 a.m., after collecting Pollman's driver's license, Officer Struble did two things. He called in the information needed to do a records check on Pollman (a step that the Court recognizes was properly part of the traffic stop), and he requested that another officer report to the scene. Officer Struble had decided to perform a dog sniff but did not want to do that without another officer present. When occupants of a vehicle who know that their vehicle contains a large amount of illegal drugs see that a drug-sniffing dog has alerted for the presence of drugs, they will almost certainly realize that the police will then proceed to search the vehicle, discover the drugs, and make arrests. Thus, it is reasonable for an officer to believe that an alert will increase the risk that the occupants of the vehicle will attempt to flee or perhaps even attack the officer. See, *e.g., United States v. Dawdy, 46 F. 3d 1427, 1429 (CA8 1995)* (recounting scuffle between officer and defendant after drugs were discovered).

**[\*510]** In this case, Officer **[\*\*37]** Struble was concerned that he was outnumbered at the scene, and he therefore called for backup and waited for the arrival of another officer before conducting the sniff. As a result, the sniff was not completed until seven or eight minutes after he delivered the warning. But Officer Struble could have proceeded with the dog sniff while he was waiting for the results of the records check on Pollman and before the arrival of the second officer. The drug-sniffing dog was present in Officer Struble's car. If he had chosen that riskier sequence of events, the dog sniff would have been completed before the point in time when, according to the Court's analysis, the authority to detain for the traffic stop ended. Thus, an action that would have been lawful had the officer made the *unreasonable* decision to risk his life became unlawful when the officer made the *reasonable* decision to wait a few minutes for backup. Officer Struble's error—apparently—was following prudent procedures motivated by legitimate safety concerns. The Court's holding therefore makes no practical sense. And nothing in the *Fourth Amendment*, which speaks of *reasonableness*, compels this arbitrary line.

The rule that the Court adopts will **[\*\*38]** do little good going forward. [2] It is unlikely to have any appreciable effect on the length of future traffic stops. Most officers will learn the prescribed sequence of events even if they cannot fathom the reason for that requirement. (I would love to be the proverbial fly on the wall when police instructors teach this rule to officers who make traffic stops.)

---

[2]  It is important to note that the Court's decision does not affect procedures routinely carried out during traffic stops, including "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Ante,* at 6. And the Court reaffirms that police "may conduct certain unrelated checks during an otherwise lawful traffic stop." *Ibid.* Thus, it remains true that police may ask questions aimed at uncovering other criminal conduct and may order occupants out of their car during a valid stop. See *Arizona v. Johnson, 555 U. S. 323, 333, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009)*; *Maryland v. Wilson, 519 U. S. 408, 414-415, 117 S. Ct. 882, 137 L. Ed. 2d 41 (1997)*; *Pennsylvania v. Mimms, 434 U. S. 106, 111, 98 S. Ct. 330, 54 L. Ed. 2d 331 (1977)* (*per curiam*).

For these reasons and those set out in JUSTICE THOMAS's opinion, I respectfully dissent.

# [Ohio v. Robinette](#)

Supreme Court of the United States

October 8, 1996, Argued ; November 18, 1996, Decided

No. 95-891.

**Reporter**

519 U.S. 33; 117 S. Ct. 417; 136 L. Ed. 2d 347; 1996 U.S. LEXIS 6971; 65 U.S.L.W. 4013; 148 A.L.R. Fed. 739; 96 Cal. Daily Op. Service 8278; 96 Daily Journal DAR 13761; 10 Fla. L. Weekly Fed. S 200

OHIO, PETITIONER v. ROBERT D. ROBINETTE

**Prior History:**  ON WRIT OF CERTIORARI TO THE SUPREME COURT OF OHIO.
_[State v. Robinette, 73 Ohio St. 3d 650, 1995 Ohio 162, 653 N.E.2d 695, 1995 Ohio LEXIS 1872 (1995)](#)_

**Disposition:** _[73 Ohio St. 3d 650, 653 N. E. 2d 695](#)_, reversed.

## Case Summary

**Procedural Posture**

A writ of certiorari was granted to the Supreme Court of Ohio upon the question of whether the _[Fourth Amendment](#)_ required that a lawfully seized defendant must be advised that he was "free to go" before his consent to search would be recognized as voluntary.

**Overview**

Police stopped defendant for speeding, and defendant was issued a verbal warning. The officer then asked whether defendant was carrying illegal contraband, to which defendant answered "no." Subsequently, defendant consented to a search of the car, and drugs were discovered. Defendant was charged with knowing possession of drugs. The state supreme court held that any attempt by the police at casual interrogation had to be proceeded by the phrase "At this time you are legally free to go." Initially, the United States Supreme Court decided that it had jurisdiction to review the state court decision because the opinion clearly relied on federal law. The Court held that the officer was objectively justified in asking defendant to get out of the car, subjective thoughts notwithstanding. The Court found that the touchstone inquiry was reasonableness measured in objective terms by examining the totality of the circumstances. The Court concluded that it would be unrealistic to require police officers to always inform detainees that they were free to go before consent to a search could be deemed voluntary. Voluntariness was a fact question to be determined from all the circumstances.

**Outcome**

The Court reversed the judgment of the state supreme court and remanded the cause for further proceedings.

## Syllabus

After an Ohio deputy sheriff stopped respondent Robinette for speeding, gave him a verbal warning, and returned his driver's license, the deputy asked whether he was carrying illegal contraband,

weapons, or drugs in his car. Robinette answered "no" and consented to a search of the car, which revealed a small amount of marijuana and a pill. He was arrested and later charged with knowing possession of a controlled substance when the pill turned out to be methylenedioxy-methamphetamine. Following denial of his pretrial suppression motion, he was found guilty, but the Ohio Court of Appeals reversed on the ground that the search resulted from an unlawful detention. The State Supreme Court affirmed, establishing as a bright-line prerequisite for consensual interrogation under these circumstances the requirement that an officer clearly state when a citizen validly detained for a traffic offense is "legally free to go."

*Held:*

1. This Court has jurisdiction to review the Ohio Supreme Court's decision. The contention that jurisdiction is lacking because the Ohio decision rested in part upon the State Constitution is rejected under *Michigan v. Long, 463 U.S. 1032, 1040-1041, 77 L. Ed. 2d 1201, 103 S. Ct. 3469*. Although the opinion below mentions the Ohio Constitution in passing, it clearly relies on federal law, discussing and citing federal cases almost exclusively. It is not dispositive that those citations appear only in the opinion and not in the official syllabus. Under *Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562, 566, 53 L. Ed. 2d 965, 97 S. Ct. 2849*, it is permissible to turn to an Ohio opinion's body when the syllabus speaks only in general terms of "the federal and Ohio Constitutions." Nor is the Court's jurisdiction defeated by the additional holding below that continuing detention of a person stopped for a traffic violation constitutes an illegal seizure when the officer's motivation for continuing is not related to the purpose of the original, constitutional stop and there are no articulable facts giving rise to a suspicion of some separate illegal activity. Under *Whren v. United States, 517 U.S. 806, 813, 135 L. Ed. 2d 89, 116 S. Ct. 1769*, the officer's subjective intentions do not make continued detention illegal, so long as the detention is justified by the circumstances viewed objectively. Pp. 36-39.

2. The *Fourth Amendment* does not require that a lawfully seized defendant be advised that he is "free to go" before his consent to search will be recognized as voluntary. The Amendment's touchstone is reasonableness, which is measured in objective terms by examining the totality of the circumstances. In applying this test, the Court has consistently eschewed bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry. Indeed, in rejecting a *per se* rule very similar to one adopted below, this Court has held that the voluntariness of a consent to search is a question of fact to be determined from all the circumstances. *Schneckloth v. Bustamonte, 412 U.S. 218, 248-249, 36 L. Ed. 2d 854, 93 S. Ct. 2041*. The Ohio Supreme Court erred in holding otherwise. It would be unrealistic to require the police to always inform detainees that they are free to go before a consent to search may be deemed voluntary. Cf. *412 U.S. at 231*. Pp. 39-40.

**Counsel:** Carley J. Ingram argued the cause for petitioner. With her on the briefs was Mathias H. Heck, Jr.

Irving L. Gornstein argued the cause for the United States as amicus curiae urging reversal. On the brief were Solicitor General Days, Acting Assistant Attorney General Keeney, Deputy Solicitor General Dreeben, Paul A. Engelmayer, and Joseph C. Wyderko.

James D. Ruppert argued the cause and filed a brief for respondent. *

**Judges:** REHNQUIST, C. J., delivered the opinion of the Court, in which O'CONNOR, SCALIA, KENNEDY, SOUTER, THOMAS, and BREYER, JJ., joined. GINSBURG, J., filed an opinion concurring in the judgment, post, p. 40. STEVENS, J., filed a dissenting opinion, post, p. 45.

**Opinion by:** REHNQUIST

# Opinion

 [*35]  CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

[1A] [**419]  [***352]  [*36] We are here presented with the question whether the _Fourth Amendment_ requires that a lawfully seized defendant must be advised that he is "free to go" before his consent to search will be recognized as voluntary. We hold that it does not.

This case arose on a stretch of Interstate 70 north of Dayton, Ohio, where the posted speed limit was 45 miles per hour because of construction. Respondent Robert D. Robinette was clocked at 69 miles per hour as he drove his car along this stretch of road, and was stopped by Deputy Roger Newsome of the Montgomery County Sheriff's office. Newsome asked for and was handed Robinette's driver's license, and he ran a computer check which indicated that Robinette had no previous violations. Newsome then asked Robinette to step out of his car, turned on his mounted video camera, issued a verbal warning to Robinette, and returned his license.

At this point, Newsome asked, "One question before you get gone: Are you carrying any illegal contraband in your car? Any weapons of any kind, drugs, anything like that?" App. to Brief for Respondent 2 (internal quotation marks omitted). Robinette answered "no" to these questions, after which Deputy Newsome asked if he could search the car. Robinette consented. In the car, Deputy Newsome discovered a small amount of marijuana and, in a film container, a pill which was later determined to be methylenedioxymethamphetamine (MDMA). Robinette was then arrested and charged with knowing possession of a controlled substance, MDMA, in violation of _Ohio Rev. Code Ann. § 2925.11(A)_ (1993).

---

\* Briefs of *amici curiae* urging reversal were filed for the State of Alabama et al. by *Betty D. Montgomery*, Attorney General of Ohio, *Jeffrey S. Sutton*, State Solicitor, and *Simon B. Karas*, and by the Attorneys General for their respective States as follows: *Jeff Sessions* of Alabama, *Daniel E. Lungren* of California, *Gale A. Norton* of Colorado, *M. Jane Brady* of Delaware, *Robert Butterworth* of Florida, *Margery S. Bronster* of Hawaii, *Alan G. Lance* of Idaho, *Jim Ryan* of Illinois, *Carla J. Stovall* of Kansas, *A. B. Chandler III* of Kentucky, *Richard P. Ieyoub* of Louisiana, *Andrew Ketterer* of Maine, *J. Joseph Curran, Jr.*, of Maryland, *Scott Harshbarger* of Massachusetts, *Frank J. Kelley* of Michigan, *Hubert H. Humphrey III* of Minnesota, *Mike Moore* of Mississippi, *Jospeh P. Mazurek* of Montana, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *Jeffrey R. Howard* of New Hampshire, *Deborah T. Poritz* of New Jersey, *Dennis C. Vacco* of New York, *Michael F. Easley* of North Carolina, *W. A. Drew Edmondson* of Oklahoma, *Theodore Kulongoski* of Oregon, *Thomas W. Corbett, Jr.*, of Pennsylvania, *Jeffrey B. Pine* of Rhode Island, *Mark Bennett* of South Dakota, *Charles W. Bursen* of Tennessee, *Dan Morales* of Texas, *Jeffrey L. Amestoy* of Vermont, *James S. Gilmore III* of Virginia, *Darrell V. McGraw, Jr.*, of West Virginia, *James E. Doyle* of Wisconsin, and *William U. Hill* of Wyoming; and for Americans for Effective Law Enforcement, Inc., by *Fred E. Inbau, Wayne W. Schmidt, James P. Manak*, and *Bernard J. Farber*.

*Tracey Maclin, Steven R. Shapiro*, and *Jeffrey M. Gamso* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging affirmance.

Briefs of *amicus curiae* were filed for the National Association of Criminal Defense Lawyers by *Sheryl Gordon McCloud;* and for the Ohio Association of Criminal Defense Lawyers by *W. Andrew Hasselbach*.

Before trial, Robinette unsuccessfully sought to suppress this evidence. He then pleaded ″no contest,″ and was found guilty. On appeal, the Ohio Court of Appeals reversed, ruling that the search resulted from an unlawful detention. The Supreme Court of Ohio, by a divided vote, affirmed. *73 Ohio St. 3d 650, 653 N.E.2d 695 (1995)*. In its opinion, that court established a bright-line prerequisite for consensual interrogation under these circumstances:

> [***353] ″The right, guaranteed by the federal and Ohio Constitutions, to be secure in one's person and property requires that citizens stopped for traffic offenses be clearly informed by the detaining officer when they [**420] are free to go after a valid detention, before an officer attempts to engage in a consensual interrogation. Any attempt at consensual interrogation must be preceded by the phrase 'At this time you legally are free to go' or by words of similar import.″ *73 Ohio St. 3d at 650-651, 653 N.E.2d at 696*.

We granted certiorari, *516 U.S. 1157 (1996)*, to review this *per se* rule, and we now reverse.

[2A] [3]We must first consider whether we have jurisdiction to review the Ohio Supreme Court's decision. Respondent contends that we lack such jurisdiction because the Ohio decision rested upon the Ohio Constitution, in addition to the [*37] Federal Constitution. Under *Michigan v. Long, 463 U.S. 1032, 77 L. Ed. 2d 1201, 103 S. Ct. 3469 (1983)*, when ″a state court decision fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion, we will accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it to do so.″ [*] *463 U.S. at 1040-1041*. Although the opinion below mentions *Art. I, § 14, of the Ohio Constitution* in passing (a section which reads identically to the *Fourth Amendment*), the opinion clearly relies on federal law nevertheless. Indeed, the only cases it discusses or even cites are federal cases, except for one state case which itself applies the Federal Constitution.

[2B] [4]Our jurisdiction is not defeated by the fact that these citations appear in the body of the opinion, while, under Ohio law, ″[the] Supreme Court speaks as a court only through the syllabi of its cases.″ See *Ohio v. Gallagher, 425 U.S. 257, 259, 47 L. Ed. 2d 722, 96 S. Ct. 1438 (1976)*. When the syllabus, as here, speaks only in general terms of ″the federal and Ohio Constitutions,″ it is permissible for us to turn to the body of the opinion to discern the grounds for decision. *Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562, 566, 53 L. Ed. 2d 965, 97 S. Ct. 2849 (1977)*.

[5]Respondent Robinette also contends that we may not reach the question presented in the petition because the Supreme Court of Ohio also held, as set out in the syllabus paragraph (1):

> ″When the motivation behind a police officer's continued detention of a person stopped for a traffic violation is not related to the purpose of the original, constitutional stop, and when that continued detention is not based on any articulable facts giving rise to a suspicion of some [*38] separate illegal activity justifying an extension of the detention, the continued detention constitutes an illegal seizure.″ *73 Ohio St. 3d at 650, 653 N.E.2d at 696*.

---

[*]    Respondent and his *amici* ask us to take this opportunity to depart from *Michigan* v. *Long*. We are no more persuaded by this argument now than we were two Terms ago, see *Arizona* v. *Evans*, 514 U.S. 1, 131 L. Ed. 2d 34, 115 S. Ct. 1185 (1995), and we again reaffirm the *Long* presumption.

In reliance on this ground, the Supreme Court of Ohio held that when **[***354]** Newsome returned to Robinette's car and asked him to get out of the car, after he had determined in his own mind not to give Robinette a ticket, the detention then became unlawful.

Respondent failed to make any such argument in his brief in opposition to certiorari. See this Court's Rule 15.2. We believe the issue as to the continuing legality of the detention is a "predicate to an intelligent resolution" of the question presented, and therefore "fairly included therein." This Court's *Rule 14.1(a)*; *Vance v. Terrazas, 444 U.S. 252, 258-259, n. 5, 62 L. Ed. 2d 461, 100 S. Ct. 540 (1980)*. The parties have briefed this issue, and we proceed to decide it.

[6] [7]We think that under our recent decision in *Whren v. United States, 517 U.S. 806, 135 L. Ed. 2d 89, 116 S. Ct. 1769 (1996)* (decided after the Supreme Court of Ohio decided the present case), the subjective intentions of the officer did not make the continued detention of respondent illegal under the *Fourth Amendment*. As we made clear in *Whren*, "'the fact that [an] officer does not have the state of mind which is hypothecated by the reasons which provide the legal **[**421]** justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.' . . . Subjective intentions play no role in ordinary, probable cause *Fourth Amendment* analysis." *517 U.S. at 813* (quoting *Scott v. United States, 436 U.S. 128, 138, 56 L. Ed. 2d 168, 98 S. Ct. 1717 (1978))*. And there is no question that, in light of the admitted probable cause to stop Robinette for speeding, Deputy Newsome was objectively justified in asking Robinette to get out of the car, subjective thoughts notwithstanding. See *Pennsylvania v. Mimms, 434 U.S. 106, 111, n. 6, 54 L. Ed. 2d 331, 98 S. Ct. 330 (1977)* ("We hold . . . that once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out **[*39]** of the vehicle without violating the *Fourth Amendment's* proscription of unreasonable searches and seizures").

[8]We now turn to the merits of the question presented. We have long held that the "touchstone of the *Fourth Amendment* is reasonableness." *Florida v. Jimeno, 500 U.S. 248, 250, 114 L. Ed. 2d 297, 111 S. Ct. 1801 (1991)*. Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances.

In applying this test we have consistently eschewed bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry. Thus, in *Florida v. Royer, 460 U.S. 491, 75 L. Ed. 2d 229, 103 S. Ct. 1319 (1983)*, we expressly disavowed any "litmuspaper test" or single "sentence or . . . paragraph . . . rule," in recognition of the "endless variations in the facts and circumstances" implicating the *Fourth Amendment*. *460 U.S. at 506*. Then, in *Michigan v. Chesternut, 486 U.S. 567, 100 L. Ed. 2d 565, 108 S. Ct. 1975 (1988)*, when both parties urged "bright-line rule[s] applicable to all investigatory pursuits," we rejected both proposed rules as contrary to our "traditional contextual approach." *486 U.S. at 572-573*. And again, in *Florida v. Bostick, 501 U.S. 429, 115 L. Ed. 2d 389, 111 S. Ct. 2382 (1991)*, when the Florida Supreme Court adopted a *per se* rule that questioning aboard a bus always constitutes a seizure, we reversed, reiterating that the proper inquiry necessitates a consideration of "all the circumstances surrounding **[***355]** the encounter." *Id., at 439*.

[1B]We have previously rejected a *per se* rule very similar to that adopted by the Supreme Court of Ohio in determining the validity of a consent to search. In *Schneckloth v. Bustamonte, 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973)*, it was argued that such a consent could not be valid unless the defendant knew that he had a right to refuse the request. We rejected this argument: "While

knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent." *Id., at 227*. And just as it "would be thoroughly impractical to impose on the normal consent search the detailed requirements of an effective warning," *id., at 231*, so too would it be **[*40]** unrealistic to require police officers to always inform detainees that they are free to go before a consent to search may be deemed voluntary.

The *Fourth Amendment* test for a valid consent to search is that the consent be voluntary, and "voluntariness is a question of fact to be determined from all the circumstances," *500 U.S. at 248-249*. The Supreme Court of Ohio having held otherwise, its judgment is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

**Concur by:** GINSBURG

## Concur

JUSTICE GINSBURG, concurring in the judgment.

Robert Robinette's traffic stop for a speeding violation on an interstate highway in Ohio served as prelude to a search of his automobile for illegal drugs. Robinette's experience was not uncommon in Ohio. As the Ohio Supreme Court related, the sheriff's deputy who detained Robinette for speeding and then asked Robinette for permission to search his vehicle "was on drug interdiction patrol at the time." *73 Ohio St. 3d 650, 651,* **[**422]** *653 N.E.2d 695, 696 (1995)*. The deputy testified in Robinette's case that he routinely requested permission to search automobiles he stopped for traffic violations. *Ibid.* According to the deputy's testimony in another prosecution, he requested consent to search in 786 traffic stops in 1992, the year of Robinette's arrest. *State v. Retherford, 93 Ohio App. 3d 586, 594, n. 3, 639 N.E.2d 498, 503, n. 3*, dism'd, *69 Ohio St. 3d 1488, 635 N.E.2d 43 (1994)*.

From their unique vantage point, Ohio's courts observed that traffic stops in the State were regularly giving way to contraband searches, characterized as consensual, even when officers had no reason to suspect illegal activity. One Ohio appellate court noted: "Hundreds, and perhaps thousands of Ohio citizens are being routinely delayed in their travels and asked to relinquish to uniformed police officers their **[*41]** right to privacy in their automobiles and luggage, sometimes for no better reason than to provide an officer the opportunity to 'practice' his drug interdiction technique." *93 Ohio App. 3d at 594, 639 N.E.2d at 503* (footnote omitted).

Against this background, the Ohio Supreme Court determined, and announced in Robinette's case, that the federal and state constitutional rights of Ohio citizens to be secure in **[***356]** their persons and property called for the protection of a clear-cut instruction to the State's police officers: An officer wishing to engage in consensual interrogation of a motorist at the conclusion of a traffic stop must first tell the motorist that he or she is free to go. The Ohio Supreme Court described the need for its first-tell-then-ask rule this way:

> "The transition between detention and a consensual exchange can be so seamless that the untrained eye may not notice that it has occurred. . . .

. . . .

″Most people believe that they are validly in a police officer's custody as long as the officer continues to interrogate them. The police officer retains the upper hand and the accouterments of authority. That the officer lacks legal license to continue to detain them is unknown to most citizens, and a reasonable person would not feel free to walk away as the officer continues to address him.

. . . .

″While the legality of consensual encounters between police and citizens should be preserved, we do not believe that this legality should be used by police officers to turn a routine traffic stop into a fishing expedition for unrelated criminal activity. The *Fourth Amendment to the federal Constitution* and *Section 14, Article I of the Ohio Constitution* exist to protect citizens against such an unreasonable interference with their liberty.″ *73 Ohio St. 3d at 654-655, 653 N.E.2d at 698-699*.

 **[*42]** Today's opinion reversing the decision of the Ohio Supreme Court does not pass judgment on the wisdom of the first-tell-then-ask rule. This Court's opinion simply clarifies that the Ohio Supreme Court's instruction to police officers in Ohio is not, under this Court's controlling jurisprudence, the command of the Federal Constitution. See *ante*, at 39-40. The Ohio Supreme Court invoked both the Federal Constitution and the Ohio Constitution without clearly indicating whether state law, standing alone, independently justified the court's rule. The ambiguity in the Ohio Supreme Court's decision renders this Court's exercise of jurisdiction proper under *Michigan v. Long, 463 U.S. 1032, 1040-1042, 77 L. Ed. 2d 1201, 103 S. Ct. 3469 (1983)*, and this Court's decision on the merits is consistent with the Court's ″totality of the circumstances″ *Fourth Amendment* precedents, see *ante*, at 39. I therefore concur in the Court's judgment.

I write separately, however, because it seems to me improbable that the Ohio Supreme Court understood its first-tell-then-ask rule to be the Federal Constitution's mandate for the Nation as a whole. ″[A] State is free *as a matter of its own law* to impose greater restrictions on police activity than those this Court holds to be necessary upon federal constitutional standards.″ *Oregon v. Hass, 420 U.S. 714, 719,* **[**423]** *43 L. Ed. 2d 570, 95 S. Ct. 1215 (1975)*. [*] But ordinarily, when a state high court grounds a rule of criminal procedure in the Federal Constitution, the **[*43]** court thereby signals its view that the Nation's Constitution **[***357]** would require the rule in all 50 States. Given this Court's decisions in consent-to-search cases such as *Schneckloth v. Bustamonte, 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973)*, and *Florida v. Bostick, 501 U.S. 429, 115 L. Ed. 2d 389, 111 S. Ct. 2382 (1991)*, however, I suspect that the Ohio Supreme Court may not have homed in on the implication ordinarily to be drawn from a state court's reliance on the Federal Constitution. In other words, I question whether the Ohio court thought of the strict rule it announced as a rule for the governance of police conduct not only in Miami County, Ohio, but also in Miami, Florida.

The first-tell-then-ask rule seems to be a prophylactic measure not so much extracted from the text of any constitutional provision as crafted by the Ohio Supreme Court to reduce the number of violations

---

[*]   Formerly, the Ohio Supreme Court was ″reluctant to use the Ohio Constitution to extend greater protection to the rights and civil liberties of Ohio citizens″ and had usually not taken advantage of opportunities to ″use the Ohio Constitution as an independent source of constitutional rights.″ *Arnold* v. *Cleveland*, 67 Ohio St. 3d 35, 42, n. 8, 616 N.E.2d 163, 168, n. 8 (1993). Recently, however, the state high court declared: ″The Ohio Constitution is a document of independent force. . . . As long as state courts provide at least as much protection as the United States Supreme Court has provided in its interpretation of the federal ***Bill of Rights***, state courts are unrestricted in according greater civil liberties and protections to individuals and groups.″ *Id., at 35, 616 N.E.2d at 164* (syllabus).

of textually guaranteed rights. In *Miranda v. Arizona, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966)*, this Court announced a similarly motivated rule as a minimal national requirement without suggesting that the text of the Federal Constitution required the precise measures the Court's opinion set forth. See *id., at 467* ("The Constitution [does not] necessarily requir[e] adherence to any particular solution" to the problems associated with custodial interrogations.); see also *Oregon v. Elstad, 470 U.S. 298, 306, 84 L. Ed. 2d 222, 105 S. Ct. 1285 (1985)* ("The *Miranda* exclusionary rule . . . sweeps more broadly than the *Fifth Amendment* itself."). Although all parts of the United States fall within this Court's domain, the Ohio Supreme Court is not similarly situated. That court can declare prophylactic rules governing the conduct of officials in Ohio, but it cannot command the police forces of sister States. The very ease with which the Court today disposes of the federal leg of the Ohio Supreme Court's decision strengthens my impression that the Ohio Supreme Court saw its rule as a measure made for Ohio, designed to reinforce in that State the right of the people to be secure against unreasonable searches and seizures.

 **[*44]** The Ohio Supreme Court's syllabus and opinion, however, were ambiguous. Under *Long*, the existence of ambiguity regarding the federal- or state-law basis of a state-court decision will trigger this Court's jurisdiction. *Long* governs even when, all things considered, the more plausible reading of the state court's decision may be that the state court did not regard the Federal Constitution alone as a sufficient basis for its ruling. Compare *Arizona v. Evans, 514 U.S. 1, 7-9, 131 L. Ed. 2d 34, 115 S. Ct. 1185 (1995)*, with *id., at 31-33* (GINSBURG, J., dissenting).

It is incumbent on a state court, therefore, when it determines that its State's laws call for protection more complete than the Federal Constitution demands, to be clear about its ultimate reliance on state law. Similarly, a state court announcing a new legal rule arguably derived from both federal and state law can definitively render state law an adequate and independent ground for its decision by a simple declaration to that effect. A recent Montana Supreme **[***358]** Court opinion on the scope of an individual's privilege against self-incrimination includes such a declaration:

> "While we have devoted considerable time to a lengthy discussion of the application of the *Fifth Amendment to the United States Constitution*, it is to be noted that this holding is also based separately and independently on [the defendant's] right to remain silent pursuant to *Article II, Section **[**424]** 25 of the Montana Constitution*." *State v. Fuller, 276 Mont. 155, 167, 915 P.2d 809, 816*, cert. denied, *post*, p. 930.

An explanation of this order meets the Court's instruction in *Long* that "if the state court decision indicates clearly and expressly that it is alternatively based on bona fide separate, adequate, and independent grounds, [this Court] will not undertake to review the decision." *463 U.S. at 1041*.

On remand, the Ohio Supreme Court may choose to clarify that its instructions to law enforcement officers in Ohio find **[*45]** adequate and independent support in state law, and that in issuing these instructions, the court endeavored to state dispositively only the law applicable in Ohio. See *Evans, 514 U.S. at 30-34* (GINSBURG, J., dissenting). To avoid misunderstanding, the Ohio Supreme Court must itself speak with the clarity it sought to require of its State's police officers. The efficacy of its endeavor to safeguard the liberties of Ohioans without disarming the State's police can then be tested in the precise way Our Federalism was designed to work. See, *e. g.*, Kaye, State Courts at the Dawn of a New Century: Common Law Courts Reading Statutes and Constitutions, *70 N. Y. U. L. Rev. 1,*

*11-18 (1995)*; Linde, First Things First: Rediscovering the States' Bills of Rights, 9 U. Balt. L. Rev. 379, 392-396 (1980).

**Dissent by:** STEVENS

## Dissent

JUSTICE STEVENS, dissenting.

The Court's holding today is narrow: The Federal Constitution does not require that a lawfully seized person be advised that he is "free to go" before his consent to search will be recognized as voluntary. I agree with that holding. Given the Court's reading of the opinion of the Supreme Court of Ohio, I also agree that it is appropriate for the Court to limit its review to answering the sole question presented in the State's certiorari petition. [1] As I read the state-court opinion, however, the prophylactic rule announced in the second syllabus was intended as a guide to the decision of future cases rather than an explanation of the decision in this case. I would therefore affirm the judgment of the Supreme Court of Ohio because it correctly held that respondent's consent to the search of his vehicle was the product of an unlawful detention. Moreover, it is important **[*46]** to emphasize that nothing in the Federal Constitution--or in this Court's opinion--prevents a State from requiring its law enforcement officers to give detained motorists the advice mandated by the Ohio court.

**[***359]** I

The relevant facts are undisputed. [2] Officer Newsome stopped respondent because he was speeding. Neither at the time of the stop nor at any later time prior to the search of respondent's vehicle did the officer have any basis for believing that there were drugs in the car. After ordering respondent to get out of his car, issuing a warning, and returning his driver's license, Newsome took no further action related to the speeding violation. He did, however, state: "One question before you get gone: are you carrying any illegal contraband in your car? Any weapons of any kind, drugs, anything like that?" Thereafter, he obtained respondent's consent to search the car.

These facts give rise to two questions of law: whether respondent was still being detained when the "one question" was asked, and, if so, whether that detention was unlawful. In my opinion the Ohio Appellate Court and the Ohio Supreme Court correctly answered both of those questions.

The Ohio Supreme Court correctly relied upon *United States v. Mendenhall, 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870 (1980),* [3] which stated that "a person has been 'seized' within the meaning of the *Fourth Amendment* **[**425]** . . . if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id., at 554* (opinion of Stewart, J.); see *Michigan v. Chesternut, 486 U.S. 567, 573, 100 L. Ed. 2d 565, 108 S. Ct. 1975 (1988)* (noting that "the Court has since embraced this test"). See also *Florida v. Bostick, 501 U.S. 429, 435-436, 115*

---

[1]   "Whether the ***Fourth Amendment to the United States Constitution*** requires police officers to inform motorists, lawfully stopped for traffic violations, that the legal detention has concluded before any subsequent interrogation or search will be found to be consensual?" Pet. for Cert. i.

[2]   This is in part because crucial portions of the exchange were videotaped; this recording is a part of the record.

[3]   See *73 Ohio St. 3d 650, 654, 653 N.E.2d 695, 698 (1995)*.

*L. Ed. 2d 389, 111 S. Ct. 2382 (1991)* (applying variant of this approach). The Ohio Court **[*47]** of Appeals applied a similar analysis. See App. to Pet. for Cert. 17-18.

Several circumstances support the Ohio courts' conclusion that a reasonable motorist in respondent's shoes would have believed that he had an obligation to answer the "one question" and that he could not simply walk away from the officer, get back in his car, and drive away. The question itself sought an answer "*before* you get gone." In addition, the facts that respondent had been detained, had received no advice that he was free to leave, and was then standing in front of a television camera in response to an official command are all inconsistent with an assumption that he could reasonably believe that he had no duty to respond. The Ohio Supreme Court was surely correct in stating: "Most people believe that they are validly in a police officer's custody as long as the officer continues to interrogate them. The police officer retains the upper hand and the accouterments of authority. That the officer lacks legal license to continue to detain them is unknown to most citizens, and a reasonable person would not feel free to walk away as the officer continues to address him." *73 Ohio St. 3d at 655, 653 N.E.2d at 698*. [4]

Moreover, as an objective matter it **[***360]** is fair to presume that most drivers who have been stopped for speeding are in a hurry to get to their destinations; such drivers have no interest in prolonging the delay occasioned by the stop just to engage in idle conversation with an officer, much less to allow **[*48]** a potentially lengthy search. [5] I also assume that motorists--even those who are not carrying contraband--have an interest in preserving the privacy of their vehicles and possessions from the prying eyes of a curious stranger. The fact that this particular officer successfully used a similar method of obtaining consent to search roughly 786 times in one year, *State v. Retherford, 93 Ohio App. 3d 586, 591-592, 639 N.E.2d 498, 502*, dism'd, *69 Ohio St. 3d 1488, 635 N.E.2d 43 (1994)*, indicates that motorists generally respond in a manner that is contrary to their self-interest. Repeated decisions by ordinary citizens to surrender that interest cannot satisfactorily be explained on any hypothesis other than an assumption that they believed they had a legal duty to do so.

The Ohio Supreme Court was therefore entirely correct to presume in the first syllabus preceding its opinion that a "continued detention" was at issue here. *73 Ohio St. 3d* **[**426]** *at 650, 653 N.E.2d at*

---

[4]    A learned commentator has expressed agreement on this point. See 4 W. LaFave, Search and Seizure § 9.3(a), p. 112 (3d ed. 1996 and Supp. 1997) ("Given the fact that [defendant] quite clearly had been seized when his car was pulled over, the return of the credentials hardly manifests a change in status when it was immediately followed by interrogation concerning other criminal activity"); see also *ibid.* (approving of Ohio Supreme Court's analysis in this case). We have indicated as much ourselves in the past. See *Berkemer* v. *McCarty, 468 U.S. 420, 436, 82 L. Ed. 2d 317, 104 S. Ct. 3138 (1984)* ("Certainly few motorists would feel free either to disobey a directive to pull over or to leave the scene of a traffic stop without being told they might do so").

[5]    Though this search does not appear to have been particularly intrusive, that may not always be so. See Brief for American Civil Liberties Union et al. as *Amici Curiae* 28-29. Indeed, our holding in *Florida* v. *Jimeno, 500 U.S. 248, 114 L. Ed. 2d 297, 111 S. Ct. 1801 (1991)*, allowing police to open closed containers in the context of an automobile consent search where the "consent would reasonably be understood to extend to a particular container," *id., at 252*, ensures that many motorists will wind up "consenting" to a far broader search than they might have imagined. See *500 U.S. at 254-255* ("only objection that the police could have to" a rule requiring police to seek consent to search containers as well as the automobile itself "is that it would prevent them from exploiting the ignorance of a citizen who simply did not anticipate that his consent to search the car would be understood to authorize the police to rummage through his packages") (Marshall, J., dissenting).

696. [6] The Ohio Court of Appeals reached a similar conclusion. In response to the State's contention [*49] that Robinette "was free to go" at the time consent was sought, that court held--after reviewing the record--that "a reasonable person in Robinette's position would not believe that the investigative stop had been concluded, and that he or she was free to go, so long as the police officer was continuing to ask investigative questions." App. to Pet. for Cert. 17-18. As I read the Ohio opinions, these determinations were independent of the bright-line rule criticized by the majority. [7] I see no reason to disturb them.

In the first syllabus, the Ohio Supreme [***361] Court also answered the question whether the officer's continued detention of respondent was lawful or unlawful. See *ante*, at 37-38. Although there is a possible ambiguity in the use of the word "motivation" in the Ohio Supreme Court's explanation of why the traffic officer's continued detention of respondent was an illegal seizure, the first syllabus otherwise was a correct statement of the relevant federal rule as well as the relevant Ohio rule. As this Court points out in its opinion, as a matter of federal law the subjective motivation of the officer does not determine the legality of a detention. Because I assume that the learned judges sitting on the Ohio Supreme Court were well aware of this proposition, we should construe the syllabus generously by replacing the ambiguous term "motivation behind" with the term "justification for" in order to make the syllabus unambiguously state the correct rule of federal law. So amended, the controlling proposition of federal law reads:

> "When the [justification for] a police officer's continued detention of a person stopped for a traffic violation is [*50] not related to the purpose of the original, constitutional stop, and when that continued detention is not based on any articulable facts giving rise to a suspicion of some separate illegal activity justifying an extension of the detention, the continued detention constitutes an illegal seizure." *73 Ohio St. 3d at 650, 653 N.E.2d at 696*.

Notwithstanding that the subjective motivation for the officer's decision to stop respondent related to drug interdiction, the legality of the stop depended entirely on the fact that respondent was speeding. Of course, "as a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States, 517 U.S. 806, 810, 135 L. Ed. 2d 89, 116 S. Ct. 1769 (1996)*. As noted above, however, by the time Robinette was asked for consent to search his automobile, the lawful traffic stop had come to an end; Robinette had been given his warning, and the speeding violation provided no further justification for detention. The continued detention was therefore only justifiable, if at all, on some other grounds. [8]

At no time prior to the search of respondent's vehicle did any articulable facts give rise to a reasonable suspicion of some separate illegal activity that would justify further detention. See *United States v.*

---

[6]   It is ordinarily the syllabus that precedes an Ohio Supreme Court opinion, rather than the opinion itself, that states the law of the case. *Cassidy v. Glossip*, 12 Ohio St. 2d 17, 24, 231 N.E.2d 64, 68 (1967); see *Migra v. Warren City School Dist. Bd. of Ed.*, 465 U.S. 75, 86, n. 8, 79 L. Ed. 2d 56, 104 S. Ct. 892 (1984); *Ohio v. Gallagher*, 425 U.S. 257, 259, 47 L. Ed. 2d 722, 96 S. Ct. 1438 (1976).

[7]   Indeed, the first paragraph of the Ohio Supreme Court's opinion clearly indicates that the bright-line rule was meant to apply only in *future* cases. The Ohio Supreme Court first explained: "We find that the search was invalid since it was the product of an unlawful seizure." *73 Ohio St. 3d at 652, 653 N.E.2d at 697*. Only then did the court proceed to point out that it would "also use this case to establish a bright-line test . . . ." *Ibid.*

[8]   Cf. *Florida v. Royer*, 460 U.S. 491, 500, 75 L. Ed. 2d 229, 103 S. Ct. 1319 (1983) (plurality opinion) ("An investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop"); *United States v. Brignoni-Ponce*, 422 U.S. 873, 881, 45 L. Ed. 2d 607, 95 S. Ct. 2574 (1975) ("stop and inquiry must be 'reasonably related in scope to the justification for their initiation'" (quoting *Terry v. Ohio*, 392 U.S. 1, 29, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968)).

*Sharpe, 470 U.S. 675, 682, 84 L. Ed. 2d 605, 105 S. Ct. 1568* **[\*\*427]** (1985); *United States v. Brignoni-Ponce, 422 U.S. 873, 881-882, 45 L. Ed. 2d 607, 95 S. Ct. 2574 (1975)*; *Terry v. Ohio, 392 U.S. 1, 21, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968)*. As an objective matter, it inexorably follows that when the officer had completed his task of either arresting or reprimanding the driver of the speeding car, his continued detention of that **[\*51]** person constituted an illegal **[\*\*\*362]** seizure. This holding by the Ohio Supreme Court is entirely consistent with federal law. [9]

The proper disposition follows as an application of well settled law. We held in *Florida v. Royer, 460 U.S. 491, 75 L. Ed. 2d 229, 103 S. Ct. 1319 (1983)*, that a consent obtained during an illegal detention is ordinarily ineffective to justify an otherwise invalid search. [10] See also *Florida v. Bostick, 501 U.S. at 433-434* (noting that if consent was given during the course of an unlawful seizure, the results of the search "must be suppressed as tainted fruit"); *Dunaway v. New York, 442 U.S. 200, 218-219, 60 L. Ed. 2d 824, 99 S. Ct. 2248 (1979)*; *Brown v. Illinois, 422 U.S. 590, 601-602, 45 L. Ed. 2d 416, 95 S. Ct. 2254 (1975)*. Cf. *Wong Sun v. United States, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963)*. Because Robinette's consent to the search was the product of an unlawful detention, "the consent was tainted by the illegality and was ineffective to justify the search." *Royer, 460 U.S. at 507-508* (plurality opinion). I would therefore affirm the judgment below.

II

A point correctly raised by JUSTICE GINSBURG merits emphasis. The Court's opinion today does not address either the wisdom of the rule announced in the second syllabus preceding **[\*52]** the Ohio Supreme Court's opinion or the validity of that rule as a matter of Ohio law. Nevertheless the risk that the narrowness of the Court's holding may not be fully understood prompts these additional words.

There is no rule of federal law that precludes Ohio from requiring its police officers to give its citizens warnings that will help them to understand whether a valid traffic stop has come to an end, and will help judges to decide whether a reasonable person would have felt free to leave under the circumstances at issue in any given case. [11] Nor, as I have previously observed, is there anything "in the Federal Constitution that prohibits a State from giving lawmaking **[\*\*\*363]** power to its courts."

[9] Since "this Court reviews judgments, not opinions," *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842, 81 L. Ed. 2d 694, 104 S. Ct. 2778 (1984)*, the Ohio Supreme Court's holding that Robinette's continued seizure was illegal on these grounds provides a sufficient basis for affirming its judgment.

[10] Writing for a plurality of the Court, Justice White explained that "statements given during a period of illegal detention are inadmissible even though voluntarily given if they are the product of the illegal detention and not the result of an independent act of free will." *460 U.S. at 501*. The defendant in *Royer* had been "illegally detained when he consented to the search." *460 U.S. at 507*. As a result, the plurality agreed that "the consent was tainted by the illegality and was ineffective to justify the search." *460 U.S. at 507-508*. Concurring in the result, Justice Brennan agreed with this much of the plurality's decision, diverging on other grounds. See *460 U.S. at 509*. Justice Brennan's agreement on that narrow principle represents the holding of the Court. See *Marks v. United States, 430 U.S. 188, 193, 51 L. Ed. 2d 260, 97 S. Ct. 990 (1977)*.

[11] Indeed, we indicated in *Florida v. Bostick, 501 U.S. 429, 437, 115 L. Ed. 2d 389, 111 S. Ct. 2382 (1991)*, that the fact a defendant had been explicitly advised that he could refuse to give consent was relevant to the question whether he was seized at the time consent was sought. And, in other cases, we have stressed the importance of similar advice as a circumstance supporting the conclusion that a consent to search was voluntary. See *Schneckloth v. Bustamonte, 412 U.S. 218, 227, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973)*; *United States v. Mendenhall, 446 U.S. 544, 558-559, 64 L. Ed. 2d 497, 100 S. Ct. 1870 (1980)*. Cf. *Washington v. Chrisman, 455 U.S. 1, 9, 70 L. Ed. 2d 778, 102 S. Ct. 812 (1982)* (consent to search was voluntary where defendant "consented, in writing, . . . after being advised that his consent must be voluntary and that he had an absolute right to refuse consent").

*Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 479, 66 L. Ed. 2d 659, 101 S. Ct. 715, and n. 3 (1981)* (dissenting opinion). Thus, as far as we are **[**428]** concerned, whether Ohio acts through one branch of its government or another, it has the same power to enforce a warning rule as other States that may adopt such rules by executive action. [12]

**[*53]** Moreover, while I recognize that warning rules provide benefits to the law enforcement profession and the courts, as well as to the public, I agree that it is not our function to pass judgment on the wisdom of such rules. Accordingly, while I have concluded that the judgment of the Supreme Court of Ohio should be affirmed, and thus dissent from this Court's disposition of the case, I am in full accord with its conclusion that the Federal Constitution neither mandates nor prohibits the warnings prescribed by the Ohio Court. Whether such a practice should be followed in Ohio is a matter for Ohio lawmakers to decide.

# References

---

[12]   As we are informed by a brief *amicus curiae* filed by Americans For Effective Law Enforcement, Inc.: ″Such a warning may be good police practice, and indeed *amicus* knows that many law enforcement agencies among our constituents have routinely incorporated a warning into their **_Fourth Amendment_** consent forms that they use in the field, but it is precisely that--a *practice* and *not a constitutional imperative*. An officer who includes such a warning in his request for consent undoubtedly presents a stronger case for a finding of voluntariness in a suppression hearing, and we would not suggest that such agencies and officers do otherwise. We know, too, that instructors in many police training programs of leading universities and management institutes routinely recommend such warnings as a sound practice, likely to bolster the voluntariness of a consent to search. [We ourselves] conduct law enforcement training programs at the national level and many of our own speakers have made this very point.″ Brief for Americans For Effective Law Enforcement, Inc., as *Amicus Curiae* 7.

# Thomas v. State

Court of Appeals of Texas, Seventh District, Amarillo

December 13, 2013, Decided

No. 07-11-00067-CR

**Reporter**

420 S.W.3d 195; 2013 Tex. App. LEXIS 15092; 2013 WL 6878911

HEATHER THOMAS, APPELLANT v. THE STATE OF TEXAS, APPELLEE

**Notice:** PUBLISH

**Prior History:** [**1] On Appeal from the 47th District Court, Potter County, Texas. Trial Court No. 59,706-A, Honorable Dan L. Schaap, Presiding.

*Thomas v. State, 408 S.W.3d 877, 2013 Tex. Crim. App. LEXIS 1463 (Tex. Crim. App., 2013)*

## Case Summary

### Overview

HOLDINGS: [1]-The officer had reasonable suspicion to stop defendant's vehicle where he testified that he observed the vehicle twice cross over the improved shoulder of the road on the solid white line in violation of *Tex. Transp. Code Ann. § 545.058* (2011); [2]-The officer lacked reasonable suspicion to continue to detain defendant after the issuance of the warning ticket for driving on the improved shoulder until a canine search could be performed, and therefore the trial court abused its discretion by denying defendant's motion to suppress, because the facts that defendant was nervous driving a one-way rental car with minimal luggage was insufficient to provide reasonable suspicion.

### Outcome

Judgment reversed and case remanded.

**Judges:** Before CAMPBELL and HANCOCK and PIRTLE, JJ.

**Opinion by:** Mackey K. Hancock

## Opinion

 [*196] Appellant, Heather Thomas, appeals her conviction for possession of marijuana[1] [*197] and subsequent sentence of confinement in the Institutional Division of the Texas Department of Criminal Justice (ID-TDCJ) for 78 months. Appellant contends that the trial court erred in overruling her motion to suppress the evidence of the search. We will reverse and remand.

Factual and Procedural Background

---

[1] *See* TEX. HEALTH & SAFETY CODE ANN. § 481.121(a), (b)(5) (West 2010).

This case is before the Court on remand from the Texas Court of Criminal Appeals. Previously, we held that appellant had waived her objection to the trial court's ruling denying her motion to suppress. *Thomas v. State, No. 07-11-00067-CR, 2012 Tex. App. LEXIS 7414, at *5 (Tex. App.—Amarillo Aug. 30, 2012, rev'd)* (mem. op., not designated for publication). Subsequently, the Texas Court of Criminal Appeals reversed this Court's judgment and remanded the case to this Court to consider appellant's points on appeal. *Thomas v. State, 408 S.W.3d 877, 888 (Tex. Crim. App. 2013)*. **[**2]** We will now consider appellant's issues.

Appellant was stopped by Texas Department of Public Safety Highway Patrolman Enoi Phoutthavong on March 29, 2010, while travelling east on Interstate Highway 40 in Potter County, Texas. Phoutthavong testified that he observed appellant's vehicle cross over the solid white line on the shoulder of the highway, referred to as the fog line, on two occasions before deciding to stop appellant. Upon stopping appellant, Phoutthavong noticed that, in his opinion, appellant was extremely nervous. Phoutthavong stated that appellant's hands were visibly shaking when she retrieved her license. Phoutthavong stated that the fact that the car was a one-way rental coming from Phoenix, Arizona, also aroused his suspicion. Additionally, appellant had very little in the way of luggage with her and what she had was in the rear passenger compartment. However, from the food wrappers and containers that could be observed in the front passenger compartment of the vehicle, it was obvious that appellant had eaten while travelling in the car. After making the above observations, Phoutthavong decided to give appellant a warning ticket. The warning ticket was presented to **[**3]** appellant before Phoutthavong broached the subject of inspection of the trunk of appellant's vehicle.

Phoutthavong requested permission to search the trunk compartment of the car, and appellant refused to give permission. Following this exchange, Phoutthavong called for the assistance of a DPS drug canine unit. According to the testimony at the motion to suppress, the canine unit arrived within a matter of minutes of the request. After the canine unit arrived, the drug dog alerted to the presence of drugs in the trunk of the car. Upon opening the trunk, the contraband, 227.32 pounds of marijuana, was found beneath a blanket.

Appellant filed a motion to suppress the contraband discovered in the trunk of the car she was driving. The trial court heard the motion to suppress and overruled the same. After the trial court overruled the motion to suppress, appellant entered a plea of guilty to the indictment charging possession of marijuana in an amount of less than 2000 pounds but more than 50 pounds. The trial court sentenced appellant to confinement in the ID-TDCJ for seventy-eight months and levied a fine of $2,500.

The trial court issued findings of fact and conclusions of law in support **[**4]** of its decision to deny the motion to suppress. The findings of fact were as follows:

1. Trooper Enoi Phoutthavong on March 29, 2009 was on patrol in a marked patrol car on I-40 at approximately 5:26 p.m. Trooper Phoutthavong has been with the Department of Public Safety for six years and has had substantial **[*198]** experience and training in the interdiction of controlled substances along I-40.

2. Trooper Phoutthavong was traveling eastbound on I-40 when he observed the defendant's vehicle cross across the solid white line (also known as the fog line) on two occasions near the Bushland overpass.

3. Trooper Phoutthavong reasonably believed he ha[d] observed a violation of Driving on Improved Shoulder (Tᴇx. Tʀᴀɴs[ᴘ]. Cᴏᴅᴇ *§ 545.058*).

4. The defendant was stopped at 5:27:51 p.m. in Potter County, Texas.

5. Trooper Phoutthavong contacted the defendant and determined that the vehicle was a one-way rental, the defendant was exceptionally nervous, had only stayed in the Phoenix area for a day or two and she claimed that the only luggage she had was a small back pack which was on the rear seat.

6. After checking the defendant's driver's license and criminal history Trooper Phoutthavong prepared a warning **[**5]** citation. Trooper Phoutthavong issued the warning citation to the defendant at 5:35:18 p.m. Trooper Phoutthavong determined that the defendant had flown in from Massachusetts to Arizona and rented the vehicle on the same day, two days before the stop. The defendant's explanation of her trip did not seem logical to the Trooper.

7. Based on Trooper Phoutthavong's prior experience and his training the Trooper reasonably believed [that] criminal activity was occurring.

8. Trooper Phoutthavong requested consent to search the vehicle at 5:36 p.m. which the defendant refused.

9. Trooper Phoutthavong immediately sought the assistance of a K-9 unit.

10. The K-9 unit arrived a[t] the scene at 5:41:10 p.m., approximately five minutes after being requested.

11. The K-9 alerted on [the] vehicle at 5:44 p.m. and a search was then conducted on the vehicle.

12. At 5:45:20 p.m. 227 pounds of Marihuana were located in the trunk of the vehicle and the defendant was arrested.

13. The length of the detention (about 17 minutes) was reasonable under the circumstance.

14. The Court finds that Trooper Enoi Phoutthavong was a reliable and credible witness. The Court further finds that he articulated specific facts **[**6]** that, under the circumstances that existed during the stop, would have caused a reasonable officer with similar training and experience to believe that criminal activity was occurring in his presence.

Based upon these findings of fact, the trial court then entered conclusions of law as follows:

1. Trooper Phoutthavong was authorized to stop and detain the defendant because he had observed her commit the offense of Driving on Improved Shoulder. (citations omitted).

2. Trooper Phoutthavong took only reasonable and necessary steps in conducting the traffic stop. (citations omitted)

3. His observations of the defendant and the vehicle combined with the defendant's explanation of her travels and the nature of the rental agreement provided sufficient objective facts upon which Trooper Phoutthavong based a reasonable belief that criminal activity was occurring. (citations omitted)

4. The defendant's sole objection contained in her Motion to Suppress is without merit. Given the totality of the circumstances the initial stop was justified and reasonable. Further, the detention **[*199]** was proper and lawful. (citations omitted)

Appellant filed a notice of appeal and now appeals the trial court's judgment [**7] in three issues. Appellant's first issue contends that the failure of the record to produce the videotape of the stop required this Court to abate the appeal back to the trial court because the videotape was necessary for proper resolution of the case. The videotape was in fact produced and is a part of this record; therefore, appellant's first issue is moot. Appellant's second and third issues present the questions of the validity of the initial stop (issue two) and the propriety of appellant's continued detention after the issuance of the warning ticket. We will address them in turn.

Motion to Suppress

Standard of Review

We review a trial court's ruling on a motion to suppress for abuse of discretion. *See Oles v. State, 993 S.W.2d 103, 106 (Tex. Crim. App. 1999)*. The trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *See State v. Ross, 32 S.W.3d 853, 855-56 (Tex. Crim. App. 2000)* (en banc). Accordingly, we afford almost total deference to a trial court's determination of historical facts supported by the record which are based upon evaluation of credibility and demeanor of the witnesses. *See Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)* [**8] (en banc). Thus, the findings of fact of the trial court, which find support in the record, and the rational inferences drawn from the supported facts are entitled to deference on appeal. *See Manzi v. State, 88 S.W.3d 240, 243 (Tex. Crim. App. 2002)*. However, the legal conclusion drawn from those facts is reviewed *de novo*. *See Kothe v. State, 152 S.W.3d 54, 62 (Tex. Crim. App. 2004)* (holding questions involving legal principles and the application of law to established facts are reviewed *de novo*).

A law enforcement official may stop and detain a citizen suspected of commission of a criminal offense on less evidence than that required to support probable cause. *Terry v. Ohio, 392 U.S. 1, 22, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)*. To support an investigatory detention, 1) the officer's actions must be justified at the inception of the detention, and 2) the detention must be reasonably related in scope to the circumstances that justified the interference in the first place. *Id. at 19-20*. We make the determination regarding the initial stop based on a review of the totality of the circumstances to ascertain whether the trooper had reasonable suspicion to believe that appellant had committed [**9] an offense or in some other manner provided the trooper with articulable facts that would support a detention. *Davis v. State, 947 S.W.2d 240, 244 (Tex. Crim. App. 1997)* (en banc).

Initial Stop

Regarding the initial stop of appellant, appellant asserts in her first issue that the officer did not have reasonable suspicion to stop her or did not reasonably use his community caretaking function to do so. As to the second portion of appellant's contention, the community caretaking function, this was never asserted to be the reason to stop appellant. *See Corbin v. State, 85 S.W.3d 272, 276 (Tex. Crim. App. 2002)* (noting that a police officer's job has been characterized to include a community caretaking function). The trial court's findings of fact do not mention this theory at all, and a review of the record demonstrates that the State never relied upon the community caretaking function to support the initial stop of appellant. Rather, the State avers that appellant committed a traffic offense that resulted in her stop.

 [*200]  Trooper Phouatthavong testified that he observed appellant's vehicle twice cross over onto the improved shoulder on the solid white line. This according to the trooper was  [**10] the traffic offense of driving on the improved shoulder. TEX. TRANSP. CODE ANN. § 545.058 (West 2011). The statute at issue provides:

> (a) An operator may drive on an improved shoulder to the right of the main traveled portion of a roadway if that operation is necessary and may be done safely, but only:
>
>> (1) to stop, stand, or park;
>>
>> (2) to accelerate before entering the main travelled lane of traffic;
>>
>> (3) to decelerate before making a right turn;
>>
>> (4) to pass another vehicle that is slowing or stopped on the main traveled portion of the highway, disabled, or preparing to make a left turn;
>>
>> (5) to allow another vehicle traveling faster to pass;
>>
>> (6) as permitted or required by an official traffic-control device; or
>>
>> (7) to avoid a collision.

*Id.*[2]

Appellant's contention is that, since the State has the burden of proof on the issue of legality of the initial detention, the State must elicit testimony that proves none of the seven exceptions to the prohibition about driving on the improved shoulder applies. This misses the meaning of the statute. The seven listed exceptions are instances when driving on the improved shoulder  [**11] is permissible when necessary, and can be done so safely. *See Lothrop v. State, 372 S.W.3d 187, 191 (Tex. Crim. App. 2012)*. The record reflects that Trooper Phoutthavong testified that appellant was driving on the improved shoulder when prohibited. Appellant denied ever driving on the improved shoulder. This testimony demonstrates that there is nothing in the record to reflect the necessity of appellant to drive on the shoulder or that her driving on the improved shoulder fit any of the seven listed exceptions to the prohibition to driving on the improved shoulder. *See id*. This and other intermediate appellate courts have found that the traffic offense of driving on the improved shoulder supports an initial detention of a driver. *See id*. (finding probable cause for traffic stop for violation of *section 545.058(a)*); *State v. Lockhart, No. 07-04-00304-CR, 2005 Tex. App. LEXIS 6159, at *9 (Tex. App.—Amarillo Aug. 2, 2005, no pet.)* (not designated for publication) (finding that driving on improved shoulder supported probable cause to stop appellant); *Martinez v. State, 29 S.W.3d 609, 612 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd)* (suggesting violation of driving on shoulder statute  [**12] as alternative justification for stop). Therefore, it is clear to this Court that the trooper had sufficient cause to initially detain appellant for the commission of a traffic offense. Appellant's second issue is overruled.

Continued Detention

By her third issue appellant contends that the trooper lacked reasonable suspicion to continue to detain her after the issuance of the warning ticket for driving on the improved shoulder. The trial court found that the trooper had reasonable suspicion to detain appellant further.

---

2   Further reference to the Texas Transportation Code will be by reference to "§ __."

In addressing appellant's complaint, we need to begin with a review of the applicable law. Inasmuch as we have held, in connection with appellant's second issue, that the trooper had reasonable suspicion **[*201]** to initially stop appellant, the issue now before the Court is the second prong of the *Terry* analysis. *See Kothe, 152 S.W.3d at 63*. That is, we must now determine whether the search and seizure was reasonably related, in scope, to the circumstances that justified the stop in the first place. *See id.* In making this determination, we must remember that the scope of a *Terry* investigative stop can last no longer than necessary to effect the purpose to the stop. *See id.* As **[**13]** a component of the initial stop the trooper has authority to conduct a driver's license and warrant check. *See id.* There is no formulaic order that these actions must proceed in, rather they must not detain the citizen any longer than necessary to effectuate their purpose. *See id. at 66*; *see also United States v. Sharpe, 470 U.S. 675, 685-86, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985)* (declining to "establish per se rule that a 20-minute detention is too long" under *Terry*). After completion of the purposes of the initial stop, the officer must have reasonable suspicion to believe that further criminal activity has occurred or is being committed to justify further detention of the suspect. *See Davis, 947 S.W.2d at 245*. In other words, once the original purpose for the stop is exhausted, police may not unnecessarily detain drivers solely in hopes of finding evidence of some other crime. *Kothe, 152 S.W.3d at 64*.

A review of the record before the Court indicates the following occurred. Appellant was stopped for a traffic offense. Upon initially contacting appellant, the trooper noticed that appellant was extremely nervous.[3] During a routine interview of appellant, the trooper learned that **[**14]** the car was a rental and that the rental agreement was a one-way rental from Arizona. Further, appellant learned that appellant was headed to Massachusetts. Additionally, the trooper learned that appellant only stayed in Arizona for two days. The trooper observed only a small backpack in the backseat of the car and confirmed from appellant that this was her only luggage. Upon being questioned by the trooper, appellant said she was going to meet her husband. Subsequently, the trooper requested a computer check on appellant's driver's license and criminal history. Both appellant's driver's license and criminal history were reported as clear. The trooper prepared a warning ticket for driving on the improved shoulder and gave it to appellant. The trooper then requested permission to search appellant's vehicle and appellant declined to grant permission. The trooper then requested the K-9 unit come and perform an open air search of the vehicle. Appellant was detained until this could be performed. From these facts, we must decide whether the trooper had reasonable suspicion that appellant had committed or was about to commit a criminal act.

In analyzing these facts we must remember that although we accept the trial court's findings of facts, the application of the facts to the law is reviewed *de novo*. *Kothe, 152 S.W.3d at 62*. The ultimate question before us is whether this trooper developed objective facts, other than the facts that warranted the initial stop, that would lead him to reasonably suspect that appellant has engaged or is engaging in other criminal activity. *See McQuarters v. State, 58 S.W.3d 250, 255 (Tex. App.—Fort Worth 2001, pet. ref'd)*.

The facts as found by the trial court, and supported in the record, are as follows:

   (1) Appellant flew to Arizona and stayed two days;

---

[3]   The trooper later explained that appellant, though **[**15]** polite and cooperative, was "just a little more" nervous than the average motorist.

 [*202]  (2) Appellant made a one-way rental of a vehicle in Arizona;

(3) Appellant was driving to Massachusetts;

(4) Appellant had only one small backpack as luggage;

(5) Appellant's driver's license and criminal history were clear;

(6) Appellant was issued a warning ticket for driving on the improved shoulder;

(7) Appellant refused to consent to a search of her vehicle.

The trial court stated as a finding of fact that appellant's explanation about her trip did not seem logical  [**16] to the trooper. Absent from such a finding is why this provides any reasonable suspicion. *See Thompson v. State, 408 S.W.3d 614, 625 (Tex. App.—Austin 2013, no pet.)* (disagreeing with officer's characterization of appellants account of trip as "confused" and observing that simply because officer calls story confusing does not make it so). Even if we accept as true that the answer did not seem logical to the trooper, there is nothing about this lack of logical explanation that arises to reasonable suspicion; rather, it simply reinforced the trooper's hunch or gut feeling that something more was going on. *See Davis, 947 S.W.2d at 245*.

In *Davis*, after the officer had determined Davis was not intoxicated—the basis for the original stop—and completed the driver's license check and criminal history check, the officer continued to detain Davis because he did not look like someone travelling on a business trip. *Id*. However, the Texas Court of Criminal Appeals stated that conclusion was not based upon any articulable facts that, taken together with reasonable inferences from those facts, would provide reasonable suspicion that continued detention was warranted. *Id*.

In *McQuarters*, the appellant  [**17] was stopped because the officer felt that appellant was either falling asleep at the wheel or was intoxicated after observing his slow speed and the fact that the car drifted out of its lane on a couple of occasions. *McQuarters, 58 S.W.3d at 253*. Yet, an interview with appellant quickly dispelled the notion that he was intoxicated. *Id*. While questioning McQuarters, the officer observed that McQuarters was nervous, would not make eye contact, his hands were shaking, and his breathing was shallow. *Id. at 254*. Also the officer learned that McQuarters was driving a rental car and that the car was rented in the name of a third person. *Id*. Eventually, after issuing the warning tickets, the officer asked if there was anything of an "illegal nature" in the car. *Id*. McQuarters answered no, and the officer asked for consent to search, which was refused. *Id*. At that point in time the officer just "felt like" he had reasonable suspicion that McQuarters had narcotics in the vehicle. *Id*. Therefore, the officer continued the detention until a K-9 unit could be brought to the site. *Id*. The K-9 unit alerted on the vehicle and nine to ten pounds of marijuana were found in the trunk. *Id*. Based upon these  [**18] facts, the Fort Worth Court of Appeals held that, when considering the totality of the circumstances, including the officer's personal experience, a reasonable suspicion that McQuarters was hiding narcotics in the car could not be rationally inferred from these facts. *Id. at 257*.

The State likens our case to *United States v. Pack, 612 F.3d 341, 357 (5th Cir. 2010)*, and cites the case for the proposition that the trooper does not have to observe the equivalent of direct evidence to continue to detain a lawfully detained subject. However, in *Pack* the facts are distinguishable from those presented to us. Specifically, *Pack* involved a stop where there was a passenger in the vehicle

**[*203]** stopped. *Id. at 345*. When questioning both the driver and passenger separately, the trooper got stories that were significantly divergent. *Id. at 345, 360*. The Court in Pack characterized the divergent stories as neither reconcilable nor minor. *Id. at 360*. Such additional information was not available to the trooper in the case before the Court; rather, we have the trooper's opinion that the story told by appellant did not seem logical to him.[4]

The State also cites the Court to *United States v. Brigham* for the proposition that the Court "must allow law enforcement officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Brigham, 382 F.3d 500, 507 (5th Cir. 2004)* (citing *United States v. Arvizu, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002))*. The portion of the case cited by the State is a correct statement of the law; however, it does not necessarily lead us to conclude that the facts of our case demonstrate reasonable suspicion.

In *Brigham* the facts were that a traffic stop was made, there was a rental car being driven by Brigham, there were passengers involved, Brigham and the passengers gave conflicting stories, a passenger provided a false identification card, after continued questioning of Brigham and all the passengers—there **[**20]** were a total of four occupants—the trooper got, yet again, different stories. All of these facts finally led the trooper to conclude that something was amiss, and he then requested permission to search, which was granted. *Id. at 504*. The question before the Fifth Circuit Court of Appeals, sitting en banc, was whether the scope of the valid stop was exceeded. *Id. at 506*. The court held that, under the facts of the case, the officer did not exceed the proper scope of the valid traffic stop because he was able to apply his experience and training to an analysis of these facts to justify the continued detention. *Id. at 509*.

The factual differences from our case are telling. First, in *Brigham* there were multiple stories told by the driver and the passengers, and the individual accounts apparently changed with each telling. *See id. at 504-05*. The rental agreement listed the renter as a 50-year-old female and the officer observed that no one in the car fit that description. *Id. at 504*. There was a false identification card presented to the officer. *Id*. All of these facts were articulated by the officer as reasons he continued to detain Brigham. *See id. at 508*. In our situation, we have only **[**21]** the fact that appellant's story did not seem logical to the officer and that she did not have any significant luggage in the vehicle. Granted, both she and the appellant in *Brigham* appeared nervous. Here, the trooper admitted that many people are nervous when stopped, but that appellant appeared more so. *See McQuarters, 58 S.W.3d at 257* (charactering a motorist's nervousness as a "weak indicator of hidden narcotics"); *see also St. George v. State, 237 S.W.3d 720, 726 (Tex. Crim. App. 2007)*. A review of the testimony of the trooper involved in the case at bar leads to the conclusion that the trooper made a determination to try and get more information from appellant within the first 30 to 60 seconds of his contact with her. This, by his own testimony, was **[*204]** because there was an inappropriate amount of luggage for her stated trip.[5]

---

[4] When Phoutthavong asked appellant why she was driving back, appellant **[**19]** explained that she was going to meet her husband who was in the National Guard. On cross-examination, Phoutthavong admitted that appellant's account of her travels could be a perfectly plausible story.

[5] Having too much luggage for the trip may also be suspicious. *See Love v. State*, 252 S.W.3d 684, 686 (Tex. App.—Texarkana 2008 pet. ref'd).

The essence of the State's position is that a nervous driver on I-40 driving a one-way rental with minimal luggage provides enough reasonable suspicion to warrant detention until a K-9 search can be performed. That such an **[\*\*22]** observation and analysis turned out to be accurate does not alter one fact: it was nothing more than an inarticulable hunch. *See Illinois v. Wardlow, 528 U.S. 119, 123-24, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000)* (reiterating that reasonable suspicion is "more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity"). There was nothing before the trooper that would rise to the level of reasonable suspicion that would allow him to continue to detain appellant until the K-9 unit could arrive. *See Davis, 947 S.W.2d at 245*; *McQuarters, 58 S.W.3d at 255*; *Sieffert v. State, 290 S.W.3d 478, 485-86 (Tex. App.—Amarillo 2009, no pet.)*. Accordingly, the trial court's conclusion to the contrary was an abuse of discretion. *Oles v. State, 993 S.W.2d 103*. Therefore, we sustain appellant's third issue and reverse the trial court's decision to deny the motion to suppress.

Conclusion

Having sustained appellant's third issue, we reverse the judgment the trial court and remand this case to the trial court for further proceedings consistent with this opinion.

Mackey K. Hancock

Justice

Publish.

# *Richardson v. State*

Court of Appeals of Texas, Second District, Fort Worth

April 18, 2013, Delivered

NO. 02-11-00501-CR

**Reporter**

402 S.W.3d 272; 2013 Tex. App. LEXIS 11488

ROBERT RICHARDSON, APPELLANT v. THE STATE OF TEXAS, STATE

**Notice:** PUBLISH.

**Subsequent History:** Petition for discretionary review refused by *In re Richardson, 2013 Tex. Crim. App. LEXIS 1123 (Tex. Crim. App., Aug. 21, 2013)*

**Prior History:** [**1] FROM COUNTY CRIMINAL COURT NO. 4 OF DENTON COUNTY.
*Richardson v. State, 399 S.W.3d 697, 2013 Tex. App. LEXIS 4892 (Tex. App. Fort Worth, 2013)*

## Case Summary

### Overview

HOLDINGS: [1]-The officer was thus justified in continuing the traffic stop to further investigate the driving while intoxicated offense since the officer returned defendant's driver's license contemporaneously with noticing the smell of breath mints, before smelling the breath mints the officer observed or learned of defendant's failure to maintain a single lane of traffic, defendant's quick deceleration when pulling the vehicle off of the highway, defendant's parking the vehicle very close to the fog line, the empty pill bottle, defendant's nervousness, the mild odor of alcoholic beverages, and the passengers' denials of alcohol use.

### Outcome

Judgment affirmed.

**Counsel:** FOR APPELLANT: GENE R. BEATY, DALLAS, TX; CATHERINE CLARE BERNHARD, RED OAK, TX.

FOR STATE: PAUL JOHNSON, CRIMINAL DISTRICT ATTORNEY, CHARLES E. ORBISON, ASSISTANT CRIMINAL DISTRICT ATTORNEY, CHIEF APPELLATE DIVISION, MATTHEW J. WHITTEN, LARA TOMLIN, MICHELLE BUENDIA, ASSISTANT CRIMINAL DISTRICT ATTORNEYS FOR DENTON COUNTY, DENTON, TX.

**Judges:** PANEL: DAUPHINOT, GARDNER, and WALKER, JJ. DAUPHINOT, J., filed a dissenting opinion.

**Opinion by:** ANNE GARDNER

## Opinion

[*274]  I. Introduction

Appellant Robert Richardson appeals following his guilty plea to driving while intoxicated, challenging the trial court's denial of his motion to suppress evidence. He contends in one point that the trial court erred by denying the motion to suppress because any detention beyond the issuance of a written warning for a traffic violation was unreasonable. We affirm.[1]

## II. Background

At the suppression hearing, Trooper Preston Fulford testified that he worked the 4 p.m. to 3 a.m. shift and was on routine patrol for the Texas Department of Public Safety on August 25, 2010, when he observed a vehicle make an unsafe maneuver while traveling north on Interstate 35-E near the City of Lewisville. Trooper Fulford had been observing a motorcycle because it had been speeding, but he saw Richardson's vehicle, a Tahoe, change lanes without signaling and move into the path of the motorcycle, almost hitting it. Trooper Fulford followed the Tahoe and observed as it weaved within its lane of traffic and crossed into the other lane of traffic, and he testified that he decided to make a traffic stop for failing to drive in a  [**3] single lane.

Trooper Fulford testified that he followed the vehicle until it was in a safer area to stop before activating his overhead lights. When the vehicle pulled over, it slowed down very quickly and almost completely stopped before moving off of the freeway. In addition, the vehicle stopped on the fog line, very close to the lanes of  [*275]  traffic on the freeway. Trooper Fulford testified that his main objective in stopping the vehicle was the traffic violation but that the possibility of intoxication was in his mind given the time of day and location.

Trooper Fulford testified that he approached Richardson's vehicle on the passenger side because of its proximity to the fog line and that he noticed a mild odor of an alcoholic beverage while speaking with Richardson through the passenger-side window. Richardson and the passengers in the vehicle denied having consumed alcohol.[2] Trooper Fulford advised Richardson that he had stopped him for failure to maintain a single lane and, while speaking with Richardson, noticed that there was a prescription pill bottle in the vehicle. Richardson told Trooper Fulford that the pill bottle belonged to his girlfriend, and Trooper Fulford asked Richardson  [**4] to give him the pill bottle. Trooper Fulford testified that Richardson's hands were shaking when he handed him the pill bottle and that Richardson appeared nervous when he was asked about drinking and about the pill bottle.

Trooper Fulford testified that he, at that moment, was suspicious that Richardson was driving while intoxicated based on his driving behavior before the stop, the manner in which Richardson stopped the

---

[1]  By affirming, we necessarily disagree with the dissent's contention that the trial court's ruling on Richardson's motion to suppress is not before us due to the lack of a written order denying it. The State is not attempting an interlocutory appeal of the grant of a motion to suppress. Rather, Richardson is appealing the judgment  [**2] that followed the denial of his motion to suppress. Our holding in *State v. Cox* is therefore inapplicable here. *See* 235 S.W.3d 283, 284 (Tex. App.—Fort Worth 2007, no pet.) (en banc). This court has previously declined to adopt the dissent's contentions, and we do so again. *See, e.g., Dahlem v. State*, 322 S.W.3d 685, 690-92 (Tex. App.—Fort Worth 2010, pet. ref'd); *Bracken v. State*, 282 S.W.3d 94, 96 n.1 (Tex. App.—Fort Worth 2009, pet. ref'd).

[2]  Trooper Fulford testified that Richardson was driving for a limousine service at the time of the stop, that Richardson was dressed as a professional driver would be dressed, and that the passengers reported having just left the airport.

vehicle, the mild odor of alcohol, Richardson's nervousness, the pill bottle, and the passengers' denials of any alcohol use. Even so, Trooper Fulford testified that he had not yet decided to conduct a DWI investigation.

Trooper Fulford testified that he returned to his patrol car to process Richardson's driver's license after advising Richardson that he would receive a warning for the traffic violation. After processing Richardson's driver's license and preparing the written warning, Trooper Fulford returned to the passenger window **[**5]** of Richardson's vehicle. Trooper Fulford testified that, upon arriving at the passenger window of the vehicle, he noticed an "overwhelming" odor of breath mints and that he then decided to conduct a DWI investigation.

Trooper Fulford asked Richardson if he had put a breath mint into his mouth, Richardson confirmed that he had, and Trooper Fulford asked Richardson to step out of the vehicle. Trooper Fulford testified that he had not yet advised Richardson that he was free to leave or that the traffic stop was otherwise complete, but he could not recall if he had previously returned Richardson's driver's license or given him the written warning. He also testified that the reasons to suspect intoxication at that moment were the failure to maintain a single lane of traffic, stopping the vehicle very close to the fog line, the mild odor of alcoholic beverages, the passengers' denials of alcohol use, the empty pill bottle, and the breath mints.

Richardson testified that when Trooper Fulford returned from his patrol car and approached the passenger-side window of the Tahoe, Trooper Fulford handed him his driver's license and a warning ticket. Trooper Fulford then looked up and said, "Did you **[**6]** just take a breath mint?" Richardson testified that he had put a breath mint into his mouth, but he denied that it was to mask the odor of alcohol. Richardson also testified that he returned his driver's license and the warning ticket to Trooper Fulford after Trooper Fulford had asked him to exit the vehicle.

**[*276]** The trial court, after reviewing the entire video of the traffic stop, denied Richardson's motion to suppress and dictated findings of fact onto the record. Among the trial court's findings of fact were that Trooper Fulford returned Richardson's driver's license to him contemporaneously with noticing the smell of breath mints and that the totality of the circumstances, up through and including the smell of the breath mints, provided Trooper Fulford with reasonable suspicion to continue the detention. Richardson pleaded guilty following the trial court's ruling on the motion to suppress, and this appeal followed.

### III. Discussion

Richardson argues in one point that the trial court erred by denying his motion to suppress. Richardson does not challenge the traffic stop itself, arguing instead that there was not reasonable suspicion to continue the detention beyond the issuance of the **[**7]** written warning.

### A. Applicable Law

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007)*; *Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)*. We give almost total deference to a trial court's rulings on questions of historical

fact and application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor. *Amador, 221 S.W.3d at 673*; *Estrada v. State, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005)*; *Johnson v. State, 68 S.W.3d 644, 652-53 (Tex. Crim. App. 2002)*.

The *Fourth Amendment* protects against unreasonable searches and seizures by government officials. *U.S. Const. amend. IV*; *Wiede v. State, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007)*. To suppress evidence because of an alleged Fourth Amendment violation, the defendant bears the initial burden of producing evidence that rebuts the presumption of proper police conduct. *Amador, 221 S.W.3d at 672*; *see Young v. State, 283 S.W.3d 854, 872 (Tex. Crim. App.)*, cert. denied, 558 U.S. 1093, 130 S. Ct. 1015, 175 L. Ed. 2d 622 (2009). **[**8]** A defendant satisfies this burden by establishing that a search or seizure occurred without a warrant. *Amador, 221 S.W.3d at 672*. Once the defendant has made this showing, the burden of proof shifts to the State, which is then required to establish that the search or seizure was conducted pursuant to a warrant or was reasonable. *Id. at 672-73*; *Torres v. State, 182 S.W.3d 899, 902 (Tex. Crim. App. 2005)*; *Ford v. State, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005)*.

A detention, as opposed to an arrest, may be justified on less than probable cause if a person is reasonably suspected of criminal activity based on specific, articulable facts. *Terry v. Ohio, 392 U.S. 1, 21, 88 S. Ct. 1868, 1880, 20 L. Ed. 2d 889 (1968)*; *Carmouche v. State, 10 S.W.3d 323, 328 (Tex. Crim. App. 2000)*. An officer conducts a lawful temporary detention when he or she has reasonable suspicion to believe that an individual is violating the law. *Crain v. State, 315 S.W.3d 43, 52 (Tex. Crim. App. 2010)*; *Ford, 158 S.W.3d at 492*. Reasonable suspicion exists when, based on the totality of the circumstances, the officer has specific, articulable facts that when combined with rational inferences from those facts, would lead **[**9]** him to reasonably conclude that a particular person is, has been, or soon will be engaged in criminal activity. *Ford, 158 S.W.3d at 492*. This is an objective standard that disregards any subjective intent of the officer making the stop and looks solely to whether **[*277]** an objective basis for the stop exists. *Id*.

## B. Analysis

Richardson argues that the purpose of the traffic stop was complete when Trooper Fulford returned his driver's license and gave him the written warning and that any detention beyond that moment was unreasonable. As mentioned, Richardson does not challenge the legality of the initial stop.

An investigative detention must be temporary, and the questioning must last no longer than is necessary to effectuate the purpose of the stop. *Florida v. Royer, 460 U.S. 491, 500, 103 S. Ct. 1319, 1325, 75 L. Ed. 2d 229 (1983)*; *Balentine v. State, 71 S.W.3d 763, 770-71 (Tex. Crim. App. 2002)*; *Davis v. State, 947 S.W.2d 240, 245 (Tex. Crim. App. 1997)*. Once an officer concludes the investigation of the conduct that initiated the stop, continued detention of a person is permitted for the purpose of issuing a citation. *Kothe v. State, 152 S.W.3d 54, 65 n.43 (Tex. Crim. App. 2004)* (citing **[**10]** *United States v. Wellman, 185 F.3d 651, 656 (6th Cir. 1999))*; *see Coleman v. State, 188 S.W.3d 708, 719 (Tex. App.—Tyler 2005, pet. ref'd)* (holding that purpose of stop was complete upon the issuance of the citation), cert. denied, 549 U.S. 999, 127 S. Ct. 502, 166 L. Ed. 2d 376 (2006). Further, once the reason for the stop has been satisfied, the stop may not be used as a "fishing expedition for unrelated criminal activity." *Davis, 947 S.W.2d at 243* (quoting *Ohio v. Robinette, 519 U.S. 33, 41, 117 S. Ct. 417, 422, 136 L. Ed. 2d 347 (1996)* (Ginsburg, J., concurring)).

However, if an officer develops reasonable suspicion during a valid traffic stop and detention that the detainee is engaged in criminal activity, prolonged or continued detention is justified. *See Davis, 947 S.W.2d at 244*; *Haas v. State, 172 S.W.3d 42, 52 (Tex. App.—Waco 2005, pet. ref'd)*; *see also United States v. Brigham, 382 F.3d 500, 510-11 (5th Cir. 2004)*; *McQuarters v. State, 58 S.W.3d 250, 256 (Tex. App.—Fort Worth 2001, pet. ref'd)*. Additional facts and information discovered by an officer during a lawful detention may form the basis for a reasonable suspicion that another offense has been or is being committed. [**11] *Haas, 172 S.W.3d at 52*.

The question in this case is whether Trooper Fulford had specific articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably suspect that Richardson had engaged in criminal activity. *See Terry, 392 U.S. at 21, 88 S. Ct. at 1880*; *Garcia v. State, 43 S.W.3d 527, 530 (Tex. Crim. App. 2001)*; *McQuarters, 58 S.W.3d at 255*. The trial court found that Trooper Fulford returned Richardson's driver's license contemporaneously with noticing the smell of breath mints. And before smelling the breath mints, Trooper Fulford had previously observed or learned of Richardson's failure to maintain a single lane of traffic, Richardson's quick deceleration when pulling the vehicle off of the highway, Richardson's parking the vehicle very close to the fog line, the empty pill bottle, Richardson's nervousness, the mild odor of alcoholic beverages, and the passengers' denials of alcohol use. These facts, which Trooper Fulford identified during his testimony at the suppression hearing, were sufficient to provide him with reasonable suspicion that Richardson had been driving while intoxicated. *See Mohmed v. State, 977 S.W.2d 624, 628 (Tex. App.—Fort Worth 1998, pet. ref'd)* [**12] ("An officer is entitled to rely on all of the information obtained during the course of his contact with the citizen in developing the articulable facts which would justify a continued investigatory detention.") (citing *Ortiz v. State, 930 S.W.2d 849, 856 (Tex. App.—Tyler 1996, no pet.))*; [*278] *see also Newman v. State, No. 01-00-00106-CR, 2001 Tex. App. LEXIS 1869, 2001 WL 279182, at *3 (Tex. App.—Houston [1st Dist.] Mar. 22, 2001, no pet.)* (not designated for publication) (affirming denial of motion to suppress and holding trial court could have found reasonable suspicion based on the appellant's nervousness and strong odor of alcohol, which was inconsistent with the appellant's explanation). Trooper Fulford was thus justified in continuing the traffic stop to further investigate the driving while intoxicated offense. *See Davis, 947 S.W.2d at 244*; *Haas, 172 S.W.3d at 52*. We overrule Richardson's sole point.

## IV. Conclusion

Having overruled Richardson's sole point, we affirm the trial court's judgment.

ANNE GARDNER

JUSTICE

PANEL: DAUPHINOT, GARDNER, and WALKER, JJ.

DAUPHINOT, J., filed a dissenting opinion.

PUBLISH

DELIVERED: April 18, 2013

**Dissent by:** LEE ANN DAUPHINOT

## Dissent

### DISSENTING OPINION

I write yet again **[**13]** in dissent because, again, this court applies conflicting rules of procedure to trial courts' rulings on motions to suppress, depending on whether the trial court rules for the State or for the defense.

It has been well established that when a trial court rules against a defendant on a motion to suppress, and the trial court rules orally on the record and states its findings of fact and conclusions of law on the record, the trial court has satisfied all requirements concerning the ruling and the findings of fact and conclusions of law,[1] and the defendant has preserved the complaint for appellate review.[2] But, as in *State v. Cox*,[3] the majority here confuses the criminal rules of procedure with the civil rules of procedure. When the State prevails in defeating a defendant's motion to suppress, the trial court is not required to enter a separate written order apart from that dictated into the record.[4] When, however, the defense prevails, someone must draft a written order, which the trial judge must then sign and file in the record of the case.[5]

The effect of these schizophrenic rules of procedure is to substantially extend the appellate timetable for the State in appealing the ruling on a motion to suppress in which the defense prevails. Had the legislature intended for the State's timeline for appealing the granting of a motion to suppress to be substantially longer, the legislature would have provided for a different timeline by statute. As it is, this court has usurped the province of the legislature by creating a measure that extends the State's appellate timeline without approval of the legislature by the simple expedient of applying civil rather than criminal law.[6]

**[*279]** **[*280]** I reiterate what I stated in *Bracken v. State*,[7]

> The trial court orally denied Appellant's motions to suppress but did not enter a written order. In his first point, Appellant argues that the trial court erred by denying his motions to suppress. This court has held that there is no appealable ruling on a motion to suppress unless the trial judge enters a written order. As noted in Cox, ″[W]e notified the State of our concern that we lacked jurisdiction

---

[1]  *See, e.g., Gaston v. State*, 435 S.W.2d 858, 860 (Tex. Crim. App. 1969); *Horn v. State*, 699 S.W.2d 714, 716 (Tex. App.—Fort Worth 1985, no pet.).

[2]  *See* **[**14]** Tex. R. Evid. 103(a)(1); *Gearing v. State*, 685 S.W.2d 326, 329 (Tex. Crim. App. 1985) (op. on reh'g) (″It is settled that when a pre-trial motion to suppress evidence is overruled, the accused need not subsequently object to the admission of the same evidence at trial in order to preserve error.″), *overruled on other grounds by Woods v. State*, 956 S.W.2d 33 (Tex. Crim. App. 1997).

[3]  235 S.W.3d 283 (Tex. App.—Fort Worth 2007, no pet.) (en banc majority op.).

[4]  *See, e.g., Gaston*, 435 S.W.2d at 860; Horn, 699 S.W.2d at 716.

[5]  *See Cox*, 235 S.W.3d at 284-85.

[6]  *See Getts v. State*, 155 S.W.3d 153, 158 (Tex. Crim. App. 2005) **[**15]** (quoting *Lamie v. U.S. Tr.*, 540 U.S. 526, 542, 124 S. Ct. 1023, 1034 (2004)).

[7]  282 S.W.3d 94, 99-101 (Tex. App.—Fort Worth 2009, pet. ref'd) (Dauphinot, J., dissenting).

over the appeal because there is no appealable written order." We concluded in the opinion that we indeed lacked jurisdiction based on the absence of a written order.

Following the *Rosenbaum* court, we interpreted "entered by the court" to mean the signing of a written order. We recognized that *Rosenbaum* dealt with former appellate rule 41(b)(1), which required an appealable order signed by the trial court, and which has been superseded by appellate *rule 26.2(b)*, which does not. And we did not address the fact that although *article 44.01(d) of the code of criminal procedure* and appellate *rule 26.2(b)* speak of a sentence to be appealed, the appellate timetable **[**16]** runs not from the signing of the written judgment and sentence but from the pronouncement of sentence in open court.

By holding in Cox that the trial court does not enter an order granting a motion to suppress until formally signing a written order, even though the ruling and findings of fact and conclusions of law have been pronounced on the record in open court, we allowed the State more than six extra months to perfect its appeal. Yet, in the case now before this court, the majority holds that the trial court enters an order denying a motion to suppress when the trial court pronounces its ruling orally. The majority states that the appeal lies because after a trial is concluded, the appellant is appealing from "a final judgment of conviction." But the majority confuses the criminal rules of procedure with the civil rules of procedure. While the appellate timetable in a civil case runs from the signing of the judgment, the appellate timetable in a criminal case begins to run when the sentence is pronounced orally in open court. The judgment may be signed days or even weeks later in a criminal case and has no effect on the appellate timetable.

To remain consistent with the rule of *Cox*, **[**17]** we should hold that because there is no written order denying Appellant's motions to suppress, there is nothing to appeal from the suppression ruling . . . . The majority, however, holds that when a defendant appeals from a ruling on the motion to suppress, no written order is necessary.[8]

Again, as in *Bracken*, I must respectfully dissent and would hold that we must be consistent with our ruling in *Cox*, erroneous though I believe it to be and in direct conflict with the clear mandate and intent of the legislature,[9] and hold that a trial court must go to the additional and unnecessary inconvenience of entering a written order and written findings of fact and conclusions of law apart from those already entered in the written record when ruling on a motion to suppress, no matter which side prevails.

LEE ANN DAUPHINOT

JUSTICE

PUBLISH

DELIVERED: April 18, 2013

---

[8] *Id.* (citations omitted).

[9] *Cox, 235 S.W.3d at 285-87* (Dauphinot, J., dissenting).

# [Ford v. State](#)

Court of Criminal Appeals of Texas

March 9, 2005, Delivered ; March 9, 2005, Filed

NO. PD-1946-03

**Reporter**
158 S.W.3d 488; 2005 Tex. Crim. App. LEXIS 399

MATTHEW FORD, Appellant v. THE STATE OF TEXAS

**Notice:** **[\*\*1]** PUBLISH.

**Subsequent History:** As Corrected March 11, 2005. As Corrected March 23, 2005.

**Prior History:** ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW FROM THE FIRST COURT OF APPEALS. HARRIS COUNTY.
*[Ford v. State, 2003 Tex. App. LEXIS 8725 (Tex. App. Houston 1st Dist., Oct. 9, 2003)](#)*

**Disposition:** Court reversed the judgment of the court of appeals and remanded the case to the trial court.

## Case Summary

**Procedural Posture**

Defendant appealed from a judgment of the First Court of Appeals, Harris County (Texas), which affirmed an order overruling defendant's motion to suppress evidence. The court of appeals held that defendant's initial detention was valid after concluding that the evidence was sufficient to establish reasonable suspicion.

**Overview**

A state trooper pulled defendant's vehicle over for following another car too closely, in violation of *[Tex. Transp. Code Ann. § 545.062(a)](#)* (Supp. 2004). When defendant lowered his passenger-side window, the officer noticed a strong odor of marijuana. A search of the car produced codeine and marijuana. The court held that the court of appeals erred in holding that the evidence presented at the suppression hearing supported the trial court's finding of reasonable suspicion. The officer only testified that he saw defendant's car following another car at a distance that the officer believed was insufficient. Without specific, articulable facts, the court had no means in assessing whether the officer's opinion was objectively reasonable. Reliance on the officer's special training was insufficient to establish reasonable suspicion absent objective factual support.

**Outcome**

The court reversed the judgment of the court of appeals and remanded the case to the trial court so that defendant could answer the charges in the indictment.

**Counsel:** For APPELLANT: Brian W. Wice, Houston, TX.

For STATE: Shirley Cornelius, ASSIST. DA, Houston, TX.

**Judges:** Keasler, J., delivered the opinion of the Court in which Meyers, Price, Johnson, Hervey, and Holcomb, JJ., joined. Keller, P.J., filed a dissenting opinion in which Womack and Cochran, JJ., joined.

**Opinion by:** Keasler

# Opinion

[*490] In a motion to suppress evidence, Ford asserted that his initial detention for failure to maintain a proper following distance was not supported by reasonable suspicion. The trial court overruled Ford's motion. The court of appeals held the stop was valid by concluding that the evidence was sufficient to establish reasonable suspicion. Having found the record devoid of specific, articulable facts to support the officer's conclusion, we reverse.

## I. Factual and Procedural History

Texas State Trooper Andrew Peavy pulled Matthew Ford's vehicle over for following another car too closely on Highway 290 outside of Houston in violation of *Texas Transportation Code § 545.062(a)*. *Section 545.062(a)* provides,

> An operator shall, if following another vehicle, maintain an assured clear distance between the two vehicles so that, considering [**2] the speed of the vehicles, traffic, and the conditions of the highway, the operator can safely stop without colliding with the preceding vehicle or veering into another vehicle, object, or person on or near the highway. [1]

When Ford lowered his passenger-side window, Peavy noticed a strong odor of marijuana. Peavy took Ford's driver's license and returned to his patrol car to run a check on Ford's license and to issue a warning ticket for the traffic violation. He approached the car again and asked Ford to exit his vehicle. Ford initially refused Peavy's request for permission to search his car. Peavy testified that while he was waiting for backup Ford consented to a [*491] search. After another state trooper arrived, Peavy conducted a search of Ford's car. Peavy's search produced a bottle containing codeine, and another bottle containing codeine mixed with soda. Ford was then placed under arrest. When Peavy could not discover [**3] the source of the marijuana odor, he requested the assistance of a canine unit. The canine unit's search revealed 55 grams of marijuana in the car's console.

Ford was subsequently indicted for felony possession of codeine, a controlled substance, weighing at least 400 grams. Ford filed a motion to suppress evidence challenging, among other things, the reasonable suspicion required for the initial detention. At the suppression hearing, the trial court heard testimony from Peavy, the officer who responded to Peavy's request for back-up, and Ford himself. Peavy, the only officer whose testimony related to the facts surrounding the stop, testified to the events leading up to the stop:

---

[1] TEX. TRANSP. CODE ANN. § 545.062(a) (Vernon Supp. 2004).

Q: And on September 2nd of 2001 did you notice something that caught your eye around 5:47 at night?

A: Yes, ma'am. I was patrolling and I saw a maroon utility vehicle following too close behind--I was patrolling 290 westbound. I saw a maroon GMC or Chevy utility vehicle following a white car, following too close.

Q: And where were you when you noticed this vehicle?

A: I was directly behind him.

Q: And at the time that you noticed this, what did you do?

A: I activated my emergency **[\*\*4]** overheads and the vehicle pulled over.

. . .

Q: And when you were approaching the vehicle, what were your intentions before you approached the vehicle?

A: To talk to him about his violation he had committed.

Q: Which violation is that?

A: Following too close.

This quoted portion was the only testimony given by Peavy describing the circumstances leading up to Ford being stopped. There was no other testimony relevant to Ford's driving. Peavy's testimony also established that he was a certified peace officer serving the Department of Public Service for four years enforcing traffic and criminal laws. The remainder of his testimony focused on the search of Ford's vehicle and whether Ford consented to the search. Ford also testified at the suppression hearing. Although he testified that a car "squeezed in" between his car and the car in front of him, Ford stated that he was not following too close.

Concluding that the traffic stop was supported by reasonable suspicion, the trial judge denied Ford's motion to suppress. Under a plea agreement, Ford pled guilty to a reduced second-degree felony possession of a controlled substance charge. The court deferred adjudication **[\*\*5]** and placed Ford on probation for nine years with a $ 500 fine. Ford appealed the trial court's order denying his motion.

## II. Court of Appeals

The Court of Appeals overruled Ford's point of error and found that in light of the evidence presented at the suppression hearing, the trial court did not err in denying the motion to suppress. [2] The court **[\*492]** stated that "Trooper Peavy's experience and training qualified him to make a judgment on whether, 'considering the speed of the vehicles, traffic and the conditions of the highway,' [Ford] was following the car in front of him too closely." [3] The court stated "Peavy testified that he saw [Ford]

[2] *Ford v. State*, 2003 Tex. App. LEXIS 8725, *2, No. 01-02-00643-CR, 2003 WL 22310499, at *3 (Tex. App.--Houston [1st Dist.] 2003, pet. granted).

[3] *Id.*

following another car at a distance that Peavy believed was insufficient and thus, in violation of the statute." The court also stated that the trial court was entitled to believe the officer's testimony while discounting Ford's testimony. The court additionally reasoned that Peavy's determination that Ford had violated *section 545.062(a)* "went unchallenged at the suppression hearing." In further illustrating this point, the court highlighted Ford's failure to "press Trooper Peavy on what factors might have led Peavy to make the determination **[\*\*6]** that [Ford] was following too closely" or "attempt to discredit Peavy's expertise or qualifications to make such a determination." [4]

## III. Analysis

### Burden of Proof

To suppress evidence on an alleged *Fourth Amendment* violation, the defendant bears the initial burden of producing evidence that rebuts the presumption of proper police conduct. [5] **[\*\*7]** A defendant satisfies this burden by establishing that a search or seizure occurred without a warrant. [6] Once the defendant has made this showing, the burden of proof shifts to the State where it is required to establish that the search or seizure was conducted pursuant to a warrant or was reasonable. [7]

In this case, the suppression hearing began with the State stipulating that this case involved a warrantless arrest. Because the stipulation shifted the burden of proof to the State, whether Ford attempted to refute the existence of sufficient suspicion is irrelevant to the reasonable-suspicion analysis. Contrary to both the court of appeals's and the dissent's position, Ford was not charged with the responsibility of challenging whether Peavy had specific facts warranting the detention. The State bore the burden of establishing the reasonableness of the warrantless detention. [8]

### Reasonable Suspicion

An officer conducts a lawful temporary detention when he has reasonable suspicion to believe that an individual is violating the law. [9] Reasonable suspicion exists if the officer has specific, articulable facts **[\*\*8]** that, when combined with rational inferences from those facts, would lead him to reasonably conclude that a particular person actually is, has been, or soon will be engaged in criminal activity. [10] This is an objective standard that disregards any subjective intent of the officer making the stop and looks solely to whether an objective basis for the stop exists. [11] A reasonable-suspicion determination is **[\*493]** made by considering the totality of the circumstances. [12]

---

[4] *Id.*

[5] *Russell v. State*, 717 S.W.2d 7, 9 (Tex. Crim. App. 1986).

[6] *Bishop v. State*, 85 S.W.3d 819, 822 (Tex. Crim. App. 2002).

[7] *Id.*

[8] *See id.*

[9] *Balentine v. State*, 71 S.W.3d 763, 768 (Tex. Crim. App. 2002).

[10] *Garcia v. State*, 43 S.W.3d 527, 530 (Tex. Crim. App. 2001).

[11] *Id.*

[12] *Id.*

In evaluating the totality of the circumstances, we use a bifurcated standard of review. We give almost total deference to the trial court's determination of historical facts and review de novo the trial court's application of law to facts not turning on credibility and demeanor. [13] Because the trial court did not make explicit findings of fact in this **[**9]** case, we review the evidence in a light most favorable to the trial court's ruling and assume that the trial court made implicit findings of fact supported by the record. [14]

*Application*

Ford asserts that the court of appeals erred in holding the evidence presented at the suppression hearing supported the trial court's finding of reasonable suspicion. We agree.

The court of appeals stated that "Trooper Peavy testified that he saw [Ford] following another car at a distance that Peavy believed was insufficient and, thus, in violation of the statute." While this may be a permissible interpretation of Peavy's "following too close" testimony, it does not change its conclusive character into specific, articulable facts. And attempting to do so requires a strained reading of the record. As indicated from Peavy's testimony, Peavy only stated that Ford was "following too **[**10]** close." The record reveals an absence of any facts allowing an appellate court to determine the circumstances upon which Peavy could reasonably conclude that Ford actually was, had been, or soon would have been engaged in criminal activity. [15] Instead, the trial court was presented only with a conclusory statement that Ford was violating a traffic law. We do not quarrel with the notion that Peavy may have in fact believed that Ford was following another car too closely. Nor do we dispute that the trial judge is free to believe or disbelieve Peavy's testimony. But without specific, articulable facts, a court has no means in assessing whether this opinion was objectively reasonable.

When a trial court is not presented with such facts, the detention cannot be "subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances." [16] And "when such **[**11]** a stop is not based on objective criteria, the risk of arbitrary and abusive police practices exceeds tolerable limits." [17] Allowing a police officer's opinion to suffice in specific facts' stead eviscerates *Terry*'s reasonable suspicion protection. If this Court were to hold as the dissent suggests, we would be removing the "reasonable" from reasonable suspicion. Therefore, we adhere to the principle that specific, articulable facts are required to provide a basis for finding reasonable suspicion. [18] Mere opinions are ineffective substitutes for specific, articulable facts in a reasonable-suspicion analysis.

The court's opinion further reasoned that the evidence regarding Peavy's **[*494]** training, experience, and his duties enforcing traffic laws qualified him "to make a judgment as to whether, **[**12]** 'considering the speed of the vehicles, traffic and the conditions of the highway,' [Ford] was following

[13] *Guzman v. State*, 955 S.W.2d 85, 88-89 (Tex. Crim. App. 1997).

[14] *Balentine*, 71 S.W.3d at 768.

[15] *See Garcia*, 43 S.W.3d at 530.

[16] *Terry v. Ohio*, 392 U.S. 1, 21, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1967).

[17] *Brown v. Texas*, 443 U.S. 47, 52, 61 L. Ed. 2d 357, 99 S. Ct. 2637 (1979).

[18] *See Balentine*, 71 S.W.3d at 768.

the car in front of him too closely." It is true that law enforcement training or experience may factor into a reasonable-suspicion analysis. [19] The United States Supreme Court has stated, "objective facts, meaningless to the untrained, can be combined with permissible deductions from such facts to form a legitimate basis for suspicion of a particular person and for action on that suspicion." [20] But reliance on this special training is insufficient to establish reasonable suspicion absent objective factual support. [21]

*Conclusion*

The evidence before the trial court indicated only that in Peavy's judgment, Ford was following another car too closely in violation of *Transportation Code § 545.062(a)*. The State failed to elicit any testimony pertinent **[**13]** to what facts would allow Peavy to objectively determine Ford was violating a traffic law in support of his judgment. Even viewing the evidence in the light most favorable to the trial court's ruling, the record does not support a finding of reasonable suspicion. Because the record fails to reveal any objective facts, we hold that the trial court erred in denying Ford's motion to suppress.

We reverse the judgment of the court of appeals and remand the case to the trial court so that Ford can answer the charges in the indictment.

**Dissent by:** KELLER

# Dissent

KELLER, P.J., *filed a dissenting opinion in which WOMACK and COCHRAN, JJ., joined.*

DISSENTING OPINION

This case presents a difficult question: how specific must an officer's testimony about his observations be in order to support a finding of reasonable suspicion? At issue here is an officer's opinion, based on his observations, that the accused was "following too close." I would hold that the officer's opinion constituted *prima facie* evidence sufficient to support a finding of reasonable suspicion, but the defendant or the trial court could have requested greater specificity, and if greater specificity were not forthcoming, **[**14]** then the evidence would have been subject to suppression. Because greater specificity was not requested in this case, I would affirm the trial court's judgment.

In *Terry v. Ohio*, the fountainhead case on the "reasonable suspicion" standard applicable to "stops," the Supreme Court said that a police officer had reasonable suspicion if he could "point to specific and articulable facts which, if taken together with rational inferences from those facts, reasonably warrant" the intrusion in question. [1] The requirement of "specific and articulable facts" serves the function of subjecting the police officer's actions to meaningful judicial review:

---

[19] *U.S. v. Cortez*, 449 U.S. 411, 419, 66 L. Ed. 2d 621, 101 S. Ct. 690 (1981).

[20] *Id.*

[21] *See id.*

[1] 392 U.S. 1, 21, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968).

The scheme of the *Fourth Amendment* becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular **[*495]** search or seizure in light of the particular circumstances. **[**15]** [2]

That meaningful judicial review carries over to the appellate context, which requires a *de novo* review of the circumstances relied upon to support a trial court's finding that reasonable suspicion did indeed exist. [3] But it is also true that appellate courts must give "due weight" to the "factual inferences drawn by resident judges and local law enforcement officers." [4] Texas recognized these principles in *Guzman v. State*, where we explained that, in the search and seizure context, "almost total deference" should be given to questions of historical fact, and application-of-law-to-fact questions turning on credibility and demeanor, while other application-of-law-to-fact questions are reviewed *de novo*. [5]

 **[**16]** Whether the bare testimony "he was following too close" is sufficient to support a trial court's finding of reasonable suspicion has not been squarely addressed in any jurisdiction. There are a handful of published appellate opinions in which "following too close" or "tailgating" was at issue, and in each of these cases, the appellate court found the observed conduct to be sufficient to show reasonable suspicion or probable cause. [6] **[**17]** In two of these cases, the court recited a specific fact testified to by the officers in support of their conclusions: following less than two seconds behind another vehicle. [7] In the other cases the appellate court simply remarked that the officer had validly pulled over the accused on the basis of an anti-tailgating traffic law. [8] None of these cases addressed whether the testimony in question was sufficiently specific. [9]

The testimony at issue is an opinion based on a witness' perception. As such, it implicates the concerns underlying *Texas Rule of Evidence 701*, which provides that the opinion of a witness is admissible if it is "rationally based on the perception of the witness" and "helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." [10] Our **[**18]** *Rule 701* is based on its federal counterpart, which was adopted in part due to the "practical impossibility" of determining what

---

[2]   *Id.*

[3]   *United States v. Arvizu*, 534 U.S. 266, 275, 151 L. Ed. 2d 740, 122 S. Ct. 744 (2002).

[4]   *Id.* at 273-274.

[5]   955 S.W.2d 85, 89 (Tex. Crim. App. 1997).

[6]   *United States v. Perez,* 200 F.3d 576, 577-579 (8th Cir. 2000); *United States v. Lyton,* 161 F.3d 1168, 1169-1170 (8th Cir. 1998); *United States v. Beck,* 140 F.3d 1129, 1132-1134 (8th Cir. 1998); *United States v. Rivera,* 867 F.2d 1261, 1262-1264 (10th Cir. 1989); *Peters v. State,* 859 So. 2d 451, 452-454 (Ala. Crim. App. 2003); *State v. Cohen,* 549 So. 2d 884, 886 (La. App. 1989), *cert. denied*, **559 So. 2d 135 (La. 1990)**; *State v. McGinnis,* 8 Neb. App. 1014, 1016-1020, 608 N.W.2d 605, 608, 610 (2000).

[7]   *Perez,* 200 F.3d at 578; *McGinnis,* 608 N.W.2d at 608.

[8]   *Lyton,* 161 F.3d at 1169-1170; *Beck,* 140 F.3d at 1132-1134; *Rivera,* 867 F.2d at 1262-1263; *Peters,* 859 So. 2d at 452; *see also Cohen, 549 So. 2d at 886* (rejecting challenge against constitutionality of anti-tailgating statute). The discussion in *Peters* strongly suggests that the officer did not give more specific testimony, but the court's remark about the sufficiency of this testimony to support the stop was *dicta. See Peters, 859 So. 2d at 452-454*.

[9]   *See* previously cited cases.

[10]   TEX. R. EVID. 701.

is a "fact," as opposed to mere opinion, "demonstrated by a century of litigation." [11] The advisory committee for the [*496] federal rules cited McCormick's treatise for the proposition that "a standard for permitting opinions and conclusions has proved too elusive and too unadaptable for purposes of satisfactory judicial administration." [12] As a result of the immense difficulty in sorting "fact" from "opinion," a recent edition of McCormick's treatise has concluded that trial courts should be "accorded a wide range of discretion at least in classifying evidence as 'fact' or 'opinion' and probably in admitting evidence even where found to constitute opinion." [13]

We have recognized [**19] the role of *Rule 701* in permitting the admission of opinions, where the opinion constitutes a "shorthand rendition of the facts." [14] These types of opinions, sometimes also called "collective facts," are permitted because a "catalogue of particulars may be inadequate to convey important ideas that lay witnesses are competent to express." [15] The opinion "may sum up and give the full flavor and character of the particulars (to which the witness also testifies) or may substitute for a catalogue the witness may be unable to provide." [16] "Prototypical" examples of this type of opinion include those relating to "the appearance of persons or things, identity, the manner of conduct, competency of a person, degrees of light and darkness, sound, size, weight, [and] *distance*." [17] [**20] Other common examples include speed [18] and intoxication. [19]

Authority considering the intersection of *Rule 701* with search and seizure law appears to be sparse, but one interesting case was decided in Minnesota. In *State v. Nolting*, a law enforcement agent requested a warrant to search a particular piece of mail based in part on his declaration that "I was advised that the parcel was found [in the post office by a mail clerk], who has discovered *numerous* parcels of this type containing controlled substances." [20] Although the defendant argued that the clerk's statement was conclusory and should be given no weight, the Supreme Court of Minnesota found it to be a legitimate opinion of the type covered by *Federal Rule of Evidence 701* [**21] . [21] The court remarked:

> The conclusion drawn by the mail clerk is a simple one, drawn directly from his personal sensory experience. It is the kind of conclusion that courts and juries may legitimately credit in resolving factual questions.

---

[11] Advisory Committee Notes, FED. R. EVID. 701.

[12] *Id.*

[13] MCCORMICK ON EVIDENCE, 5th ed., § 11, p. 46 (1999).

[14] *Solomon v. State*, 49 S.W.3d 356, 364 (Tex. Crim. App. 2001); *Fairow v. State*, 943 S.W.2d 895, 900 (Tex. Crim. App. 1997).

[15] Mueller & Kirkpatrick, FEDERAL EVIDENCE, 2nd ed., § 346 (1994).

[16] *Id.*

[17] Advisory Committee Notes, 2000 Amendments to Rule 701 (quoting *Asplundh Mfg. Div. V. Benton Harbor Eng'g*, 57 F.3d 1190, 1196 (3rd Cir. 1995))(bracketed material and emphasis added).

[18] *Mueller & Kirkpatrick*, *supra*; *Ho v. United States*, 331 F.2d 144 (9th Cir. 1964).

[19] *Mueller & Kirkpatrick*, *supra*; *United States v. Lechuga*, 888 F.2d 1472, 1480 (5th Cir. 1989); *Loof v. Sanders*, 686 P.2d 1205, 1212-1213 (Alas. 1984)(citing *Esquivel v. Nancarrow*, 104 Ariz. 209, 450 P.2d 399, 403 (1969)).

[20] 312 Minn. 449, 450-451, 254 N.W.2d 340, 342 (1977)(bracketed material substituted for original, emphasis in original).

[21] *Id.* at 454-455, 454 n. 3.

\* \* \*

If the affidavit had set forth the respects in which the parcel resembled the earlier **[\*497]** packages, the magistrate might have been more certain of the clerk's conclusion. But we think detailing the basis of this conclusion, while desirable, goes to its probative value to establish probable cause and not to whether the conclusion can be considered by a magistrate. [22]

The fact that a *Rule 701* type of opinion can be considered in determining a search and seizure question does not necessarily mean that the opinion **[\*\*22]** is sufficient to support the trial court's resolution of the issue. But a key to how to review this type of evidence may be found in one of the reasons that has been given for liberally allowing its admission: abuses can be effectively checked by cross-examination. The federal rules advisory committee explained:

> The rule assumes that the natural characteristics of the adversary system will generally lead to an acceptable result, since the detailed account carries more conviction than the broad assertion, and a lawyer can be expected to display his witness to the best advantage. If he fails to do so, cross-examination and argument will point up the weakness. [23]

The officer's opinion that appellant was "following too close" is a broad factual assertion based on the officer's observations. Substantiating that factual assertion with more detail - the number of car lengths separating appellant's vehicle from the one being **[\*\*23]** followed, or the number of seconds between the time each vehicle passed a fixed point, for example - would be preferable, but the officer's unchallenged assertion of what he observed was a sufficient basis for the trial court to rule as it did. The trial court could reasonably infer from the officer's testimony that he did indeed observe appellant following too closely. The information imparted was enough to convey to the trial court a factual basis for believing that appellant may have broken the law.

Cross-examination might have shown otherwise. If, upon cross-examination, the officer could offer no basis whatsoever for his conclusion that appellant was following too closely, the trial court might then have been required to find that the officer's "following too close" conclusion did not constitute specific, articulable facts to support a stop. Or perhaps cross-examination would have revealed that the officer's definition of "following too close" was not in fact a description of conduct proscribed by the statute in question. On the other hand, cross-examination might have elicited details further supporting the officer's conclusion. The trial court could have chosen to disregard **[\*\*24]** the officer's testimony due to its generality, [24] but it was also within the trial court's discretion to credit the testimony, and under the circumstances present here, I believe the testimony was sufficient to support the trial court's finding of reasonable suspicion.

I respectfully dissent.

---

[22] *Id.* at 454-455 (ellipsis inserted).

[23] Advisory Committee Notes, FED. R. EVID. 701.

[24] *See State v. Ross*, 32 S.W.3d 853 (Tex. Crim. App. 2000). And nothing prevents the trial court from asking the witness for more specificity before deciding to credit the opinion testimony. *See* MCCORMICK, § 11, p. 50 ("provided personal knowledge is adequately established the witness need not recite the observed matters that are the basis of opinion, *although the judge has discretion to require preliminary testimony abut the facts observed*" - emphasis added).

KELLER, Presiding Judge

KELLER, Presiding Judge

# *Kothe v. State*

Court of Criminal Appeals of Texas

October 20, 2004, Delivered

NO. 1738-03

**Reporter**

152 S.W.3d 54; 2004 Tex. Crim. App. LEXIS 1749

CRAIG ALLEN KOTHE, Appellee v. THE STATE OF TEXAS

**Subsequent History:** **[\*\*1]** As Corrected March 24, 2005.
Rehearing denied by *State v. Kothe, 2005 Tex. Crim. App. LEXIS 89 (Tex. Crim. App., Jan. 19, 2005)*

**Prior History:** ON STATE'S PETITION FOR DISCRETIONARY REVIEW FROM THE FOURTH COURT OF APPEALS. KENDALL COUNTY.
*State v. Kothe, 123 S.W.3d 444, 2003 Tex. App. LEXIS 8060 (Tex. App. San Antonio, 2003)*

**Disposition:** Reversed and remanded.

## Case Summary

**Procedural Posture**

The State sought discretionary review from a judgment of the Fourth Court of Appeals, Kendall County (Texas), which affirmed a trial court's order granting defendant's motion to suppress heroin.

**Overview**

A deputy detained defendant for suspected DWI. The deputy determined that defendant was not intoxicated, but during or immediately after a warrant check, he received a dispatch stating that defendant could be in possession of missing property. With defendant's consent, the deputy searched the car and found drug paraphernalia. The deputy then spoke with the passenger, who informed him that she was carrying heroin at defendant's request. The court held that, because defendant had a reasonable expectation of privacy in not being subjected to an unduly prolonged detention, he had standing to complain about the subsequent search of the passenger. The court concluded that suppression was unnecessary because the search was not an exploitation of an illegal detention. The deputy's conduct in returning to his vehicle and waiting a few minutes for the results of the license and warrant check, after determining that defendant was not intoxicated, was constitutionally reasonable under the totality of the circumstances. The deputy was not using the warrant check solely as means to purposely extend the detention but was simply completing a regular component of a routine traffic stop.

**Outcome**

The court reversed the decision by the court of appeals and remanded the case to the trial court for further proceedings.

**Counsel:** For APPELLANT: David A. Schulman, Austin, TX.

For STATE: E. Bruce Curry, DA, Kerrville, TX.

**Judges:** Cochran, J., delivered the opinion of the unanimous Court.

**Opinion by:** Cochran

## Opinion

[*57] **Cochran, J.,** *delivered the opinion of the unanimous Court.*

Deputy Forslund detained Craig Kothe for suspected DWI. In conjunction with a field sobriety test, the deputy requested a computer search for outstanding warrants on Mr. Kothe. Deputy Forslund determined that Mr. Kothe was not intoxicated, but during or immediately after the warrant check, he received a dispatch stating that Mr. Kothe might be in possession of missing property. With Mr. Kothe's consent, the deputy searched the car and found drug paraphernalia. The deputy then spoke with the passenger, Ms. Brantley, who informed him that she was carrying heroin at Mr. Kothe's request.

> Two issues are presented in this case. [1] [**3] First, does Mr. Kothe have standing to challenge the deputy's search of the passenger? We hold that, because Mr. Kothe had a reasonable expectation of privacy in [**2] not being subjected to an unduly prolonged detention, he has standing to challenge the seizure of evidence obtained by exploiting that detention. Second, is the continued detention of a driver for an additional three to twelve minutes while waiting for the results of a routine computer driver's license check "reasonable" if the officer's original articulable suspicion had already been resolved? We hold that, viewed in the totality of the circumstances, the additional short detention period was not a violation of the *Fourth Amendment*. We reverse the judgment of the court of appeals which held that Kothe's continued detention was constitutionally unreasonable. [2]

## I.

### A. Factual Background

During the evening of July 24, 2001, Kendall County Deputy Forslund was on [*58] routine patrol when he received a radio dispatch about a possibly intoxicated driver. The dispatcher said that someone driving a red Jeep behind the car had called in the report. Shortly thereafter, Deputy Forslund spotted

---

[1]   We granted the State's petition to review the following questions:

1) Does an appellate court err by holding that the defendant's lack of standing is "transcended" by an earlier illegal detention?

2) Where an officer, following a valid traffic stop, resolves the original detention issue, is the continued detention of the driver, while waiting on the return of a routine computer driver's license check, reasonable?

[2]   *State v. Kothe*, 123 S.W.3d 444, 448 (Tex. App. - San Antonio 2003).

the described car pulling into a highway rest stop. The deputy pulled up behind the car, radioed in the license plate number, approached the driver, Mr. Craig Kothe, and asked for his driver's license.

Deputy Forslund conducted a field sobriety test of Mr. Kothe, in conjunction with running a driver's license and warrant check. The deputy concluded that Mr. Kothe was not intoxicated and returned to his patrol car to wait for the results on the warrant check. The check showed no outstanding warrants. Just as Deputy Forslund prepared to release Mr. Kothe, he received a second dispatch which described Mr. Kothe and his car. The dispatcher stated that the sheriff's office had **[**4]** received a teletype earlier in the day that Mr. Kothe might be in possession of a blue bank bag containing old silver coins taken from someone's household safe. The Fredericksburg police teletype requested that officers retrieve the bank bag and coins, but not arrest Mr. Kothe.

At this point, Deputy Forslund approached Mr. Kothe's car and asked him about the bag and coins. Mr. Kothe said that there was no blue bag in his car. Deputy Forslund asked: "Do you mind if I search? Do you mind if I look?" Mr. Kothe said, "No," and filled out a written consent to search form. Deputy Forslund then looked in the front console of the car and found drug paraphernalia, but no blue bank bag. After finding the paraphernalia, the deputy questioned the passenger, Mr. Kothe's girlfriend, Jennifer Brantley. She was acting very nervous and said that she had two baggies of heroin, which Mr. Kothe had asked her to hold, in her bra. She handed over the baggies, and Officer Forslund arrested Mr. Kothe and Ms. Brantley for possession of heroin and drug paraphernalia.

After Mr. Kothe was indicted for possession of a controlled substance, he filed a motion to suppress the heroin, claiming that Deputy Forslund's **[**5]** continued detention of him after the deputy had determined that Mr. Kothe was not intoxicated was constitutionally unreasonable and illegal. The motion focused on the estimated three to twelve minute period between the moment that Deputy Forslund determined Mr. Kothe was not intoxicated and the time he re-approached Mr. Kothe to ask about the blue bank bag. [3] After hearing the evidence, the trial court orally granted the suppression motion and later filed written Findings of Fact and Conclusions of Law. [4] The State appealed.

## [**6] B. The Court of Appeals' Opinion

Initially, the San Antonio Court of Appeals reversed the trial court's ruling, but, on rehearing, it withdrew its prior opinion and substituted one affirming the trial court's suppression order.

As for the standing issue, the court of appeals agreed with the State that Mr. Kothe would normally lack standing to complain about the search of Ms. Brantley. **[*59]** The court held that, in this case however, the search issue was "transcended by the illegal detention." [5] However, the court of appeals concluded that, because of Mr. Kothe's prolonged detention, all of the evidence seized thereafter was tainted by that initial illegality.

---

[3]   In his testimony, Deputy Forslund was himself uncertain about the amount of time that elapsed between the events; he agreed with the questioners' different suggested times.

[4]   The trial judge first obtained written proposed findings from both the defense and the State. He then held a special hearing in which he, the defense, and the State together compiled an agreed set of Findings of Fact and Conclusions of Law. It is apparent from this commendable process that Judge Ables carefully reflected on the precise words that he chose.

[5]   *Kothe,* 123 S.W.3d at 449.

In assessing whether Mr. Kothe's *Fourth Amendment* rights were violated by his continued detention, the court of appeals deferred to the trial court's determination of facts and rulings on mixed questions of law and fact. The court applied an abuse of discretion standard of review to the trial court's **[**7]** legal, as well as his factual, findings. Stating that "these are findings we cannot disturb on appeal," the court held that Deputy Forslund's conduct was unreasonable under the circumstances and violated the *Fourth Amendment*. [6]

II.

Before addressing whether Mr. Kothe's *Fourth Amendment* rights were violated by the continued detention, we must first assess whether Mr. Kothe has standing to complain about the seizure of the heroin. Mr. Kothe has standing to contest the search only if he had a reasonable *personal* expectation of privacy that he claims was violated.

## A. Standing

Proof of "a reasonable expectation of privacy" is at the forefront of all *Fourth Amendment* claims. Any defendant seeking to suppress evidence obtained in violation of the *Fourth Amendment* must first show that he personally had a reasonable expectation of privacy that the government invaded. [7] He must prove that he was a "victim" of the unlawful search or seizure. [8] He has no standing to **[**8]** complain about the invasion of someone else's personal rights. [9] **[**9]** Only after a defendant has established his standing to complain may a court consider whether he has suffered a substantive *Fourth Amendment* violation. [10] Although we defer to the trial court's factual findings and view them in the light most favorable to the prevailing party, we review the legal issue of standing *de novo*. [11]

 **[**10]** **[*60]** In this case, the State failed to challenge Mr. Kothe's standing to complain about the present search or seizure in the trial court. Mr. Kothe argues that the State cannot raise the issue on appeal in the context of a warrantless search when the State was the losing party in the trial court. We disagree. This Court has previously stated that, because standing is an element of a *Fourth Amendment* claim, the State may raise the issue of standing for the first time on appeal, even when the defendant

---

[6]   *Id.* at 448.

[7]   *See Rakas v. Illinois*, 439 U.S. 128, 139, 58 L. Ed. 2d 387, 99 S. Ct. 421 (1978) (noting that issue of standing involves two inquiries: first, whether defendant has alleged an "injury in fact"; and second, "whether the proponent is asserting his own legal rights and interests rather than basing his claim for relief upon the rights of third parties"). "*Fourth Amendment* rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165, 174, 22 L. Ed. 2d 176, 89 S. Ct. 961 (1969).

[8]   *See generally* 5 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 11.3, at 118 (3d ed. 1996).

[9]   *United States v. Salvucci,* 448 U.S. 83, 84-85, 65 L. Ed. 2d 619, 100 S. Ct. 2547 (1980); *Villarreal v. State*, 708 S.W.2d 845, 849-50 (Tex. Crim. App. 1986).

[10]   *See Villarreal v. State,* 935 S.W.2d 134, 138 (Tex. Crim. App. 1996); *United States v. Pierce,* 959 F.2d 1297, 1303 (5th Cir. 1992); *United States v. Brazel*, 102 F.3d 1120, 1147 (11th Cir. 1997) Because warrantless searches and seizures are presumed to be unreasonable, the prosecution must establish that any search or seizure was justified under an exception to the warrant requirement. *Coolidge v. New Hampshire*, 403 U.S. 443, 454-455, 29 L. Ed. 2d 564, 91 S. Ct. 2022 (1971).

[11]   *State v. Johnson,* 896 S.W.2d 277, 285 (Tex. App.-Houston [1st Dist.] 1995), *aff'd,* 939 S.W.2d 586 (Tex. Crim. App. 1996); *see* United States v. Phillips, 382 F.3d 489, 2004 U.S. App. LEXIS 17274 *9 (5th Cir. 2004) (noting that "whether a defendant has standing to contest an allegedly illegal search is a question of law" and is reviewed *de novo*); *United States v. DeLuca*, 269 F.3d 1128, 1131 (10th Cir. 2001) (stating that courts review *de novo* the issue of whether a defendant has standing to challenge a search).

is the prevailing party in the trial court. [12] The appellate court may raise the issue of standing on its own; [13] it may analyze that issue as a part of the *Fourth Amendment* claim presented; [14] or it may conclude that the State has forfeited that argument because it failed to raise it in the trial court. [15] In this case, the court of appeals did address the State's complaint concerning Mr. Kothe's standing and concluded:

> Although we agree Kothe has no standing to complain about any search and seizure conducted against Brantley, that issue is transcended by the illegal detention that was found to have occurred earlier. The trial court ruled that all of the evidence seized, including **[**11]** the two baggies of heroin taken from Brantley, was tainted because it was obtained during the illegal detention. [16]

The court of appeals is correct in its conclusion on standing.

 **[**12]** In addressing standing, "it is critical that the precise police conduct being objected to be properly identified, for this may itself turn out to be determinative on the standing issue." [17] In this case, the State argues that Mr. Kothe had no reasonable expectation of privacy in the two balloons of heroin secreted in Ms. Brantley's bra. True enough. Mr. Kothe cannot complain about a search of Ms. Brantley. But that is not the basis of his complaint.

Rather, Mr. Kothe's *Fourth Amendment* claim is based upon a purportedly prolonged detention of himself as the driver of his car. He argues that, although Deputy Forslund initially had articulable suspicion to detain him, once the deputy determined that Mr. Kothe was not intoxicated, any further detention, without articulable suspicion of some other crime, violated the *Fourth Amendment*. He claims that the later search of Ms. Brantley was made by exploiting that initial illegality, and it is "fruit of the poisonous tree" of the violation **[**13]** of Mr. Kothe's personal *Fourth Amendment* right to be free from unreasonable seizures. [18]

---

[12]  *State v. Klima*, 934 S.W.2d 109, 110-11 (Tex. Crim. App. 1996).

[13]  *See State v. Brady*, 763 S.W.2d 38, 42 (Tex. App. - Corpus Christi 1988, no pet.) (addressing issue of defendant's standing to challenge search although not raised by either State or defendant in trial or appellate court).

[14]  *See Klima*, 934 S.W.2d at 110-11.

[15]  *See, e.g., United States v. Price*, 54 F.3d 342, 346 (7th Cir. 1995) (stating that "because *Rakas*' principle of 'standing' is rooted in the substantive law of the *Fourth Amendment* and not Article III [jurisdiction of courts], the government may waive these types of standing objections") (citation omitted); *see also United States v. DeGasso*, 369 F.3d 1139, 1143 n.3 (10th Cir. 2004) (concluding that standing issue was waived because government had never raised it).

[16]  *Kothe*, 123 S.W.3d at 448-49.

[17]  5 LAFAVE, § 11.3, at 120.

[18]  *See Wong Sun v. United States*, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963). In *Wong Sun,* federal narcotics agents illegally entered Blackie Toy's closed laundry and arrested him in his adjacent living quarters. In response to "on-the-spot" questioning, Toy said that he did not have any narcotics, but that Johnny Yee did. The officers then went to Yee's house, arrested him and found heroin that Yee claimed had come from both Toy and Wong Sun. The Supreme Court held that Toy would not have standing to complain about any invasion of Yee's rights, but that Toy did have standing to complain about the officers' conduct in entering his laundry and arresting him. Exploitation of that illegal conduct led to Yee and made the heroin obtained from Yee the "fruit of the poisonous tree" of the violation of Toy's *Fourth Amendment* rights. *Id.* at 488. Thus, Toy had standing to complain about any evidence acquired from the exploitation of his illegal seizure. Wong Sun, however, had no standing to complain about the violation of Toy's *Fourth Amendment* rights; he could complain only about a violation of his personal rights. *Id.* at 492. And, because Wong Sun's privacy rights were not invaded, he, unlike Toy and Yee, had no standing to challenge use of the evidence.

[**14] [*61] The testimony in this case establishes that both Mr. Kothe and Ms. Brantley had a reasonable expectation of privacy in the right to be free from an illegal detention. "The intrusion a vehicle stop causes is personal to those in the car when it occurs." [19] [**16] As explained by Professor LaFave:

> If either the stopping of the car or the passenger's removal from it are unreasonable in a *Fourth Amendment* sense, then surely the passenger has standing to object to those constitutional violations and to have suppressed any evidence found in the car which is their fruit. (Quite obviously, a driver nonowner likewise has standing regarding the stopping of the vehicle or his removal from it). [20]

Both Mr. Kothe and Ms. Brantley had a reasonable expectation of privacy in not being detained beyond the time necessary for Officer Forslund to complete his investigation. Thus, Mr. Kothe has standing to complain about any illegally prolonged detention. [21] If Officer Forslund's conduct in awaiting the results of the computer license [*62] and warrant check was "unreasonable" under the *Fourth Amendment*, Mr. Kothe has standing to complain about the subsequent search of Ms. Brantley. That search [**15] is "fruit of the poisonous tree" if it constituted an exploitation of the illegal detention. [22]

[**17] We turn, then, to the question of whether Officer Forslund's conduct in awaiting the results of the license and warrant check was "unreasonable" under the *Fourth Amendment*.

## B. "Reasonable" Detentions under the <u>Fourth Amendment</u>

---

[19] *United States v. Powell*, 929 F.2d 1190, 1195 (7th Cir. 1991) (collecting cases and concluding that passengers, as well as drivers, have standing to challenge a vehicle stop or prolonged detention); *see also United States v. Woodrum,* 202 F.3d 1, 6 (1st Cir. 2000) (citing *Rakas* and holding that "each occupant of a car has a right to challenge the propriety of a traffic stop under the *Fourth Amendment*"); *United States v. Roberson,* 6 F.3d 1088, 1091 & n.6 (5th Cir. 1993) ("whereas the search of an automobile does not implicate a passenger's *fourth amendment* rights, a stop results in the seizure of the passenger and driver alike. Thus, a passenger of a stopped automobile does have standing to challenge the seizure as unconstitutional"); *United States v. Erwin*, 875 F.2d 268, 269, n. 2 (10th Cir. 1989) (citing *Wong Sun* and holding that "even if defendant lacks standing to challenge the search of the car, if the initial stop was illegal, the seized contraband is subject to exclusion under the 'fruit of the poisonous tree' doctrine"); *State v. Harms,* 233 Neb. 882, 884-87, 449 N.W.2d 1, 4 (1989) (collecting cases and concluding that an occupant of a vehicle will ordinarily have a legitimate expectation to be free of unreasonable governmental intrusion which gives the occupant standing to challenge the stop as violative of his *Fourth Amendment* rights); *State v. DeMasi, State v. Lanoue,* 419 A.2d 285 (R.I.1980), *vacated on other grounds, 452 U.S. 934, 69 L. Ed. 2d 948, 101 S. Ct. 3072 (1981)* (holding that all occupants of the vehicle had standing to challenge the constitutionality of the stop because "all three shared a legitimate expectation that they would be free from unreasonable governmental intrusion occasioned by the stop, the request for identification, and the warrant check. To hold otherwise here would be to draw artificial, formalistic distinctions not grounded in logic").

[20] 5 LAFAVE, § 11.3(e), at 173-74.

[21] *See United States v. Brigham,* 382 F.3d 500, 506 n.3 (5th Cir. 2004) ("the Government does not dispute [defendant's] standing, as the vehicle's driver, to attack the constitutionality of the search" based upon a claim of a prolonged detention).

[22] *See Wong Sun*, 371 U.S. at 487-88 (stating that "we need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint'") (citation omitted); *see also Crosby v. State*, 750 S.W.2d 768, 780 (Tex. Crim. App. 1987) (applying *Wong Sun* "fruit of the poisonous tree" doctrine); *United States v. Portillo-Aguirre,* 311 F.3d 647, 658 (5th Cir. 2002) (noting that "under the fruit of the poisonous tree doctrine, all evidence derived from the exploitation of an illegal seizure must be suppressed, unless the government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the *Fourth Amendment* violation").

Did Deputy Forslund's conduct in awaiting the results of the license and warrant check, after determining that Mr. Kothe was not intoxicated, violate Mr. Kothe's reasonable expectation of privacy? Conversely, was the deputy's behavior constitutionally "reasonable" under the totality of the circumstances?

On appeal, the question of whether a specific search or seizure is "reasonable" under the *Fourth Amendment* is subject to *de novo* review. [23] Despite its fact-sensitive analysis, "reasonableness" is ultimately a question of substantive *Fourth Amendment* law. [24] **[**19]** It is true that, in assessing this legal issue, courts give great deference to the trial court's findings of historical fact. [25] However, questions involving legal principles and the application of law to established **[*63]** facts are properly reviewed *de novo*. [26] Thus, in deciding whether Mr. Kothe's continued detention was "reasonable" under the specific circumstances, we view the trial **[**18]** court's factual findings in the light most favorable to his ruling, but we decide the issue of "reasonableness" as a question of *Fourth Amendment* law under Supreme Court precedent.

The Supreme Court states that *Fourth Amendment* "reasonableness" is measured "in objective terms by examining the totality of the circumstances"; it "eschews bright-line rules, instead emphasizing the fact-specific nature of the … inquiry." [27] It requires a balance between the public interest served and the individual's right to be free from arbitrary detentions and **[**20]** intrusions. [28]

In this case, the court of appeals held that Mr. Kothe's continued detention to await the results of the license check was "unreasonable" under *Terry v. Ohio*. [29] **[**21]** A *Terry* analysis has two prongs. A court must first decide whether the officer's action was justified at its inception. [30] Here, both parties agree that Deputy Forslund's initial detention of Mr. Kothe was based on articulable suspicion of DWI.

---

[23]   See *United States v. Ornelas*, 517 U.S. 690, 691, 134 L. Ed. 2d 911, 116 S. Ct. 1657 (1996) ("we hold that the ultimate questions of reasonable suspicion and probable cause to make a warrantless search should be reviewed *de novo*"); *United States v. Sargent*, 319 F.3d 4, 8 (1st Cir. 2003) ("this court reviews *de novo* the ultimate conclusion as to whether a search was reasonable within the meaning of the *Fourth Amendment*"); *United States v. Flynn*, 309 F.3d 736, 738 (10th Cir. 2002) ("we review *de novo* the ultimate question of whether a search or seizure was reasonable under the *Fourth Amendment*"); *United States v. Spikes*, 158 F.3d 913, 922-23 (6th Cir. 1998).

[24]   See *United States v. Sharpe*, 470 U.S. 675, 682, 84 L. Ed. 2d 605, 105 S. Ct. 1568 (1985) (stating "the *Fourth Amendment* is not, of course, a guarantee against *all* searches and seizures, but only against *unreasonable* searches and seizures"); *Guzman v. State*, 955 S.W.2d 85, 88-89 (Tex. Crim. App. 1997); *United States v. Valadez*, 267 F.3d 395, 397 (5th Cir. 2001); *United States v. Jones*, 234 F.3d 234, 239 (5th Cir. 2000).

[25]   See *Ornelas*, 517 U.S. at 699 (noting that "a trial judge views the facts of a particular case in light of the distinctive features and events of the community; likewise, a police officer views the facts through the lens of his police experience and expertise. The background facts provide a context for the historical facts, and when seen together yield inferences that deserve deference"). In this case, Judge Ables, with the assistance of both the defense and prosecution, prepared thorough, helpful, and specific written findings of facts despite the witness's less than clear testimony.

[26]   *Ornelas*, 517 U.S. at 691; *Walter v. State*, 28 S.W.3d 538, 540 (Tex. Crim. App. 2000).

[27]   *Ohio v. Robinette*, 519 U.S. 33, 39, 136 L. Ed. 2d 347, 117 S. Ct. 417 (1996).

[28]   See *Pennsylvania v. Mimms*, 434 U.S. 106, 109, 54 L. Ed. 2d 331, 98 S. Ct. 330 (1977) (per curiam).

[29]   *Kothe*, 123 S.W.3d at 447 (citing *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968)).

[30]   *Terry,* U.S. at 19-20.

Therefore, the court of appeals focused on the second prong of *Terry*-whether the search and seizure was reasonably related, in scope, to the circumstances that justified the stop in the first place. [31]

In deciding whether the scope of a *Terry* detention is "reasonable," the general rule is that an investigative stop can last no longer than necessary to effect the purpose of the stop. [32] In other words, if a driver is stopped on suspicion of driving while intoxicated, once the police officer determines that the driver is not impaired, he should be promptly released. [33] **[**23]** However, there is an additional component to a routine traffic stop- the license and warrants check. [34] On a routine traffic stop, police officers may request certain information from a driver, such as a driver's license and car registration, and may conduct a computer check on that information. [35] It is only after this computer check is completed, and the officer knows that this driver has a currently valid license, no outstanding warrants, and the car is not **[*64]** stolen, that the traffic-stop investigation is fully resolved. [36] **[**24]** It is at this point that the detention must end and the driver must be permitted to leave. As Professor LaFave notes: **[**22]**

It is clear that there are several investigative techniques which may be utilized effectively in the course of a *Terry*-type stop. The most common is interrogation, which may include both a request for identification and inquiry concerning the suspicious conduct of the person detained. … Sometimes the officer will communicate with others, either police or private citizens in an effort to verify the explanation tendered, to determine if certain property in the possession of the suspect has been stolen, or to confirm the identification or determine whether a person of that identity is otherwise wanted. … There is no reason to conclude that any investigative methods of the type just listed are inherently objectionable; they might cast doubt upon the reasonableness of the detention, however, if their use makes the period of detention unduly long. [37]

---

[31]   *Kothe*, 123 S.W.3d at 447.

[32]   *Florida v. Royer*, 460 U.S. 491, 500, 75 L. Ed. 2d 229, 103 S. Ct. 1319 (1983) (stating the "the scope of the detention must be carefully tailored to its underlying justification").

[33]   *Davis v. State*, 947 S.W.2d 240, 245 (Tex. Crim. App. 1997).

[34]   *Id.* at n.6; *see also Walter v. State*, 28 S.W.3d 538, 542 (Tex. Crim. App. 2000).

[35]   *United States v. Brigham*, 382 F.3d 500 (5th Cir. 2004) (en banc). In *Brigham*, as in this case, the defendant was initially detained for a suspected traffic violation and did not challenge the validity of that stop. *Id.* at 506. Rather, Brigham argued that the officer "exceeded the scope of the valid stop and prolonged the occupants' detention excessively" in awaiting the results of a computer license and warrant check. *Id.* The en banc Fifth Circuit held that the officer's conduct was reasonable under the **Fourth Amendment**. *Id.* at 512.

[36]   Such checks serve a valid traffic and general law enforcement purpose as they warn the responding officer of any known dangers about the person stopped and the status of the car. They are also closely related to the purpose for the initial detention-traffic safety and security. *See, e.g., United States v. Shabazz*, 993 F.2d 431, 437 (5th Cir. 1993) ("in a valid traffic stop, an officer can request a driver's license, insurance papers, vehicle registration, run a computer check thereon, and issue a citation"); *see generally Brigham*, 382 F.3d at 507-508 (agreeing with other circuits that have found "no constitutional impediment to a law enforcement officer's request to examine a driver's license and vehicle registration or rental papers during a traffic stop and to run a computer check on both"); *United States v. Zabalza*, 346 F.3d 1255, 1259 (10th Cir. 2003) ("'during a routine traffic stop, the detaining officer may request a driver's license and vehicle registration, run a computer check on the car and driver, and issue a citation. The detaining officer may also question the vehicle's occupants regarding their identities, travel plans, and ownership of the vehicle") (citation omitted).

[37]   4 LaFave, § 9.2(f), at 51-58 (citations omitted); *see generally, Brigham,* 382 F.3d at 508.

In the present case, the court of appeals agreed that "a warrant check in the context of a traffic stop is generally viewed as a reasonable law enforcement exercise." [38] However, citing *Davis v. State*, the court of appeals stated that a warrant check cannot be used solely as a means to extend a detention "once the reasonable suspicion forming the basis for the stop has been dispelled." [39] This is consistent with the rationale behind the Supreme Court's development of *Fourth Amendment* law.

In *Ohio v. Robinette*, Justice Ginsburg discussed the need to evaluate both the reason for the initial detention as well as the scope of the detention to ensure that police **[**25]** officers are not using traffic stops merely as a means to conduct "fishing expeditions." [40] **[**26]** In other words, once the original purpose for the stop is exhausted, police may not *unnecessarily* detain drivers solely in hopes of finding evidence of some other crime. But the Supreme Court has expressly rejected placing any rigid time limitations on *Terry* stops; instead, the issue is "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." [41] **[*65]** Further, neither the *Fourth Amendment* nor the Supreme Court dictate that an officer making a *Terry* traffic stop must investigate the situation in a particular order. [42] A traffic stop may involve both an investigation into the specific suspected criminal activity and a routine check of the driver's license and car registration. **[**27]** Only if a license check "unduly prolongs" the detention is the officer's action unreasonable under the circumstances. [43]

---

[38] *Kothe*, 123 S.W.3d at 448.

[39] *Id.* (citing *Davis v. State*, 947 S.W.2d 240, 245 (Tex. Crim. App. 1997)).

[40] *Ohio v. Robinette*, 519 U.S. 33, 41, 136 L. Ed. 2d 347, 117 S. Ct. 417 (1996) (Ginsburg, J., concurring).

[41] *United States v. Sharpe*, 470 U.S. 675, 685-86, 84 L. Ed. 2d 605, 105 S. Ct. 1568 (1985) (declining to "establish a *per se* rule that a 20-minute detention is too long" under *Terry*). The Supreme Court explained:

> While it is clear that "the brevity of the invasion of the individual's *Fourth Amendment* interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion," we have emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes.

*Id.* at 685 (citation omitted).

[42] *Brigham*, 382 F.3d at 511 ("neither our prior cases nor any other caselaw of which we are aware institutes a per se rule requiring an officer immediately to obtain the driver's license and registration information and initiate the relevant background checks before asking questions. … There is … no constitutional stopwatch on traffic stops. Instead, the relevant question in assessing whether a detention extends beyond a reasonable duration is "'whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly'").

[43] *See, e.g., United States v. Purcell*, 236 F.3d 1274, 1277-78 (11th Cir. 2001) (stating that fourteen-minute detention was not unreasonable on its face and rejecting argument that officer's detention became illegal because, after writing a traffic citation, he waited for the results of a computer check on driver's criminal history; stating that an "officer may also prolong the detention to investigate the driver's license and the vehicle registration and may do so by requesting a computer check") (citation omitted); *United States v. Wellman,* 185 F.3d 651, 656 (6th Cir. 1999) (noting that "this court has ruled that an officer can lawfully detain the driver of a vehicle until after the officer has finished making record radio checks and issuing a citation, because this activity 'would be well within the bounds of the initial stop"; traffic stop not unconstitutionally extended by obtaining consent to search motor home while officer "was waiting for the central office to provide him with information on defendant's driver's license and vehicle registration"); *United States v. Zucco*, 71 F.3d 188, 190-91 (5th Cir. 1995) (*Terry* detention not prolonged merely because officer waited for computer check); *Shabazz,* 993 F.2d at 437; *compare* George E. Dix, *Nonarrest Investigatory Detentions in Search and Seizure Law*, *1985 DUKE L.J. 849, 895-96 (1985)* (suggesting a time limit of 30 minutes for a *Terry* stop as a matter of state law because "it is probably unrealistic to expect courts effectively to review officers' decisions to prolong detention for periods of fifteen to thirty minutes").

 **[**28]** In this case, the court of appeals thought that the order of events was crucial. It found that because Deputy Forslund did not initiate the warrant check until after he had determined that Mr. Kothe was not intoxicated, the deputy impermissibly extended the detention. [44]

First, the court of appeals was mistaken as to the order of events. Although the trial judge's findings of fact state: "a routine drivers license check was initiated, *in conjunction with* a field sobriety test," his later findings clarified this statement: [45]

 **[*66]** Deputy Forslund approached the defendant/driver of the vehicle, obtained the defendant's drivers license, and ran a routine computer check. *While this check was being conducted*, the officer conducted one field sobriety check (the horizontal gaze nystagmus test), following which it was determined that the defendant was not intoxicated.

The trial court did not find that the deputy initiated the warrant check after determining **[**29]** that Mr. Kothe was sober. Rather, Deputy Forslund merely awaited the results of the warrant check that was already underway when he determined that Mr. Kothe was not intoxicated. Therefore, it is highly unlikely that Deputy Forslund was using the warrant check solely as means to purposely extend the detention. Rather, he was simply completing a regular component of a routine traffic stop.

Second, the order of events, while relevant to **[**30]** the legal determination of "reasonableness," is not in itself determinative. As the en banc Fifth Circuit recently held in *Brigham*, "Computerized license and registration checks are an efficient means to investigate the status of a driver and his auto, but they need not be pursued to the exclusion of, or in particular sequence with, other efficient means." [46] *Fourth Amendment* "reasonableness" does not require a "single, formulaic approach" to a traffic stop investigation, nor does it require rigid adherence to "the least intrusive means" of investigation defined by Monday-morning reviewing courts. [47]

In the present case, there is no evidence-or even suggestion-that Deputy Forslund failed to diligently pursue his investigation. Nor is there any evidence that Officer Forslund ran the license check as a pretext to investigate an unrelated crime for which he had no reasonable suspicion. There is no suggestion that he engaged in any "fishing expedition. **[**31]** " Quite the contrary, the trial judge in his factual findings was careful not to give that impression. This is not an instance of an indefatigable Inspector Javert mercilessly pursuing, harassing, and hounding his quarry through Paris sewers or Kendall County highways by concocting excuses to detain him.

Viewing the totality of the circumstances in the light most favorable to the trial court's factual findings, Deputy Forslund's decision to return to his vehicle and simply wait a few minutes for the warrant-check results before releasing Mr. Kothe was "reasonable" as a matter of substantive *Fourth Amendment* law.

---

[44]   *Kothe*, 123 S.W.3d at 448.

[45]   Although at first glance this may appear to be loosely worded, it is clear that this fuzziness accurately reflects the fuzziness in the testimony itself. There was a discrepancy in Deputy Forslund's testimony about the timing that was not clearly resolved. On direct examination, Deputy Forslund testified that he had obtained Mr. Kothe's driver's license before conducting the field sobriety test. However, on cross-examination, Deputy Forslund agreed that he did not take Mr. Kothe's license to run the computer check until after determining that Mr. Kothe was not intoxicated.

[46]   *Brigham*, 382 F.3d at 511.

[47]   *Id.*

In addition to the period of time discussed above, there is another period that must be assessed for reasonableness. We must determine if Deputy Forslund acted "reasonably" when he remained in his vehicle after receiving notice from the dispatcher that Mr. Kothe had no outstanding warrants but before receiving the second dispatch. It is unclear exactly how long this period was. During the pretrial hearing, Deputy Forslund stated that he was waiting on the driver's license return when the dispatcher informed him of the need to talk with Mr. Kothe about the missing bank bag. **[**32]** However, in his factual findings, Judge Ables states that "the officer testified that he was just about to release the defendant to leave, when a second teletype was brought to his attention." Either way, it appears that Deputy **[*67]** Forslund received the second dispatch, if not before completing the warrant check, almost instantaneously with it. Again, there is no testimony or insinuation that Deputy Forslund was purposefully prolonging Mr. Kothe's detention.

In conclusion, Deputy Forslund's actions were "reasonable" under the circumstances, and the detention as a whole was "reasonable." Since neither the initial stop nor its duration violated the _Fourth Amendment_, Mr. Kothe's consent to search his car was not unconstitutionally tainted. The evidence gathered from his car need not be suppressed under the _Fourth Amendment_. [48] We therefore reverse the decision by the court of appeals and remand the case to the trial court for proceedings consistent with this opinion.

 **[**33]**

---

[48]   Even if the detention had been constitutionally unreasonable, that would not necessarily be the end of the matter. A court would then consider whether Mr. Kothe's consent to the search of his car was given "by means sufficiently distinguishable to be purged of the primary taint." _Wong Sun_, 371 U.S. at 487-88. That consent issue, however, is not before us.

# [Davis v. State](#)

Court of Criminal Appeals of Texas

June 4, 1997, Delivered

NO. 918-96

**Reporter**

947 S.W.2d 240; 1997 Tex. Crim. App. LEXIS 43

MARTIN DAVIS, Appellant v. THE STATE OF TEXAS

**Prior History:** **[\*\*1]** Petition for Discretionary Review from the NINTH Court of Appeals [ANGELINA County].

**Disposition:** Reversed and remanded.

## Case Summary

**Procedural Posture**

Defendant petitioned for discretionary review of the judgment of the Ninth Court of Appeals (Texas), which affirmed his conviction for possession of marijuana discovered during a stop to determine if he was driving while intoxicated.

**Overview**

The court reversed the appellate court, which had upheld defendant's conviction for possession of marijuana. Defendant was stopped for suspicion of driving while intoxicated. The officers determined defendant was not intoxicated but told defendant that his vehicle was being detained for an on-scene investigation that ultimately led to the discovery of marijuana in the car's trunk. The court applied the Terry two-prong test, holding that 1) the officer must have had a reasonable suspicion and 2) the detention must have been temporary and lasted not longer than was necessary to effectuate the purpose of the stop. The court found that the purpose of the investigative detention of defendant was effectuated when the officers determined he was not intoxicated. The continued detention of defendant, based upon the officer's conclusion that he did not appear to be someone who was on a business trip, was not based upon articulable facts which, taken together with rational inferences from those facts, would warrant a man of reasonable caution in the belief that continued detention was justified.

**Outcome**

The court reversed the decision of the appellate court and held that the lower court erred in holding there was a reasonable suspicion that defendant was engaged in criminal activity that would justify his continued detention because the suspicion was not based upon articulable facts which would warrant it.

**Counsel:** Ray Bass, Austin.

David V. Wilson, II, Assist. DA, Lufkin.

**Judges:** BAIRD, Judge. MANSFIELD, J. and KELLER, J. concur. McCormick, P.J., joins. MEYERS, Judge dissents.

**Opinion by:** BAIRD

# Opinion

[*241] OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

Appellant was convicted of possession of marihuana and sentenced to five years confinement. *Tex. Health & Safety Code Ann. § 481.121*. The Court of Appeals affirmed. *Davis v. State, 923 S.W.2d 781* (Tex.App.--Beaumont 1996). We granted review to determine whether the Court of Appeals erred in holding further detention was justified after the officer determined appellant was not driving while intoxicated. We will reverse.

I.

A.

The following facts are taken from the Court of Appeals opinion. Appellant was stopped at 1:00 a.m. in Lufkin for suspicion of driving while intoxicated. Appellant exited his vehicle and walked to the officers' patrol vehicle. When told the reason for the stop, appellant stated he was not intoxicated, merely tired. The officers did not detect an odor of alcohol on appellant; nor [**2] did they detect an odor of alcohol or any type of drug emanating from the vehicle. The officers determined appellant was not intoxicated. At this point, the initial purpose of the traffic stop was completed. *Davis, 923 S.W.2d at 784*.

The officers questioned appellant and his passenger separately. Appellant stated he was from New York and he and the passenger had been looking at apartment buildings. The passenger stated she was accompanying appellant while he looked at property in Houston. The officers believed the statements were inconsistent. *Id., at 784-785*.

A background check on appellant revealed appellant had no history of convictions and his drivers' license was valid. A background check on the passenger revealed she had an arrest and conviction for a drug offense. A license check on the vehicle revealed the car was not in appellant's name; however, the check also revealed the vehicle was not reported stolen. Appellant stated the vehicle was borrowed from his girlfriend. The insurance papers on the vehicle were in proper order. The officers concluded appellant did not appear to be someone who was on a business trip. *Id., at 785*.

After questioning appellant and [**3] the passenger, the officers asked appellant for permission to search the vehicle. Appellant refused to give consent. [1] One of the officers did a pat down search of appellant but found no weapons or drugs. The officers then informed appellant that he was free to leave at any time but the vehicle was being detained for an on-scene investigation. A canine unit was called

---

[1] The videotape of the detention reveals the officers twice asked appellant for consent to search the vehicle and twice appellant refused.

to the scene. The narcotics dog arrived and made a positive alert at the trunk of the vehicle. Upon request, appellant handed the keys to an officer who searched the trunk. Inside the trunk the officer found a suitcase containing marihuana. The trial judge overruled appellant's motion to suppress this evidence. Ibid.

 **[\*242]**  B.

A majority of the Court of Appeals held:

… the fact that appellant was traveling late at night in a borrowed car, appeared nervous, was dressed poorly considering **[\*\*4]**  the explanation for travel given, told a story which could be interpreted as being inconsistent with that of his passenger, immediately got out of his vehicle when stopped and went back to the patrol car door, and repeatedly attempted to distance himself from his own vehicle, was enough to raise reasonable suspicion justifying further detention until the drug dogs came to the scene to sniff the car.

*Davis, 923 S.W.2d at 789*.

However, in dissent, Justice Burgess stated:

… even taking those facts as true, within the "totality of the circumstances" and viewing them in the light most favorable to the trial court's ruling, see *State v. Carter, 915 S.W.2d 501 (Tex.Crim.App.1996)*, they are not, as a matter of law, specific articulable facts which created a reasonable suspicion that criminal activity was afoot.

Where events are as consistent with innocent activity as with criminal activity, detention based upon those events is unlawful. *Johnson v. State, 658 S.W.2d 623, 626 (Tex.Crim.App.1983)*. The suspicious conduct relied upon by the officers must be sufficiently distinguishable from that of innocent people under the same circumstance to clearly, if not conclusively, **[\*\*5]**  set the suspect apart from them. *Crockett v. State, 803 S.W.2d 308, 311 (Tex.Crim.App.1991)*.

*Davis, 923 S.W.2d at 790*. The dissent concluded: "The Fourth Amendment, in my view, protects late-night, out-of-state travelers from being subjected to detentions that provide officers the opportunity to 'get lucky.'" *Id., 923 S.W.2d at 791-92*.

We granted review to determine whether the decision of the of the Court of Appeals conflicts with the applicable decisions of the United States Supreme Court, this Court and/or the courts of appeals. Tex. R. App. P. 200 (b)(1), (3) and (5). See, *Crockett v. State, 803 S.W.2d 308 (Tex.Cr.App. 1991)*; *Daniels v. State, 718 S.W.2d 702 (Tex.Cr.App. 1986)*; and, *Montano v. State, 843 S.W.2d 579 (Tex.Cr.App. 1992)*.

II.

A.

In the landmark case of *Terry v. Ohio, 392 U.S. 1, 20, 88 S. Ct. 1868, 1879, 20 L. Ed. 2d 889 (1968)*, the Supreme Court recognized the rights insured by the Fourth Amendment belong "as much to the citizen on the streets of our cities as to the homeowner closeted in his study to dispose of his secret

affairs." *Id., 392 U.S. at 8-9, 88 S. Ct. at 1873*. However, the Fourth Amendment does **[\*\*6]** not forbid all searches and seizures, but only <u>unreasonable</u> searches and seizures. <u>Ibid</u>. (quoting *Elkins v. United States, 364 U.S. 206, 222, 80 S. Ct. 1437, 1446, 4 L. Ed. 2d 1669 (1960))*. [2]

The question in <u>Terry</u> was whether it was always unreasonable for a peace officer to seize a person and subject him to a limited search unless there is probable cause for an arrest. *392 U.S. at 15, 88 S. Ct. at 1877*. The Court held that even though a "stop" and "frisk" was a search and seizure under the Fourth Amendment, *392 U.S. at 16, 88 S. Ct. at 1877*, such actions by peace officers could be reasonable under the Fourth Amendment. To determine the reasonableness of such an investigative detention the Court adopted a dual inquiry: (1) whether the officer's **[\*\*7]** action was justified at its inception; and, (2) whether it was reasonably related in scope to the circumstances which justified the interference in the first place. *Id ., 392 U.S. 19-20, 88 S. Ct. 1879*.

Under the first prong, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id., 392 U.S. at 21, 88 S. Ct. at 1880*. In short, the officer must have **[\*243]** a reasonable suspicion. [3] In assessing whether the intrusion was reasonable, an objective standard is utilized: would the facts available to the officer at the moment of the seizure or search warrant a man of reasonable caution in the belief that the action taken was appropriate. **[\*\*8]** *Id., 392 U.S. at 21-22, 88 S. Ct. at 1880*. [4] An investigative detention not based on reasonable suspicion is unreasonable and, thus, violative of the Fourth Amendment.

The second prong of <u>Terry</u> deals with the scope of the detention. The Court noted that an investigative detention, "like any other search, must be strictly circumscribed by the exigencies which justify its initiation." *Id., 392 U.S. at 25-26, 88 S. Ct. at 1882*. The scope of the search must be limited because "a search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope." *Id., 392 U.S. at 18, 88 S. Ct. at 1878*. Several years later, the Supreme Court stated:

The predicate permitting seizures on suspicion short of probable cause **[\*\*9]** is that law enforcement interests warrant a limited intrusion on the personal security of the suspect. The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case. <u>This much,</u>

---

[2] The Fourth Amendment is applicable to the States under the Fourteenth Amendment. <u>See</u>, Wolf v. Colorado, 338 U.S. 25, 69 S. Ct. 1359, 93 L. Ed. 1782 (1949); <u>and</u>, Mapp v. Ohio, 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961).

[3] As the Court further explained:

…in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.

Id., 392 U.S. at 27, 88 S. Ct. at 1883.

[4] The Court continued:

… And simple good faith on the part of the arresting officer is not enough. … If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be secure in their persons, houses, papers and effects only in the discretion of the police.

Id., 392 U.S. at 21-22, 88 S. Ct. at 1880 (quoting Beck v. Ohio, 379 U.S. 89, 97, 85 S. Ct. 223, 229, 13 L. Ed. 2d 142 (1964))(internal quotations deleted).

however, is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. [5]

*Florida v. Royer, 460 U.S. 491, 500, 103 S. Ct. 1319, 1325, 75 L. Ed. 2d 229 (1983)*. This limitation means that once the reason for the stop has been satisfied, the stop may not be used as a "fishing expedition for unrelated criminal activity." *Ohio v. Robinette, 136 L. Ed. 2d 347, 117 S. Ct. 417, 422 (1996)* (Ginsberg, J., concurring). Consequently, a detention that is not temporary and reasonably related in scope to the circumstances which justified the interference, is unreasonable and, thus, violative of the Fourth Amendment.

While a Terry-stop is traditionally **[**10]** considered in the context of a seizure of the person, the Supreme Court has extended Terry to personalty as well. *United States v. Place, 462 U.S. 696, 706, 103 S. Ct. 2637, 2644, 77 L. Ed. 2d 110 (1983)*. As the Court stressed in Place, even though the defendant may be free to leave, the seizure of the personalty is still a restraint upon the person.

… The precise type of detention we confront here is seizure of personal luggage from the immediate possession of the suspect for the purpose of arranging exposure to a narcotics detection dog. Particularly in the case of detention of luggage within the traveler's immediate possession, the police conduct intrudes on both the suspect's possessory interest in his luggage as well as his liberty interest in proceeding with his itinerary. The person whose luggage is detained is technically still free to continue his travels or carry out other personal activities pending release of the luggage. Moreover, he is not subjected to the coercive atmosphere of a custodial confinement or to the public indignity of being personally detained. Nevertheless, such a seizure can effectively restrain the person since he is subjected to the **[**11]** possible disruption of his travel plans in order to remain with his luggage or to arrange for its return. Therefore, when the police seize luggage from the suspect's custody, we think the limitations applicable to investigative detentions of the person should **[*244]** define the permissible scope of an investigative detention of the person's luggage on less than probable cause.

*462 U.S. at 708-709, 103 S. Ct. at 2645*. In sum, for an intrusion on such personalty, reasonable suspicion is required and, even if reasonable suspicion exists, the detention must be temporary and last no longer than necessary to effectuate the purpose of the intrusion.
B.

Consistent with Terry, Texas courts require reasonable suspicion before a seizure of the person or property can occur. For example, in *Garza v. State, 771 S.W.2d 549, 558 (Tex.Cr.App. 1989)*, this Court stated:

… It is clear that circumstances short of probable cause may justify temporary detention for purposes of investigation. *Schwartz v. State, 635 S.W.2d 545, 546 (Tex.Cr.App.1982)*; *Terry v. Ohio, supra.* To justify an investigative detention, the officer must have specific articulable facts, which, premised **[**12]** upon his experience and personal knowledge, when coupled with the logical inferences from those facts would warrant the intrusion on the detainee. These facts must amount to more than a mere hunch or suspicion. *Williams v. State, 621 S.W.2d 609, 612 (Tex.Cr.App.1981)*. The articulable facts used by the officer must create some reasonable suspicion that some activity out of the ordinary is

---

[5] All emphasis is supplied unless otherwise indicated.

occurring or has occurred, some suggestion to connect the detainee with the unusual activity, and some indication the unusual activity is related to crime. *Meeks v. State, 653 S.W.2d 6, 12 (Tex.Cr.App.1983)*; *Schwartz, supra at 547*, citing, *Shaffer v. State, 562 S.W.2d 853 (Tex.Cr.App.1978)*.

Similarly, in *Crockett v. State, 803 S.W.2d 308, 311 (Tex.Cr.App. 1991)*, we recognized:

It has been an accepted part of state and federal jurisprudence for many years that law enforcement officers may stop and briefly detain persons suspected of criminal activity on less information than is constitutionally required for probable cause to arrest. *United States v. Brignoni-Ponce, 422 U.S. 873, 95 S. Ct. 2574, 45 L. Ed. 2d 607 (1975)*; *Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20* [**13] *L. Ed. 2d 889 (1968)*. Nevertheless, even a temporary detention of this kind is not permissible unless the circumstances upon which the officers rely objectively support a reasonable suspicion that the person detained actually is, has been, or soon will be engaged in criminal activity. *United States v. Hensley, 469 U.S. 221, 229, 105 S. Ct. 675, 680, 83 L. Ed. 2d 604 (1985)*; *Brown v. Texas, 443 U.S. 47, 51, 99 S. Ct. 2637, 2640, 61 L. Ed. 2d 357 (1979)*; *Johnson v. State, 658 S.W.2d 623, 626 (Tex.Cr.App.1983)*.

See also, *Davis v. State, 829 S.W.2d 218 (Tex.Cr.App. 1992)*, and, *Johnson v. State, 658 S.W.2d 623 (Tex.Cr.App. 1983)*. In short, under our interpretation of Terry and its progeny, reasonable suspicion requires "that there is something out of the ordinary occurring and some indication that the unusual activity is related to crime." *Viveros v. State, 828 S.W.2d 2, 4 (Tex.Cr.App. 1992)* (citing *Garza, 771 S.W.2d at 558* ).

Additionally, Texas Courts recognize that investigative detentions become unreasonable when they are not reasonably related in scope to the circumstances which justified the interference in the first place. For [**14] example, in *Collier v. State, 843 S.W.2d 176, 177* (Tex.App.--Houston [14th Dist.] 1992), officers stopped a vehicle to question its occupants about their possible involvement in a narcotics transaction. The driver and Collier denied any involvement. A citation was written to the driver for an expired license and no proof of liability insurance but the officers found nothing to confirm their suspicion of a narcotics transaction or any other criminal activity. Nevertheless, the officers radioed for a female officer to search the occupants. The officers testified the women were not under arrest, yet the officers continued to detain the women even though there was no probable cause to justify an arrest or a continued detention. The Collier Court stated:

… [An investigative] detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. The police may not carry out a full search of the person or his effects. Nor [*245] may they verify their suspicions by means that approach an arrest.

*Id., 843 S.W.2d at 177* (internal quotation marks and cites deleted). The court held that the continued detention of Collier was unlawful [**15] and, therefore, reversed her conviction. See also, *Ussery v. State, 651 S.W.2d 767, 770 (Tex.Cr.App.1983)* (a detention for investigatory purposes must be limited; it must be temporary and last no longer than necessary to effect the purpose of the stop); *Lopez v. State, 663 S.W.2d 587, 589* (Tex. App.--Houston [1st Dist.] 1983) ("an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.") (emphasis in the original); and, *Anderson v. State, 787 S.W.2d 221, 229* (Tex.App.--Fort Worth 1990) ("the propriety of the duration of the detention is judged by whether police pursued a means of investigation which dispelled or confirmed their suspicions quickly and in a manner that did not exceed the scope of the detention.").

On the basis of these cases, the law is clear.

An investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. *Royer, 460 U.S. at 500, 103 S. Ct. at 1325-26*. The investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.

 [**16] *Perez v. State, 818 S.W.2d 512, 517* (Tex.App.--Houston [1st Dist.] 1991). "The propriety of the stop's duration is judged by assessing whether the police diligently pursued a means of investigation that was likely to dispel or confirm their suspicions quickly." *Perez, 818 S.W.2d at 517* (citing *United States v. Sharpe, 470 U.S. 675, 686, 105 S. Ct. 1568, 1575, 84 L. Ed. 2d 605 (1985))*.

III.

In the instant case, appellant was stopped for suspicion of driving while intoxicated. The parties do not contest the reasonableness of the stop. Therefore, we begin our inquiry with the assumption that this investigation was reasonable. Under the authority cited above, this investigative detention was required to be temporary and could last no longer than was necessary to determine whether appellant was intoxicated. [6] *Royer, 460 U.S. at 500, 103 S. Ct. at 1325-26*. Moreover, the officers were required to employ the least intrusive means reasonably available to verify or dispel their suspicion in a short period of time. *Perez, 818 S.W.2d at 517*. Their suspicion was dispelled with appellant's explanation that he was tired, not intoxicated, and the lack of an odor of alcohol [**17] or drug emanating from either appellant or his vehicle. In sum, the purpose of the investigative detention was effectuated when the officers determined appellant was not intoxicated. *Davis, 923 S.W.2d at 784*.

Nevertheless, the officers continued to detain appellant and the vehicle. This continued detention revealed that appellant had a valid driver's license and there were no warrants for his arrest. [**18] The pat down search of appellant revealed neither a weapon nor contraband. The continued detention of appellant was based upon the officer's conclusion that appellant did not appear to be someone who was on a business trip. However, this conclusion was not based upon articulable facts which, taken together with rational inferences from those facts, would warrant a man of reasonable caution in the belief that continued detention was justified. *Terry, 392 U.S. at 21-22, 88 S. Ct. at 1880*. Indeed, when viewed in an objective fashion, no known fact, or rational inferences from those facts, would support the conclusion that appellant was engaged in or soon would engage in criminal activity. *Crockett, 803 S.W.2d at 311*. The officers obviously made the same determination because they informed appellant that he was free to leave. *Davis, 923 S.W.2d at 785*. Consequently, the [*246] Court of Appeals erred in holding there was a reasonable suspicion that appellant was engaged in criminal activity. *Davis, 923 S.W.2d at 789*.

We now turn to consider the continued detention of the vehicle. First, we note that even though the officers stated appellant was free to leave, he [**19] was effectively restrained as it was 1:00 a.m.,

---

[6] We pause to note that in a traffic stop situation, an officer may demand identification, a valid driver's license, and proof of insurance from the driver. Tex. Trans. Code §§ 521.025, 601.053 (Vernon's Supp. 1996); and, **Sendejo v. State, 841 S.W.2d 856, 859** (Tex.App.--Corpus Christi 1992). Additionally, it is not unreasonable for an officer to check for outstanding warrants. Smith v. State, 840 S.W.2d 689, 692 (Tex.App.--Fort Worth 1992) (citing Petty v. State, 696 S.W.2d 635, 639 (Tex.App.--Dallas 1985, no pet.). See also, United States v. Shabazz, 993 F.2d 431, 436 (5th Cir. 1993).

appellant's destination was New York state and his only visible means of transportation was the detained vehicle. Therefore, in detaining the vehicle, the officers were effectively depriving appellant of his liberty interest of proceeding with his itinerary. *Place, 462 U.S. at 708-709, 103 S. Ct. at 2645*. As previously noted, there was no justification for appellant's detention.

Second, when the officers decided to detain the vehicle, they knew the vehicle was not reported stolen and the insurance papers were in proper order. Additionally, there was no odor of alcohol or any type of drug emanating from the vehicle. *Id. at 784-85*. The absence of an odor is important when we remember the purpose of the stop was to determine if appellant was intoxicated. In short, there was nothing out of the ordinary about the vehicle nor was there any indication that the vehicle was in any way related with criminal conduct. *Viveros, 828 S.W.2d at 4*. Consequently, the Court of Appeals erred in holding the continued detention of the vehicle was reasonable. *Davis, 923 S.W.2d at 789*.

The judgment of the Court of Appeals is reversed and **[**20]** the case is remanded to the trial court.

BAIRD, Judge

(Delivered June 4, 1997)

En banc

**Concur by:** MANSFIELD; KELLER

## Concur

CONCURRING OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

I join the opinion of the Court and write to express my concern that, in our well-meaning efforts to combat the flow of illegal drugs in our state and our country, we are coming close to destroying the protections afforded citizens from unreasonable searches and seizures under the United States and Texas Constitutions.

The record supports the conclusion the initial stop of appellant for suspicion of driving while intoxicated was permissible as a temporary investigative detention to determine if appellant was driving while intoxicated. The uncontested testimony of Officer Bivins was that appellant's vehicle was observed weaving within its lane, behavior consistent with potential driver intoxication. Officer Bivins testified he stopped appellant's vehicle and subsequently informed appellant of the reason for the stop. Officer Bivins testified he did not detect any odor of alcohol on or about appellant's person. A check of the vehicle's license plates - which **[**21]** were from New York - did not reveal any indication that it was stolen or involved in a criminal offense. Appellant also produced a valid New York driver's license and informed Officer Bivins he was in the process of returning to New York.

Officer Bivins then approached appellant's vehicle. Appellant's female passenger identified herself and produced a valid New York driver's license. She told Officer Bivins she was not appellant's girlfriend but had driven with appellant to Houston a few days earlier to check out some property, and they were now on their way back to New York. Officer Bivins testified he did not detect any "suspicious odors" inside the vehicle or anything else which suggested that drugs were present.

Appellant also informed Officer Bivins the vehicle belonged to his girlfriend, Nancy Terasockus, and showed Officer Weatherford (Bivins' partner) insurance papers on the vehicle. Officer Bivins testified he was satisfied at that point appellant was not intoxicated. He did not cite appellant for any traffic offense. Appellant informed Officer Bivins he had been arrested once, for "a college protest" 25 years ago.

It has been a long-established principle of law that a police **[**22]** officer may briefly detain a person for limited investigative purposes if, based on specific articulable facts, an objectively reasonable suspicion exists that the person has committed, is committing, or is about to commit a crime. *Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)*; *Saenz v. State, 842 S.W.2d 286 (Tex.Crim.App. 1992)*; *Hernandez v. State, 523 S.W.2d 410 (Tex.Crim.App. 1975)*. No person, however, may be detained, even momentarily, without reasonable and objective grounds. **[*247]** *Florida v. Royer, 460 U.S. 491, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983)*; *Dunaway v. New York, 442 U.S. 200, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979)*. These principles apply to a seizure of personal property (e.g. a vehicle) for temporary investigative purposes. *United States v. Place, 462 U.S. 696, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1985)*. Furthermore, any detention which goes beyond the limited exception constitutionally permitted for temporary investigative detentions must be supported by probable cause. *Dunaway v. New York, supra*; *Florida v. Royer, supra*; *Garza v. State, 771 S.W.2d 549, 558 (Tex.Crim.App. 1989)*.

It is **[**23]** not disputed by either the State or the appellant that the initial stop of appellant was a valid temporary investigative detention, its sole purpose being to determine if appellant was driving while intoxicated. The officers quickly determined appellant was not intoxicated. It is equally clear the Fourth Amendment did not prohibit the police officers, pursuant to a valid temporary investigative detention, from checking appellant's drivers license to determine it was valid, [1] to verify the vehicle was not stolen or otherwise suspected of being involved in criminal activity, and to determine if appellant maintained required liability insurance. Finally, the police officers' non-invasive visual check of the passenger compartment for the odor of drugs or alcohol and for the presence of contraband, weapons and other evidence in plain view of criminal activity was also constitutionally permissible as part of a temporary investigative detention. Up to this point, every action taken by the officers was reasonably a part of their valid temporary investigative detention to determine if appellant was driving while intoxicated.

**[**24]** Unfortunately, having accomplished their objective, the officers proceeded to cross the line into constitutionally-forbidden territory. As stated in Justice Burgess' dissenting opinion, we have held where events are as consistent with innocent activity as with criminal activity, detention based upon those events is unlawful. The suspicious conduct relied upon by the officers must be sufficiently distinguishable from that of innocent people under the same circumstances to clearly, if not conclusively, set the suspect apart from them. *Davis v. State, 923 S.W.2d 781, 790* (Tex.App.-Beaumont 1996), citing *Crockett v. State, 803 S.W.2d 308, 311 (Tex.Crim.App. 1991)*; and *Johnson v. State, 658 S.W.2d 623, 626 (Tex.Crim.App. 1983)*.

The justifications cited by the officers to continue the investigation, which included forcing appellant to allow a drug-detection dog to sniff his vehicle, are, at best, tenuous. The first justification given was

---

[1] Additionally, it was constitutionally permissible to "run" appellant's license number through the computer to determine if he was the subject of any outstanding warrants.

it was late at night, about 1 A.M. While some drug dealers do travel after midnight on Texas interstate highways, so do thousands of law-abiding Texans every day of the week (including this writer who has first-hand knowledge of the large **[**25]** volume of traffic on the many interstates of Texas at all times of the day and night gained while campaigning for the Court throughout much of 1993 and 1994). The videotape indicates close to 100 vehicles passed by during the stop and investigation of appellant. Traveling at night is <u>not</u> in any way inherently suspicious.

A second factor cited by the police to justify the continued investigation was appellant told him the vehicle was borrowed. It is hard for this writer to find this as suspicious, especially since the officers had already verified the vehicle was not stolen or wanted in connection with criminal activity, the insurance papers were in order and appellant had volunteered the vehicle belonged to his girlfriend and gave them her name. The status of the vehicle, in light of the information already verified by the officers, is no indication of suspicious, much less criminal, activity.

Another factor cited by the police was appellant's attire was "not consistent with his claimed status as a businessman." Appellant was dressed casually at the time of the stop. To suspect someone of criminal activity who is in the process of driving from Houston to New York at 1 A.M. because **[**26]** he is not wearing a suit or similar attire is absurd. This Court has previously rejected attire as a ground for police to "stop and frisk" an individual. **[*248]** *Baker v. State, 478 S.W.2d 445 (Tex.Crim.App. 1972)*.

The officers also testified appellant appeared "nervous" and his movements were suspicious after they stopped his vehicle. With respect to his movements, appellant exited his car and approached the officers' vehicle. Far from being suspicious, appellant's movements were consistent with an intent to demonstrate he was neither dangerous nor drunk and his desire "to make points with the police by coming to them instead of making them come to him." There is nothing (the stop was videotaped) to support any contention appellant was trying to hide anything or to hinder the investigation.

As for appellant acting nervous, it was 1 A.M., he was tired and he was a resident of a distant state stopped late at night by the police in a relatively rural area. Under such circumstances, many, if not most, people would be nervous. It is not indicative of guilt for a person to be nervous when confronted by police officers asking questions. *Montano v. State, 843 S.W.2d 579 (Tex.Crim.App.* **[**27]** *1992)*.

Although the record does not affirmatively state so, it is reasonable to assume that perhaps the main reason why the investigation continued after the police determined appellant was not driving while intoxicated was the fact he was from out-of-state. It is common knowledge that a significant source of illegal drugs consumed in the midwestern and northeast sections of the country is Mexico and southeast Texas, including Houston. It is also common knowledge that a large percentage of these drugs are transported by vehicle and two of the major freeways utilized by the vehicles are Interstate 10 and Interstate 59 (which goes through Lufkin, where appellant's vehicle was stopped). Neither the Fourth Amendment nor Article IV, Section 2 of the United States Constitution allow police to single out vehicles with out-of-state license plates as out-of-state residence is not a ground to suspect those in the vehicle of criminal activity. Likewise, an individual's out-of-state residence does not constitutionally permit the continuation of the investigation of said individual once the justification for the stop itself has ended.

As the front-line warriors in the war against drugs, police **[**28]** officers see first-hand the tremendous harm caused every day by those who deal in drugs and the destruction of the lives and families of many

of the users of drugs. There is little doubt in my mind the police officers acted with the best of intentions, yet we provide often-conflicting guidelines as to how police officers are to conduct this war. Similar to the shabby treatment by our society of those Americans who served in Vietnam upon their return from Southeast Asia, police officers suffer the taunts of detractors (notably in the worlds of academia and entertainment) who mock their efforts and their sacrifice.

In the present case, however, I must agree with the Court that applicable precedent from the Supreme Court and this Court does not permit continuance of a valid temporary investigative detention once the purpose of the detention has been accomplished and where, as here, the totality of the circumstances did not reasonably justify the officers' continuing suspicion and investigation of appellant as a criminal suspect.

I join the opinion of the Court.

MANSFIELD, J.

DELIVERED JUNE 4, 1997

EN BANC

CONCURRING OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

 [**29]  I write separately to comment on the appropriate standard of review. Although it does not expressly say so, the majority opinion apparently decides *de novo* that the circumstances in the present case do not constitute reasonable suspicion to detain appellant's vehicle for further investigation. I agree with this approach. As I stated in my concurring opinion in Villarreal, appellate courts must always give deference to trial courts' determinations of historical fact, but some application of law to fact questions warrant *de novo* review. *Villarreal v. State, 935 S.W.2d 134, 145-150 (Tex. Crim. App. 1996)*(Keller, J. concurring).

The Supreme Court has mandated, in the federal system, *de novo* review of what circumstances constitute reasonable suspicion. *Ornelas v. United States,     U.S.   , 116 S. Ct. 1657 (1996)*. While  [*249]  we <u>may</u> not be bound to apply the same standard in the state system, we should seriously consider following the Supreme Court's lead when federal constitutional issues are involved. *Villarreal, 935 S.W.2d at 149*. I believe there is good reason to follow the Supreme Court's lead here. Whether a certain set of circumstances [**30]  gives rise to reasonable suspicion should be viewed *de novo* because doing so will advance uniform outcomes and provide guidance for law enforcement behavior. *Id. at 148* (citing *Thompson v. Keohane, 133 L. Ed. 2d 383,     U.S.   , __, 116 S. Ct. 457, 467 (1995))*. While reasonable suspicion is a "fluid concept," that is "not readily, or even usefully, reduced to a neat set of legal rules," a case-by-case *de novo* evaluation is nevertheless desirable as a way to "reduce the area of uncertainty." *Villarreal, 935 S.W.2d at 147, 148* (quoting from *Ornelas,   U.S. at   , 116 S. Ct. at 1661* and <u>Thompson</u>, __U.S. at __, 116 S. Ct. at 466 n. 13. Indeed, because the concept of reasonable suspicion acquires content only through application, *de novo* review is "necessary if appellate courts are to maintain control of, and to clarify the legal principles." *Villarreal, 935 S.W.2d at 149* (quoting from *Ornelas,     U.S.   , 116 S. Ct. at 1661-1662*).

In his dissenting opinion, Judge Meyers contends that my reliance upon <u>Ornelas</u> is misplaced because the Supreme Court "did not address [**31]  the appropriate standard of review for <u>discretionary</u> <u>review</u>

courts…but…set out the appropriate standard of review for appellate courts reviewing trial court decisions." Dissenting op. at 2 n. 1 (emphasis in original, ellipses inserted). But in Ornelas, the Supreme Court, a discretionary review court, recognized that it had conducted *de novo* reviews, and the Court referred to its own practice to support its holding that lower appellate courts should do the same. __U.S. at __, 116 S. Ct. at __, 134 L. Ed. 2d at 919.

In this vein, the Supreme Court cited *Brinegar v. United States, 338 U.S. 160, 93 L. Ed. 1879, 69 S. Ct. 1302 (1949)* and *Alabama v. White, 496 U.S. 325, 110 L. Ed. 2d 301, 110 S. Ct. 2412 (1990)*. Ornelas, __U.S. at __, 116 S. Ct. at __, 134 L. Ed. 2d at 919. In Brinegar, the trial court held that government agents lacked probable cause to search the defendant's car. *338 U.S. at 163* (The trial court denied the defendant's motion to suppress on an alternate ground). The Court of Appeals took the same view as the trial court. Id. Nevertheless, the Supreme Court disagreed **[**32]** with the lower courts after conducting a *de novo* review based upon *Carroll v. United States, 267 U.S. 132, 69 L. Ed. 543, 45 S. Ct. 280* -- despite the fact that neither of the courts below had considered the Carroll case. *Brinegar, 338 U.S. at 164 n. 3, 171*, & 171 n. 10. In White, the Supreme Court held that an anonymous tip, combined with the particular corroborating facts present in the case, gave rise to reasonable suspicion. *496 U.S. at 332*. The Court of Appeals opinion to the contrary was overturned, even though the Supreme Court characterized the case as a "close" one. Id.

Hence, the Supreme Court has recognized that it may, but need not, remand a case to a lt in Ornelas concerning its own practice of *de novo* review may technically be *dicta* in that case, such statements are an (accurate) assessment of the holdings of other Supreme Court cases and should not be lightly dismissed.

Unlike the dissent, I do not believe that *Arcila v. State, 834 S.W.2d 357 (Tex. Crim. App. 1992)* requires a different result. Arcila is concerned with our review of a lower appellate court's resolution of factual issues, not with application-of-law-to-fact **[**33]** questions that are treated as questions of law. *Id. at 360* ("ultimate responsibility for the resolution of factual disputes lies elsewhere")(emphasis added) & 361 ("we decline to substitute our own judgment on ultimate questions of fact for that of the lower courts")(emphasis added). In his concurring opinion in Villarreal, Judge Clinton correctly recognized that the **[*250]** appropriate standards of review on appeal and on discretionary review are "functionally identical" questions. *935 S.W.2d at 143* (Clinton, J. concurring). The interest in uniformity of outcomes that supports conducting a *de novo* review applies equally to direct appeal and discretionary review proceedings. Id. To leave constitutional norm elaboration solely to the courts of appeals would substantially thwart the purpose of requiring *de novo* review: uniformity is best achieved with one interpretation rather than fourteen. The critical inquiry is whether the issue before us is the kind of issue subject to *de novo* review. If it is, then Arcila is inapplicable. With these comments, I join the majority opinion.

KELLER, J.

DELIVERED: June 4, 1997

McCormick, P.J., joins. **[**34]**

**Dissent by:** MEYERS

# Dissent

DISSENTING OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

The majority disagrees with the court of appeals in this case with good reason. In fact, had I been a judge on the court of appeals I most probably would have joined Judge Burgess in concluding that the detention of appellant's vehicle was constitutionally problematic. *Davis v. State, 947 S.W.2d 240, 1997 Tex. Crim. App. LEXIS 43*, No. 09-94-340-CR (Tex. App.--Beaumont 1996)(Burgess, J., dissenting). But I am not a judge on the court of appeals--I am a judge on the Court of Criminal Appeals. As such, I am bound to respect the judgment of the court of appeals so long as it "fairly addresses [the issues raised on appeal], using the correct legal standard, considering all relevant evidence in the record, and affording proper deference to the trial court as primary factfinder". *Arcila v. State, 834 S.W.2d 357, 360(Tex. Crim. App. 1992)*. Of course, when the court of appeals fails in any one of these duties, this Court should step in and both articulate the way in which it erred and also set out the correct way of doing things. After that, we should send the case back to the court of appeals so **[**35]** that it can make a new determination in light of our suggestions. To do more is intrusive, not instructive. Id.

In the present cause, the Ninth Court of Appeals determined that the trial court did not abuse its discretion in denying appellant's motion to suppress. It came to this determination after considering six factors which, it found, "gave rise to reasonable suspicion…that criminal activity was afoot". But the court of appeals should not have considered the three of these six factors which arose only after the initial purpose of the stop had ended. In other words, in deciding whether reasonable suspicion existed to justify detaining appellant beyond the point at which the officers determined he was not intoxicated, the court of appeals should have considered only those factors that the officers could have know about at that point. Pursuant to a license check on the vehicle that appellant was driving and a conversation between the officers and appellant, the officers determined that the vehicle was borrowed and that appellant's story that he was a businessman evaluating some real estate in Houston was problematic because it conflicted with that of his passenger and did **[**36]** not seem plausible in light of appellant's attire, which the officers deemed too casual for someone on a purported business trip. But, since both the license check and the conversation with appellant came after the officer's determined appellant was not intoxicated, the court of appeals should not have considered any factors gleaned from either in deciding whether the officers' had reasonable suspicion to further detain appellant. Thus, the court of appeals should have considered only whether the remaining factors, that appellant was traveling late at night, that he seemed to want to keep the officers away from his car, and that he was "really nervous", amounted to conduct that is more consistent with criminal activity than with innocent activity such that reasonable suspicion to constitutionally justify a further detention of appellant and his vehicle existed. *Saenz v. State, 842 S.W.2d 286, 289 (Tex. Crim. App. 1992)*. Because the court of appeals did not do this, we ought to remand this case to them and allow them the opportunity to do so.

I dissent to the majority's de novo review of the trial court's ruling. [1]

---

[1] In her concurring opinion, Judge Keller applauds the majority's use of de novo review in this case and, in so doing, suggests that in setting the appropriate standard of review for this Court we ought to "follow the Supreme Court's lead" in Ornelas-Ledesma v. United States, 134 L. Ed. 2d 911, 116 S. Ct. 1657 (1996) (mandating de novo appellate review of probable cause and reasonable suspicion findings in federal court). In conducting its de novo review in this case, the majority does not rely at all on Ornelas-Ledesma. This is

 **[**37]**  MEYERS, Judge

EN BANC

DELIVERED: June 4, 1997

---

probably because the majority understands that the holding in Ornelas-Ledesma did not address the appropriate standard of review for discretionary review courts like this Court, but instead set out the appropriate standard of review for appellate courts reviewing trial court decisions. No doubt, in mandating de novo review on questions of probable cause and reasonable suspicion in the lower appellate courts, the Supreme Court noted its own practice of conducting de novo reviews for support that appellate courts should do the same. But dicta in a Supreme Court opinion that applies only to federal courts ought not be thought of as persuasive authority on this Court, especially when this Court has already stated that we should not be conducting de novo reviews in circumstances like the one presented here. Arcila v. State, 834 S.W.2d 357 (Tex. Crim. App. 1992). The concurrence contends that Arcila extends only to factual questions, not to application of law to fact questions. Yet the concurring opinion does not explain what we could have meant in Arcila when we stated that ″our principal role as a court of last resort is the caretaker of Texas law, not the arbiter of individual applications″. Id. at 360 (emphasis added). Nor does the concurring opinion explain how the question of whether probable cause or reasonable suspicion exist are any more legal than the question in Arcila, which was whether the police had obtained adequate consent to search appellant's residence. As with probable cause and reasonable suspicion, we have a body of cases that, taken together, set out when the police have obtained consent to search.

Furthermore, if it is true, as the concurring opinion, citing Judge Clinton in Villarreal v. State, 935 S.W.2d 134, 143 (Tex. Crim. App. 1996) (Clinton, J., concurring), contends, that ″the appropriate standards of review on appeal and on discretionary review are 'functionally identical' questions″, then didn't we essentially determine these questions in Dubose v. State, 915 S.W.2d 493 (Tex. Crim. App. 1996) and Carter v. State, 915 S.W.2d 501 (Tex. Crim. App. 1996), decided just this past year? In fact, in his Villarreal concurrence, Judge Clinton adhered to the basic tenet of Dubose and Carter that ″practically all applications of law to fact should be left to the trial court in the first instance, subject to a deferential standard of appellate review″. Villarreal v. State, 935 S.W.2d at 142 (Clinton, J., concurring). To the best of my knowledge, Dubose and Carter have not been overruled yet.